08 CV 00329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

STAR ENERGY CORPORATION

                           Plaintiff,

-against-



                             **Civ. Action, File. No.**

                             **COMPLAINT**

RSM TOP-AUDIT, RSM INTERNATIONAL,        **JURY TRIAL DEMANDED**
ELENA P. LOSS, SERGEY SALNIKOV, ARMENAK
SAFAROV,  and JOHN DOES 1-5.

                             Defendants.
------------------------------------------------------------------ X

## Nature of the Action

1.      This action arises out of an ongoing and continuous pattern of racketeering in Russia which has targeted the financial markets of the United States of America.  The defendants associated-in-fact and have conspired to obtain capital through multiple publicly traded U.S. entities by engaging in organized and systemic fraud.  Specifically, the participants in the RICO conspiracy acted in concert as an enterprise (the "Salnikov Criminal Enterprise") with the objective of attracting U.S. investment to Russian companies by falsifying financial statements  and having RSM Top-Audit use its PCAOB certification and status as a member of RSM International to defraud acquiring companies and their U.S. shareholders.

2.      Plaintiff Star Energy Corporation ("Star Energy"), a publicly traded U.S. company, fell victim to the illegal activity of the Salnikov Criminal Enterprise when it was approached by persons associated with the enterprise and offered the opportunity to acquire a the stock of Volga-Neft, a Russian oil company.  Using RSM International and RSM Top-Audit as a vehicle, the members of the Salnikov Criminal Enterprise created and presented to Star Energy a business plan and false financial statements which purported to be audited and

compliant with Generally Accepted Accounting Principles ("GAAP"). Relying on the reputation of RSM International and its duty to police its members, the publicly traded Star Energy purchased Volga-Neft Limited Company ("Volga-Neft") for millions of dollars in stock and contributed several million dollars to working capital. As is set forth more fully below, the financial statements created by the Salnikov Criminal Enterprise and certified by RSM International through RSM Top-Audit grossly overvalued the assets of Volga-Neft.

3.      Thereafter, through Volga-Neft, the Salnikov Criminal Enterprise continued to seek additional funds from Star Energy. To achieve this goal, members of the Salnikov Criminal Enterprise created false "audited" Volga-Neft financial statements for the fiscal year 2006 and attempted to pass the same on to Star Energy for filing with the Securities and Exchange Commission. With respect to Star Energy, the scheme fell apart when the company's auditors noticed inconsistencies in the Volga-Neft financial statements and began to press RSM Top-Audit for work papers and inventory verification.

4.      Seeing the writing on the wall, the Salnikov Criminal Enterprise caused RSM Top-Audit to disavow the audit. RSM Top-Audit and its parent, RSM International, then began to engage in a cover-up of the firm's role in the Salnikov Criminal Enterprise. In the meantime, the Salnikov Criminal Enterprise directly interfered with the progress of two separate legitimate auditing firms hired at Star Energy's request to perform an audit of Volga-Neft which would be compliant with U.S. securities laws. To minimize exposure and in the hope of continuing its pattern of racketeering activity, the Salnikov Criminal Enterprise arranged for Volga-Neft to rescind the acquisition by Star Energy. Nevertheless, as a result of the aforementioned conduct, Star Energy suffered significant financial and reputational injury. By this lawsuit, Star Energy seeks to recover for its losses.

## Jurisdiction And Venue

5.      The Court has proper jurisdiction under Title 18, United States Code, and

particularly Section 1964 thereof, and under Title 28, United States Code, Section 1332. The

amount in controversy exceeds, exclusive of interest and costs, $75,000.

6.      Venue is proper in this Court under Title 18, United States Code, and

particularly Section 1965 thereof, and under Title 28, United States Code, Section 1391(d).

## Parties

7.      Plaintiff Star Energy Corporation is a corporation duly organized and existing

under the laws of the State of Nevada, with its principal place of business in the Southern

District of the State of New York.  Star Energy is an oil and gas exploration company which

seeks out investment and acquisition opportunities in areas of the world that are considered

emerging markets.  The company's goal is to provide Western investors with access to a

portfolio of natural resource licenses and operating companies in such emerging markets. Star

Energy is a reporting public company and its common stock is traded on the NASDAQ Over-

the-Counter Bulletin Board (ticker symbol SERG).

8.      Upon information and belief, Defendant RSM Top-Audit is a company duly

organized and existing under the laws of Russia, with its principal place of business in

Moscow, Russia.  RSM Top-Audit purports to be a legitimate Russian auditing and

consultancy firm servicing clients in the oil, and oil and gas industries.  According to its

website, RSM Top-Audit is RSM International's only representative in Russia since 1997, it is

authorized to audit public companies listed on the NYSE, and its signature on an auditor's

report is recognized by the U.S. Securities and Exchange Commission.  At all times relevant

hereto, RSM Top-Audit was a person comprising part of the Salinkov Criminal Enterprise and

committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

9.      Upon information and belief, Defendant RSM International is a company duly organized and existing under the laws of the United Kingdom of Great Britain, with its principal place of business in London, England. RSM International is a worldwide network of professional services firms which purport to provide tax, accounting, consulting, and specialist advisory services to companies around the world under the "RSM" brand. According to RSM International's website, it requires member firms to meet high quality standards in order to use the "RSM" brand, and member firm compliance is monitored. As described more fully herein, RSM had significant control over the activities of RSM Top-Audit and a principal-agent relationship existed. By allowing RSM Top-Audit to use its name and failing to police its conduct, RSM International empowered the Salnikov Criminal Enterprise with the endorsement of a "top-ten" international accounting firm. At all times relevant hereto, RSM International committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

10.      Upon information and belief, Defendant Elena P. Loss is an individual residing in Russia. At all times relevant hereto, Ms. Loss was an owner, Chairman of the Board and the highest ranking employee of RSM Top-Audit. Ms. Loss also was a person comprising part of the Salinkov Criminal Enterprise and committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

11.      Upon information and belief, Defendant Sergey Salnikov is an individual residing in Russia. At all times relevant hereto, Mr. Salnikov was employed by RSM Top-Audit as the Head of Investment Audit and was heralded as an expert in transactions involving a U.S. public company's acquisition of Russian companies. Mr. Salnikov also was a person

comprising part of the Salinkov Criminal Enterprise and committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

12.    Upon information and belief, Defendant Armenak Safarov is an individual residing in Russia. Mr. Safarov posed as Volga-Neft's consultant in connection with raising capital through the U.S. equity markets and was the "attorney-in-fact" for Volga-Neft in connection with Star Energy's acquisition of the company.  At all times relevant hereto, Mr. Safarov was a person comprising part of the Salinkov Criminal Enterprise and committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

13.    Defendants John Does 1-5, are persons whose identity presently is unknown to Star Energy, but who were persons comprising part of the Salinkov Criminal Enterprise and committed acts outside the State of New York which caused injury in the Southern District of the State of New York.

### Factual Allegations

14.    In or about 2005, Defendants Salnikov, Safarov, Loss, RSM Top-Audit and John Does 1-5 did meet and conspire to perpetrate a pattern of racketeering activity targeting the U.S. equity markets.  The individual participants agreed to form the Salnikov Criminal Enterprise which would fraudulently market certain natural resource assets located in Russia to publicly traded U.S companies.  The Salnikov Criminal Enterprise viewed the U.S. equity markets as a source to obtain interest free money which never would have to be paid back.

15.    Defendant Safarov acted as a "consultant" to the Russian natural resource companies and would locate potential U.S. investors.  In the interim, they would meet with Salnikov, Loss and other RSM Top-Audit personnel to prepare a business plan and create financial statements that appeared to be reliable and purported to be audited in accordance with

GAAP. Once a U.S. corporate investor was located, the consultants introduced the U.S. corporate investor to the Russian company by utilizing the false RSM Top-Audit materials which often prominently stated "RSM International" on every page. At no time did any of the defendants disclose that the assets reflected in the financial statements were overstated, or that in certain cases they were "shared" with several affiliated companies under common control.

16.    One of the first companies targeted by the Salnikov Criminal Enterprise was a publicly traded U.S. company named Bio-Tracking Security Inc. ("Bio-Tracking"). RSM Top-Audit through Salnikov and Loss prepared business plans and/or financials for Nord Oil and North-West Oil Group which, upon information and belief, were relied upon by Bio-Tracking in acquiring the entities. Bio-Tracking has made SEC filings that include financial statements for Nord Oil and North-West Oil Group which purport to have been audited by RSM Top-Audit. Upon information and belief, RSM Top-Audit now disavows having prepared these purportedly audited financial statements, but neither RSM Top-Audit nor RSM International have informed Bio-Tracking or reported the disavowel to the SEC.

17.    In or about early 2006, the Salnikov Criminal Enterprise determined to raise capital in the United States equity markets by proposing to sell Volga-Neft. Volga-Neft is a limited liability company duly organized and existing under the laws of Russia, with its principal place of business in Samara, Russia. Volga-Neft claims that it sells crude oil it has purchased from local oil developers to local oil exporters, wholesalers, and distributors. It also purports to process crude oil purchased from local oil developers, selling the processed petroleum products in the local market to oil exporters, wholesalers, and distributors. Safarov, Salnikov, Loss, John Does 1-5, Volga-Neft and other Top-Audit personnel met in Moscow, Russia and determined to construct a business plan with fraudulent financials. While

Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, prepared the business plan and the financials, Safarov identified Star Energy as a suitable victim.

18.     Upon information and belief, by the time Safarov approached Star Energy, the Salnikov Criminal Enterprise had engaged or were continuing to engage in the same pattern of racketeering activity utilizing other Russian companies, including Zabaikalgeoprom, Trans-Oil Limited Liability Company, Univer Company and Nessa AD.

19.     The Salnikov Criminal Enterprise through RSM Top-Audit, aided and abetted by Salnikov, Loss, Safarov and John Does 1-5, then presented the Volga-Neft business plan to Star Energy. There were two versions of the business plan, one in English and the other in Russian. Both versions, however, contained prominent footer at the bottom center of each page which read "RSM International" directly above "RSM Top-Audit" on every page. The numbers reflected in the financial sections of these business plans were false. The business plan was transmitted to Star Energy by electronic mail.

20.     Thereafter, Star Energy engaged in communications with RSM Top-Audit through Salnikov, regarding the financials of Volga-Neft. Negotiations ensued and Star Energy agreed to purchase Volga-Neft. Many of the negotiations were conducted by telephone.

21.     Prior to closing the deal with Volga-Neft, Star Energy demanded that RSM International's agent, RSM Top-Audit, certify the financials they had presented and issue an opinion regarding the transaction. On or about August 15, 2006, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, forwarded to Star Energy a letter on RSM Top-Audit letterhead which identified RSM International in the lower left-hand corner and was signed by Nina Dantser as the Head of Audit Department. The letter was transmitted

to Star Energy by electronic mail.  Thereafter, Star Energy's attorneys communicated by telephone with Salnikov about changes they wanted to the letter.

22.    On or about August 22, 2006, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, forwarded a second such certification to Star Energy by electronic mail.  That certification was drafted on RSM Top-Audit letterhead which identified RSM International in the lower left-hand corner and was signed "RSM International" by "RSM Top-Audit" by Salnikov as Head of Investment Audit Unit.  The first words of the Certification Letter read "RSM Top Audit, a member firm of the RSM International Audit Organization."  The Salnikov Criminal Enterprise intended that Star Energy rely upon the certification which was false.   Star Energy accepted the certification and relied upon the same.

23.    Based upon the business plan's financials, the representations made by Volga-Neft, and the RSM International certification issued by its agent RSM Top-Audit, Star Energy acquired Volga-Neft pursuant to a stock purchase agreement on October 6, 2006.  Thereafter, Star Energy contributed approximately $ 3 million to the working capital of Volga-Neft.

24.    After October 2006 and continuing through April 2007, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, communicated in person, by telephone and by e-mail with representatives of Star Energy regarding Volga-Neft's financial statements and GAAP.   Salnikov represented to Star Energy that he was an experienced auditor and that RSM Top-Audit was conducting an audit of Volga-Neft for filing with the U.S. Securities and Exchange Commission.

25.    On or about November 10, 2006, the Salnikov Criminal Enterprise through Salnikov, aided and abetted by Loss, Safarov, and John Does 1-5, provided Star Energy with a "Report of Independent Registered Accounting Firm" which stated that RSM Top-Audit had audited the accompanying balance sheets and the related statements of income, stockholders'

equity and cash flows and that, in the opinion of RSM Top-Audit, the financial statements

presented fairly, in all material respects, the financial position of Volga-Neft and the results of

its operations and cash flows for the ten months and year ended October 6, 2006 and

December 31, 2005 in conformity with GAAP. This report was transmitted by electronic mail.

  26.  In or about the middle of November 2006, Star Energy hired SF Partnership

LLP ("SF Partnership") to serve as its auditors in connection with the preparation and

anticipated filing of consolidated financial statements for Star Energy and Volga-Neft. RSM

Top-Audit, through Salnikov, and aided and abetted by RSM Top-Audit, Loss, Safarov, and

John Does 1-5, continued to purport to serve as Volga-Neft's outside auditing firm during this

time. Over the course of the next five months, SF Partnership requested various materials in

connection with the purported audit of Volga-Neft to assist in SF Partnership's preparation of

the consolidated financial statements. RSM Top-Audit repeatedly failed to provide the

requested materials.

  27.  On or about November 15, 2006, SF Partnership received by electronic mail

financial statements which purported to be U.S. GAAP compliant financial statements for

Volga-Neft prepared by Salnikov and RSM Top-Audit and aided and abetted by Loss, Safarov,

and John Does 1-5. The next day, SF Partnership received another electronic mail which

purported to attach the "final opinion from RSM" on Volga-Nefts 2006 and 2005 financials.

The attachment consisted of an auditor's report for the periods ended October 6, 2005 and

October 6, 2006.

  28.  On November 29, 2006, SF Partnership sent an electronic mail to Salnikov at

RSM Top-Audit seeking clarification of several items contained in audit. On December 6,

2006, SF Partnership received documents from Salnikov, who was aided and abetted by RSM

Top-Audit, Loss, Safarov, and John Does 1-5, which he represented were updated financial

statements of Volga-Neft for the period ended December 31, 2005, as well as balance sheet numbers for the period ended October 6, 2006.

29.     Relying on the RSM Top-Audit opinion, Star Energy filed an amended Form 8-K with the Securities & Exchange Commission on December 8, 2006 and attached the Volga-Neft financial statements.

30.     On December 13, 2006, representatives of Star Energy met with Salnikov, Safarov, and Loss at RSM Top-Audit's offices to discuss a GAAP compliant audit of the Volga-Neft financial statements through December 31, 2006.  Following the meeting, the Salnikov Criminal Enterprises caused Star Energy to believe that RSM Top-Audit was conducting the requested audit.  Specifically, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, had telephone and electronic communications with representatives of Star Energy about the progress of the audit.

31.     Following the end of its fiscal year, Star Energy was required to file a Form 10-KSB containing consolidated financial statements of Star Energy and Volga-Neft for the period ending December 31, 2006.  Unlike the amended Form 8-K, the anticipated Form 10-KSB was to include an audit opinion issued by SF Partnership in connection with the consolidated financial statements of Star Energy and Volga-Neft.  Accordingly, SF Partnership was required to review RSM Top-Audit's work papers and back-up documentation for the audit work.

32.     SF Partnership began requesting materials from RSM Top-Audit which should have been obtained in connection with the audit of Volga-Neft.  In particular, SF Partnership was  seeking documentation of Volga-Neft's inventory because it was the largest item on Volga-Neft's balance sheet.   SF Partnership made several requests for documents, but RSM Top-Audit did not provide satisfactory responses.  No work papers were produced.  In

addition, the only the information that RSM Top-Audit provided to SF Partnership through Salnikov was a series of draft financial statements that did not balance correctly.

33.     In February 2007, representatives of Star Energy travelled to Samara to meet with Volga-Neft. Mr. Safarov was present at Volga-Neft during this visit. In Samara, the Star Energy representatives were shown various pieces of equipment from a distance, but there was no way for them to verify that the equipment belonged to Volga-Neft. At that time, Star Energy provided Volga-Neft with a list of items that SF Partnership had requested in connection with the Volga-Neft audit, but those items were never produced. Upon information and belief, the argument shown to Star Energy representatives was not the sole property of Volga-Neft.

34.     Throughout March and April 2007, the Salnikov Criminal Enterprise continued to resist SF Partnership's requests for documents and information. SF Partnership made multiple requests for RSM Top-Audit's working papers in connection with the Volga-Neft audit. In general, when documents were produced, it took an unusually long time for RSM Top-Audit to collect and send them to SF Partnership. SF Partnership later determined that any documents it did receive were not auditors' work papers; rather, they were a random assortment of invoices, spreadsheets, and various other items which did not tie into the numbers set forth on the balance sheet that RSM Top-Audit had provided to SF Partnership.

35.     On or about April 2, 2007, SF Partnership received by electronic mail what purported to be the final version of the audited December 31, 2006 Volga-Neft financial statements from RSM Top-Audit, which was aided and abetted by Salnikov, Safarov, Loss, and John Does 1-5. On April 12, 2002, SF Partnership again attempted to obtain information from RSM Top-Audit regarding the Volga-Neft statements. By letter dated April 13, 2007,

Loss on behalf of RSM Top Audit and aided and abetted by Salnikov, Safarov, and John Does 1-5, denied that RSM Top-Audit ever conducted an audit of Volga-Neft.

36.    Shortly after RSM Top-Audit's disavowal, SF Partnership had a telephone call with "Konstantine" translating for Salnikov (purportedly from the offices of RSM Top-Audit), aided and abetted by Safarov, Loss, and John Does 1-5, and was told that the disavowal was made in error. SF Partnership was promised a notarized letter retracting disavowal. No such document was ever received by SF Partnership.

37.    Upon information and belief, RSM International exercises sufficient control over RMS Top-Audit to deem RSM Top-Audit an agent of RSM International. RSM International takes credit for the audits performed by its affiliates and boasts through its website content that it audits and renders professional services to several thousand leading international companies. It also controls the auditing actions of its member firms through the use of a common manual of auditing which is maintained by joint technical teams in the United States of America, United Kingdom of Great Britain and France.

38.    RSM International member firms apply a single methodological system to their auditing as dictated by RSM International. This method, dubbed the "RSM Audit Methodology," purports to be in compliance with International Standards on Auditing and is regularly updated by RSM International for new technical pronouncements and efficiency changes in best practices. RSM International considers training to be critical across the network to ensure consistency, objectivity and the highest levels of client service. It provides training on the audit manual and other related policies through training courses run on-site, written training materials issued to firms and by global web-conferencing.

39.     To manage quality control, the central RSM Transnational Assurance Services

Executive Committee supervises the compliance of RSM member-firms.  In addition, RSM

International dictates the attributes of each member firm before the firm is allowed to bear the

name "RSM".  When advertising, RSM International pools the earnings of its member firms

for purposes of inducing companies to retain its agents.  It advertises itself as one combined

organization.  As part of its sales materials, it boasts that "RSM International has member

firms in over 64 countries and is represented in each of the top 40 major business centres

throughout the world.  The combined organisation has more than 24,500 professionals in more

than 660 offices and generates total fee income exceeding US $3.06 billion, placing it amongst

the Top Seven international accounting organisations [sic] world-wide."

40.     Star Energy's counsel promptly wrote to Jean Stephens, the Chief Executive

Officer of RSM International to seek an explanation of its agent's disavowel.  Exercising RSM

International's control over RSM Top-Audit, Stephens summoned Loss to the London

headquarters from Moscow.  Loss immediately travelled to London for the meeting.  Upon

information and belief, Stephens explored the factual circumstances with Loss, and

recognizing the culpable conduct of RSM International's agent instructed Loss to engage

Hogan & Hartson as attorneys for RSM Top-Audit.  Stephens also directed Loss to draft a

responsive letter and provide it to her at RSM International for review before sending it to Star

Energy's counsel.  Loss prepared a letter, aided and abetted by Salnikov, Safarov, and John

Does 1-5, and after approval from Stephens of RSM International, forwarded the same to Star

Energy's counsel by electronic mail.

41.     The response letter, dated August 20, 2007, stated that it was the "official reply

of RSM Top-Audit to [Star Energy's] query addressed to Jean Stephens, Chief Executive

Officer of RSM International" and was made "upon the request of Jean Stephens, Head of
RSM International."

42.     As a result of RSM's disavowal of Volga-Neft, Star Energy sough a legitimate
replacement auditor to conduct an audit of Volga-Neft. Star Energy hired UHY Advisors
("UHY") which began working at Volga-Neft in or around May 2007.   UHY was actually
present at Volga-Neft and commenced work on items such as inventory inspection. UHY
ceased working on the Volga-Neft audit shortly after it started, however, because Volga-Neft
could not provide the documents UHY requested. The unsatisfied requests sought basic items
that would be expected of any company that had been audited. It became apparent that no
observation of physical inventory had ever occurred in the past and that Star Energy may have
been defrauded.

Moreover, during the course of the attempt to re-audit Volga-Neft's financial statements
following the RSM disavowal, it appeared that Volga-Neft's 2006 revenues were substantially
lower than had previously be represented by the Salnikov Criminal Enterprise through the RSM
Top Audit Certified Business Plan.

43.     SF Partnership's inability to obtain the necessary documentation from RSM
Top-Audit prevented Star Energy from timely filing its Form 10-KSB.

44.     To relieve itself of the burden of filing consolidated audited financial
statements that included Volga-Neft, Star Energy agreed to a rescission of the stock purchase
agreement dated October 6, 2006.

### First Claim

(RICO- Violation of 18 U.S.C. § 1962(c), Against RSM Top-Audit,
Loss, Salnikov, Safarov, and John Does 1-5)

45.     Star Energy repeats and realleges each of the allegations contained on
paragraphs 1 through 44, as if fully set forth herein.

46.    At all times relevant to this Complaint, the defendants RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 were "persons" within the meaning of 18 U.S.C. § 1961(3) since they were individuals capable of holding a legal or beneficial interest in property (the "RICO Persons"). The RICO Persons were associated-in-fact to form the Salnikov Criminal Enterprise within the meaning of 18 U.S.C. § 1961(4). Each RICO Person committed acts outside the State of New York which caused injury in the Southern District of the State of New York. The Salnikov Criminal Enterprise was based in Russia and engaged in foreign commerce in the furtherance of committing criminal acts for the purpose of obtaining capital from multiple publicly traded U.S. entities. Each of the RICO Persons defined above associated with and participated in the affairs of the Salnikov Criminal Enterprise through the activities described in the preceding paragraphs.

47.    As alleged in greater detail in the preceding paragraphs, each of the RICO Persons conducted, participated in and aided and abetted the Salnikov Criminal Enterprise's racketeering activities through multiple acts of wire fraud in violation of 19 U.S.C § 1343. In each instance of wire fraud, the RICO Persons transmitted or caused to be transmitted, by means of wire in interstate or foreign commerce, writings, signals or sounds comprising false statements for the purpose of executing a scheme to defraud Star Energy.

48.    As alleged in greater detail in the preceding paragraphs, the foregoing racketeering activities by the RICO Persons constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). For example, and without limiting the preceding allegations in this Complaint, the RICO Persons' pattern of racketeering activities include:

a.    The acts of wire fraud committed by the RICO Persons as alleged in the preceding paragraphs constituted multiple acts of racketeering activity within the past ten years.

b.   The Salnikov Criminal Enterprise was formed with the purpose of conducting racketeering activities and such activities comprise its ongoing business.  It engaged in similar racketeering activities with respect to other Russian companies seeking to obtain capital through publicly traded U.S. entities.  By way of example, the Salnikov Criminal Enterprise targeted a publicly traded U.S. company named Bio-Tracking Security Inc. ("Bio-Tracking").  RSM Top-Audit through Salnikov and Loss prepared business plans and/or financials for Nord Oil and North-West Oil Group which, upon information and belief, were relied upon by Bio-Tracking in acquiring the entities.  Bio-Tracking has made SEC filings that include financial statements for Nord Oil and North-West Oil Group which purport to have been audited by RSM Top-Audit.  Upon information and belief, RSM Top-Audit now disavows having prepared these purportedly audited financial statements, but neither RSM Top-Audit nor RSM International have informed Bio-Tracking or reported the disavowel to the SEC.

c.   The Salnikov Criminal Enterprise engaged in similar racketeering activities utilizing other Russian companies, including Zabaikalgeoprom, Trans-Oil Limited Liability Company, Univer Company and Nessa AD.

d.   The very nature of these acts of racketeering imply a threat of continued criminal activity.  The RICO Persons regularly engaged in preparing so-called business plans and creating fraudulent financial statements for Russian natural resource companies to lure U.S. publicly traded entities to invest in these Russian oil companies.

49.    In summary, the RICO Persons conducted and participated in the Salnikov Criminal Enterprise's ongoing business through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

50.     As alleged in greater detail in the preceding paragraphs, Star Energy was directly injured in its business and property by reason of the violation of 18 U.S.C. § 1962 set forth above, and therefore, is entitled to damages pursuant to 18 U.S.C. § 1964 (c) in an amount to be determined, but that exceeds $ 2 million, trebled, plus interest and attorneys' fees.

## Second Claim

(RICO Conspiracy- Violation of 18 U.S.C. § 1962(d), Against RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5)

51.     Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 50 as if fully set forth herein.

52.     At all times relevant to this Complaint, the RICO Persons were "persons" within the meaning of 18 U.S.C. § 1961(3).

53.     As alleged in greater detail in the preceding paragraphs, the RICO Persons intended to, and agreed to, conspire with each other and with others, known and unknown, to violate 18 U.S.C. § 1962 (c), all in violation of 18 U.S.C. § 1962 (d).

54.     The RICO Persons intended to, agreed to, conspired to further, and did in fact further, the criminal conduct of the Salnikov Criminal Enterprise's ongoing affairs through a pattern of racketeering activity.

55.     As alleged in greater detail in the preceding paragraphs, Star Energy was directly injured in its business and property by reason of the violations of 18 U.S.C. § 1962 set forth above, and therefore, is entitled to damages pursuant to 18 U.S.C. § 1964 (c) in an amount to be determined, but that exceeds $ 2 million in compensatory damages, trebled, plus interest and attorneys' fees.

## Third Claim

(Common Law Fraud Against RSM Top-Audit,
Loss, Salnikov, Safarov, and John Does 1-5 )

56.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 55 as if fully set forth herein.

57.    At all times relevant to this Complaint each of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 made an omission, misrepresentation, or false statement of material fact to Star Energy with respect to Volga-Neft's financial statements and business plan and RSM Top-Audit's preparation of Volga-Neft's audited financial statements. Each one of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 made statements with knowledge of their falsity and with the intent to defraud Star Energy.

58.    Star Energy reasonably relied upon the omissions and misrepresentations when it agreed to acquire Volga-Neft, when it filed its amended Form 8-K on or about December 8, 2006, and when it sought to rely on the RSM Top-Audit Report of Volga-Neft in connection with the filing of a Form 10-KSB with the Securities & Exchange Commission.

59.    Star Energy was damaged due to its reliance upon the omissions and misrepresentations made by RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5, in an amount to be determined, but that exceeds $2 million in compensatory damages, plus interest and costs.

## Fourth Claim

(Respondent Superior Against RSM TOP-AUDIT)

60.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61.    Salnikov's and Loss's actions in creating a business plan for Volga-Neft to position it for acquisition by a U.S. public entity, targeting and soliciting Star Energy to acquire Volga-Neft was within the scope of their employment with RSM Top-Audit.

62.    Salnikov's representations to Star Energy that RSM Top-Audit was capable of conducting a GAAP compliant audit of Volga-Neft, and that RSM Top-Audit was in fact conducting a GAAP compliant audit of Volga-Neft was within the scope of his employment with RSM Top-Audit.

63.    Salnikov and Loss were acting within the scope of their employment in that the preparation of business plans, financial statements, and audits are the type of services RSM Top-Audit purports to perform on a regular basis and it actively markets and sells such services to clients.

64.    It was reasonably foreseeable that Salnikov and Loss would participate in the fraudulent scheme under the apparent authority of RSM Top-Audit as described in the preceding paragraphs.

65.    RSM-Top Audit, through the use of due diligence, knew or should have known of the conduct of Salnikov and Loss.

66.    As a direct result thereof, Star Energy is damaged in the amount to be determined, but that exceeds $2 million in compensatory damages, plus interest and costs.

## Fifth Claim

(Respondeat Superior- RSM International)

67.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

68.    RSM Top-Audit purports to be a member firm and agent of RSM International. It also purports to be a member firm in good standing with RSM International.  According to

RSM Top-Audit, "RSM is one of the few international organizations with a common worldwide manual of auditing. The RSM International manual of auditing is maintained by joint technical teams in the USA, UK and France. RSM Transnational Assurance Services Executive Committee manages the quality control process between RSM member-firms. As a consequence RSM International audits are undertaken to common international standards and comply with the International Standards on Auditing."

69.     RSM International purports that it requires member firms to meet high quality standards in order to use the "RSM" brand and purports that member firm compliance is monitored. Specifically, RSM International states that "RSM is committed to meeting international standards as well as playing an active role within the wider auditing profession. This is primarily done through a global audit committee that is responsible for setting the policies and procedures that all our member firms need to implement and for monitoring the quality of the firms through an ongoing program of inspections."

70.     RSM Top-Audit purports to be authorized to audit public companies listed on the NYSE and that its signature on an auditor's report is recognized by the U.S. Securities and Exchange Commission.

71.     RSM International exerts sufficient control over RSM Top Audit to create a principal-agent relationship. RSM International permits RSM Top-Audit to use the "RSM" name as a member firm and allows it to perform audits and other services utilizing its reputation. RSM International purports to control the standards by which RSM Top-Audit performs these services.

72.     RSM Top-Audit has actual authority to perform audits and other services as an "RSM" firm because it is a member firm approved by RSM International.

73.    RSM Top-Audit was acting within the scope of its agency relationship with RSM International when it prepared the business plan, financial statements, and audits. Such services are the type RSM International member firms purport to perform on a regular basis and which it actively markets and sells to clients.

74.    It was reasonably foreseeable that RSM Top-Audit, Salnikov and Loss would participate in the fraudulent scheme under the actual authority of RSM International as described in the preceding paragraphs.

75.    RSM International, through the use of due diligence, knew or should have known of the conduct of RSM Top-Audit, Salnikov and Loss.

76.    As the principal, RSM International is responsible for the fraudulent acts of its agents RSM Top-Audit and its employees Salnikov and Loss.

77.    As a direct result thereof, Star Energy was damaged in an amount to be determined, but which exceeds $2 million in compensatory damages, plus interest and costs.

## Sixth Claim

(Aiding and Abetting Common Law Fraud-
RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 )

78.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 77 as if fully set forth herein.

79.    Star Energy was defrauded by each of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 with respect to the business plan, financials and the preparation of Volga-Neft's audited financial statements.

80.    Each of RSM-Top Audit, Loss, Salnikov, Safarov, and John Does 1-5 had actual knowledge of the fraud committed on Star Energy.

81.    RSM-Top Audit, Loss, Salnikov, Safarov, and John Does 1-5 provided substantial assistance to each other in carrying out the fraudulent acts.

82.    Star Energy was damaged due to the aiding and abetting of the fraud by RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5, in an amount to be determined, but hat exceeds $2 million in compensatory damages, plus interest and costs.

W H E R E F O R E, Plaintiff Star Energy Corporation demands judgment as follows:

a)    On the first claim for relief, two million dollars ($2,000.000) in compensatory damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

b)    On the first claim for relief, treble damages for a total compensatory amount of six million dollars ($6,000,000) plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

c)    On the first claim for relief, attorneys fees in an amount to be determined against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

d)    On the second claim for relief, two million dollars ($2,000.000) in compensatory, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

e)    On the second claim for relief, treble damages for a total compensatory amount of six million dollars ($6,000,000) plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

f)    On the second claim for relief, attorneys fees in an amount to be determined against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

g)    On the third claim for relief, two million dollars ($2,000,000) in compensatory damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

h) On the fourth claim for relief, two million dollars ($2,000,000) in compensatory damages, plus interest and costs against RSM Top-Audit.

i) On the fifth claim for relief, two million dollars ($2,000,000) in compensatory damages, plus interest and costs against RSM International.

j) On the sixth claim for relief, two million dollars ($2,000,000) in compensatory damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5.

Dated: New York, New York
       January 14, 2008

                                   NIXON PEABODY LLP

                         By: _____
                                   Martin P. Russo (MR 4134)
                                   Alison B. Cohen (AC 7702)
                                   437 Madison Avenue
                                   New York, New York 10022
                                   (212) 940-3000
                                   (212) 940-3111 (fax)

                                   *Attorneys for Plaintiff Star Energy
                                   Corporation*