UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STAR ENERGY CORPORATION, Plaintiff, | : | 08 Civ. 00329 (DC) |
| - against - | : | |
| RSM TOP-AUDIT, RSM INTERNATIONAL LIMITED, ELENA P. LOSS, SERGEY SALNIKOV, ARMENAK SAFAROV, and JOHN DOES 1-5, Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RSM INTERNATIONAL LIMITED'S MOTION TO DISMISS**

BUTZEL LONG,
a professional corporation
Martin P. Russo (MR 4164)
Robert Sidorsky (RS 2490)
Alison B. Cohen (AC 7702)
380 Madison Avenue
New York, New York 10017
(212) 818-1110

Attorneys for Plaintiff
Star Energy Corporation

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 1

A. RSMi's Enforcement of Uniform, Worldwide Quality Control and Auditing Standards by Its Member Firms, Including RSM Top-Audit .......... 2

B. The Salnikov Criminal Enterprise .......... 5

C. The False Volga-Neft Business Plan Issued Under the Names of RSMi and RSM Top-Audit .......... 6

D. The False August 22, 2007 Certification Executed by RSM Top-Audit on Behalf of RSMi .......... 8

E. The False October 6, 2006 Financial Statements and the RSM Top-Audit Certification Received by Star Energy and Filed with the SEC .......... 9

F. The False December 31, 2006 Financial Statements and the RSM Top-Audit Certification Received by Star Energy .......... 10

G. RSMi's Exercise of Control in Connection with the Disavowal of the False Financial Statements and Cover-up of RSM Top-Audit's Fraudulent Conduct .......... 11

H. Star Energy's Claim Against RSMi for Respondeat Superior .......... 13

POINT I
PLAINTIFF HAS ADEQUATELY PLED AN AGENCY RELATIONSHIP BETWEEN RSMI AND RSM TOP-AUDIT SO AS TO STATE A CLAIM AGAINST RSMI BASED ON VICARIOUS LIABILITY .......... 14

POINT II
RSMI IS SUBJECT TO PERSONAL JURISDICTION IN NEW YORK .......... 22

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Applied Hydro-Pneumatics, Inc. v. Bauer Mfg.*, 68 A.D.2d 42, 416 N.Y.S.2d 817 (2d Dep't 1979) ........ 24

*Bank of Montreal v. Mitsui Manufacturers Bank*, No. 85 Civ. 1519 (JFK), U.S. Dist. LEXIS 282 (S.D.N.Y. Jan. 21, 1987) ........ 24

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991) ........ 15

*Bell Atlantic Corp. v. Twombly*, No. 05-1126, 2007 U.S. LEXIS 5901 (May 21, 2007) ........ 14

*Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469 (S.D.N.Y. 2005) ........ 14

*Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ........ 15

*Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94 (2d Cir. 2003) ........ 23

*Bullard v. City of New York*, 240 F. Supp. 2d 292 (S.D.N.Y. 2003) ........ 14

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ........ 14

*Cicalo v. Harrah's Operating Co.*, No. 06 Civ 221 (PKL), 2008 U.S. Dist. LEXIS 33806 (S.D.N.Y. Apr. 24, 2008) ........ 24

*Cortec Indus, v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992) ........ 15

*Cromer Fin. Ltd. v. Berger*, 00 Civ. 2284 (DLC), 2002 U.S. Dist LEXIS 7782 (S.D.N.Y. May 2, 2002) ........ 1, 16-19

*Enron Corp. v. Int'l Fin. Corp.*, 343 B.R. 75 (Bankr. S.D.N.Y. 2006) ........ 15

*Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.)*, 230 F. Supp. 2d 152 (D. Mass. 2002) ........ 19, 21

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ........ 15

*Hollins v. United States Tennis Ass'n*, 469 F. Supp. 2d 67 (E.D.N.Y. 2006) ........ 24

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997) ........ 21

*In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003) ........ 21

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ........ 24

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........ 1, 14, 15, 18-20

*In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509 (D.N.J. 2005) ........ 21

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328 (S.D.N.Y. 2000) ........................................22

*In re Worldcom Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003) ........................................19, 21

*Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1998)........................................24

*Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319 (S.D.N.Y. 1998)........................................22

*Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 N.Y.S.2d 195 (1988)........................................23

*Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993)........................................14

*Mazart v. State*, 441 N.Y.S2d 600 Misc.2d 1092 (NY Ct. Cl. 1981)........................................15

*Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.*, No. 93 Civ. 2680 (RPP), 1996 WL 263008 (S.D.N.Y. May 17, 1996)........................................24

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004)........................................19, 21

*Pena v. Deprisco*, 432 F.3d 98 (2d Cir. 2005)........................................14

*Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241 (S.D.N.Y. 1984)........................................21

*Reiss v. Societe Centrale due Groupe des Assurances Nationales*, 185 F. Supp. 2d 335 (S.D.N.Y. 2002)........................................24

*Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods N.V.*, No. Civ.A. 00-5965 (JCL), 2005 WL 1365772 (D.N.J. June 8, 2005)........................................21

*Ryder Energy Dist. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774 (2d Cir. 1984)........................................15

*Skidmore Energy, Inc. v. KPMG*, No. Civ.A. 3:03CV2138-B, 2004 WL 3019097 (N.D. Tex. Dec. 28, 2004) ........................................21

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)........................................14

**Statutes and Rules**

18 U.S.C. § 1962(c) ........................................14

18 U.S.C. § 1962(d) ........................................14

CPLR § 302(a)(3)(ii)........................................22-24

Fed. R. Civ. P. 12(b)(2)........................................24

Fed. R. Civ. P. 12(b)(6)........................................14

Fed. R. Civ. P. 8 ........................................14

Sarbanes-Oxley Act § 102 ........................................4

## PRELIMINARY STATEMENT

Plaintiff Star Energy Corporation ("Star Energy") respectfully submits this Memorandum in Opposition to the Motion to Dismiss of defendant RSM International Limited ("RSMi").[1]

Plaintiff's Second Amended Complaint sets forth extensive and detailed factual allegations demonstrating each element of a principal-agent relationship between RSMi and its member firm in the Russian Federation, defendant RSM Top-Audit. Under black letter principles of agency law, these allegations supporting an agency relationship give rise to a claim for vicarious liability against RSMi based on the fraudulent acts perpetrated against Star Energy in New York by defendants RSM Top-Audit, Sergey Salnikov ("Salnikov") and Elena Loss ("Loss"). Moreover, contrary to RSMi's assertion in its Memorandum, the district courts in this jurisdiction have upheld the application of vicarious liability to international accounting firms in circumstances very similar to this one based on factual allegations supporting an agency relationship. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005); *Cromer Fin. Ltd. v. Berger*, 00 Civ. 2284 (DLC), 2002 U.S. Dist. LEXIS 7782 (S.D.N.Y. May 2, 2002). As set forth below, RSMi is also subject to personal jurisdiction in New York based on the purposeful activities and tortious conduct of its agents targeted at Star Energy in New York.

## FACTUAL BACKGROUND

The Second Amended Complaint sets forth specific factual allegations substantiating a principal-agent relationship between RSMi and RSM Top-Audit. These factual allegations showing RSM TopAudit's actual authority to act for RSMi and RSMi's ability to exercise

[1] Star Energy, a public company whose common stock is traded on the NASDAQ Over-the-Counter Bulletin Board, is a Nevada corporation with its principal place of business in the Southern District of New York. Second Amended Complaint ("Second Am. Compl.") ¶ 7. A copy of the Second Amended Complaint is attached as Exhibit A to the accompanying Declaration of Robert Sidorsky, Esq. in Opposition to Motion to Dismiss, dated May 28, 2008 (hereinafter "Sidorsky Decl.").

control over the activities of RSM Top-Audit appear throughout the Second Amended Complaint and are summarized below.

A. RSMi's Enforcement of Uniform, Worldwide Quality Control and Auditing Standards by Its Member Firms, Including RSM Top-Audit

RSMi is alleged to be a company organized under the laws of the United Kingdom with its principal office in London, which operates as a worldwide network of member accounting firms. *See* Second Am. Compl. ¶ 9. According to the RSMi website, *www.rsmi.com*, the "combined organisation has almost 25,000 professionals in more than 660 offices and generates fee income exceeding US $3.06 billion, placing it amongst the Top Seven international accounting organisations world-wide."[2]

RSMi controls the selection process for its member firms, which are required by RSMi to meet a number of quality standards in order to hold themselves out as part of RSMi and make use of the RSM brand, a process which differentiates RSMi from its competitors. *See* Second Am. Compl. ¶¶ 9, 39. In this regard, the website states: "Member firms are recruited based on their commitment to apply high skills and world-class standards and to share a common work ethic of innovative thinking to develop and deliver high quality and timely results for their clients. Member firms must meet a number of membership requirements before being permitted to adopt the 'RSM' prefix as part of their firm-name and this is a key differentiator for RSM International."

RSMi exercises control over the conduct of audits by its member firms by requiring its members to perform audits in accordance with a single, unified auditing methodology, known as the RSM Audit Methodology, which is represented by RSMi to be in compliance with International Standards on Auditing. *See* Second Am. Compl. ¶ 38. The imposition and

[2] The relevant excerpts from the RSMi website are attached as Exhibit B to the Sidorsky Decl..

enforcement of uniform standards is carried out by RSMi through a "global audit committee," which is responsible for setting the policies and procedures that all member firms are required to implement and for monitoring the quality of the member firms through an ongoing program of inspections.  *See* Second Am. Compl. ¶ 71.  RSMi also provides training with respect to the common, worldwide audit manual and other related policies, which are issued by RSMi.  RSMi is also alleged to have the authority to impose disciplinary or remedial measures on member firms for failure to adhere to firmwide standards of audit quality or ethical conduct.[3]  *See* Second Am. Compl. ¶¶ 37-39.

RSM Top-Audit is the RSMi member firm in the Russian Federation.  RSMi provides contact information for RSM Top-Audit on its website, including a direct link to the RSM Top-Audit website, *www.top-audit.ru*.  Second Am. Compl. ¶ 40.  RSM Top-Audit states on its website that it is authorized to audit public companies listed on the New York Stock Exchange

---

[3]  With respect to audit quality, the RSMi website states:

> The RSM Audit Methodology is in compliance with International Standards on Auditing (ISA'S) and is regularly updated for new technical pronouncements and efficiency changes in best practices. This methodology is supported by other global policies relating to:
>
> - Ethics and Independence
> - Quality Assurance and risk containment
> - Training and Continuing Professional Education (CPE).
>
> Training is seen as critical across the network to ensure consistency, objectivity and the highest levels of client service. All our member's [sic] conduct significant levels of training locally, in addition to which RSM International also provides training on the audit manual and other related policies through training courses run on-site, written training materials issued to firms and by global web-conferencing.
>
> RSM is committed to meeting international standards as well as playing an active role within the wider auditing profession. This is primarily done through a global audit committee that is responsible for setting the policies and procedures that all our member firms need to implement and for monitoring the quality of the firms through an ongoing program of inspections.

and that "RSM Top-Audit's signature on the auditor's report will be recognized by the US Securities and Exchange Commission (SEC)."[4] *Id.*

RSM Top-Audit's website similarly emphasizes that its audit work is required to be performed in accordance with the uniform standards of RSMi and, in particular, pursuant to a common worldwide audit manual, thereby distinguishing RSM from its competitors. In this regard, the website states:

> Audit under the international standards is performed in accordance with the uniform standards of RSM International accounting and consulting organization which is the 6th largest organization in the world for the fee income of its full member-firms.
>
> RSM is one of the few international organizations with a common worldwide manual of auditing developed in full accord with the international standards.
>
> The RSM International manual of auditing is maintained by joint technical teams in the USA, UK and France. RSM Transnational Assurance Services Executive Committee (TASEC) manages the quality control process between RSM member-firms.
>
> The headquarters of RSM International are located in London. RSM is represented in over 80 countries by over 90 member firms.
>
> RSM audits over 500 companies listed on the international Stock Exchanges.
>
> RSM International enjoys impeccable reputation in the business community. All international financial institutions recognize the audits and expert opinions produced by the organization.

(emphasis added). *See* Second Am. Compl. ¶¶ 40, 70.

[4] The relevant excerpts from the RSM Top-Audit website are attached as Exhibit C to the Sidorsky Decl. RSM Top-Audit is registered with the Public Company Accounting Oversight Board ("PCAOB"). See *www.pcaobus.org/Registration/Registered_Firms.pdf.* Section 102 of the Sarbanes-Oxley Act prohibits accounting firms that are not registered with the PCAOB from preparing or issuing audit reports on U.S. public companies and from participating in such audits.

B. The Salnikov Criminal Enterprise

The Second Amended Complaint alleges that RSM Top-Audit, and two of its principals, defendants Salnikov[5] and Loss,[6] as well as defendant Armenak Safarov ("Safarov")[7] and others, were engaged in an organized and systematic criminal enterprise (the "Salnikov Criminal Enterprise") to defraud Star Energy and other U.S.-based companies and their shareholders by creating false or fake financial statements, purportedly audited by RSMi through its agent, RSM Top-Audit, in order to induce Star Energy and other U.S. targets of the fraudulent schemes to invest in or acquire Russian business ventures. *See* Second Am. Compl. ¶ 1.

In particular, Star Energy acquired Volga-Neft, a Russian oil company, based on a false business plan and phony audited financial statements created by the Salnikov Criminal Enterprise. These false financial statements, which grossly overvalued the assets of Volga-Neft, were accompanied by audit reports issued by RSMi through RSM Top-Audit, certifying that the financial statements were prepared in accordance with U.S. Generally Accepted Auditing Standards ("GAAS") and presented in compliance with U.S. Generally Accepted Accounting Principles ("GAAP"). *See* Second Am. Compl. ¶ 2. Thus, the Salnikov Criminal Enterprise was able to engage in its fraudulent schemes by using RSMi, through its agent, RSM Top-Audit, as a vehicle to issue false audit reports on sham financial statements, and to attract U.S. investors based on the reputation of RSMi and its professed commitment to policing its members and maintaining high, uniform standards of audit quality and ethical conduct throughout the integrated RSMi organization. *See* Second Am. Compl. ¶¶ 2, 9.

---

5 Salnikov was employed by RSM Top-Audit as the Head of Investment Audit. Second Am. Compl. ¶ 11.

6 Loss was an owner and Chairman of the Board of RSM Top-Audit. Second Am. Compl. ¶ 10.

7 Safarov posed as Volga-Neft's consultant and was the "attorney-in-fact" for Volga-Neft in connection with Star Energy's acquisition. Second Am. Compl. ¶ 12.

The false business plan and false Volga-Neft financial statements created by the Salnikov Criminal Enterprise, including RSM Top-Audit, and the accompanying audit reports signed by RSM Top-Audit, were transmitted to Star Energy in New York, and the false Volga-Neft financial statements as of October 6, 2006 and the accompanying audit report of RSM Top-Audit were filed by Star Energy with the SEC on its Form 8-K/A. *See* Second Am. Compl. ¶¶ 3, 29. The scheme eventually unraveled in April 2007, when Star Energy's outside auditors pressed RSM Top-Audit for its work papers and supporting financial information in connection with their audit of Star Energy's consolidated financial statements as of December 31, 2006. At that point, RSMi and RSM Top-Audit disavowed any involvement with the false Volga-Neft financial statements, disowned the audit reports, and sought to cover up the role of RSM Top-Audit, Salnikov and Loss in the Salnikov Criminal Enterprise. *See* Second Am. Compl. ¶¶ 3, 4.

C. The False Volga-Neft Business Plan Issued <u>Under the Names of RSMi and RSM Top-Audit</u>

The fraud perpetrated by the Salnikov Criminal Enterprise against Star Energy had its genesis in early 2006, when the Salnikov Criminal Enterprise determined to raise capital in the U.S. equity markets by proposing to sell Volga-Neft, a Russian limited liability company based in Samara that purported to be engaged in the sale of crude oil. *See* Second Am. Compl. ¶ 17. The Second Amended Complaint alleges that Safarov, Salnikov, Loss, Volga-Neft and other RSM Top-Audit personnel met in Moscow and conspired to create a business plan with false financial information, which was intrinsic to the scheme of fraud against Star Energy. *Id.*

The Business Plan of the Limited Liability Company "Volga-Oil" (the "Business Plan") was transmitted to Star Energy by electronic mail in both English and Russian versions.[8] The

[8] Copies of the English and Russian versions of the Business Plan are attached as Exhibits D and E, respectively, to the Sidorsky Decl.

Business Plan is attributed to RSM International by RSM Top-Audit as its Russian representative. Thus, in both versions, on every page, "RSM International" is printed above "RSM Top-Audit Auditing and Consulting Group." *See* Second Am. Compl. ¶ 19. The Business Plan states at the outset that RSM Top-Audit "is the exclusive representative in territory of Russia and the CIS countries [of] auditor and consulting association RSM International which head office is in London." (emphasis added). It goes on to state: "Owing to branching of network RSM International has an opportunity to expand the activity worldwide and to render professional services, applying uniform standards and uniform methodology within the limits of the integrated structure." The next paragraph states that RSM Top-Audit "has the right to use international brand RSM International. The group leans on uniform base international techniques and standards RSM International . . . . Standards have complex character. They are carefully developed. Their application is rigidly supervised, owing to what ethical standards are strictly observed." (emphasis added).

On the following page, the Business Plan identifies the "project executor" as Salnikov, "Head of the Investment audit sector in the Audit Department." The next page of the Business Plan, which is headed "Representation RSM International in the countries of the world," states: "6th Largest international accounting and consulting organization" and that "RSM's footprint is extensive. We operate and experience in all major markets. We have the ability to offer local advice on multyjucdictional [sic] assignments particularly in Europe, North America and Asia."[9]

[9] While RSMi and RSM Top-Audit have sought to disavow the Volga-Neft financial statements and the audit reports thereon, they have admitted that RSM Top-Audit was engaged to present the Business Plan and have not disputed its authenticity.

D. The False August 22, 2007 Certification
Executed by RSM Top-Audit on Behalf of RSMi

During the negotiations among representatives of Star Energy, RSM Top-Audit, and Volga-Neft in connection with Star Energy's proposed acquisition of Volga-Neft, on August 28, 2006, Salnikov sent an email to Howard L. Margulis, Esq., the partner at Troutman Sanders LLP in New York representing Star Energy in the acquisition, attaching a certification dated August 22, 2007 addressed to Star Energy Corporation, 245 Park Avenue, 39th Floor, New York, NY 10167.[10] *See* Second Am. Compl. ¶ 22. The certification represents at the outset that RSM Top-Audit, a member firm of the RSM International audit organization, is the independent auditor in the Russian Federation duly appointed by "Volga-Oil". *Id.*

The certification goes on to state that it is being provided at the request of Volga-Neft as a closing document in connection with the acquisition of shares of Volga-Neft by Star Energy and that "[w]e have made such factual, accounting and legal investigations as we have deemed necessary to enable us to issue this certification, which investigations have in all cases been carried out in accordance with the worldwide audit methodologies and professional standards applied by RSM International in the United Kingdom, the Russian Federation, and all other jurisdictions in which RSM International does business."

The certification is signed "RSM International" by RSM Top-Audit, a member of the Firm, with defendant Salnikov's signature as "Authorized Signatory." In other words, the certification is signed by RSM Top-Audit on behalf of RSM International in precisely the form in which an authorized agent would sign on behalf of its principal. *See* Second Am. Compl. ¶ 22.

[10] A copy of the covering email and attached August 22, 2007 certification is attached as Exhibit F to the Sidorsky Decl.

E.    The False October 6, 2006 Financial Statements and the RSM
      Top-Audit Certification Received by Star Energy and Filed with the SEC

On October 6, 2006, in reliance upon, among other things, the fraudulent Business Plan created by RSM Top-Audit and attributed to RSMi and the false August 22, 2007 certification issued expressly on behalf of RSMi by RSM Top-Audit, Star Energy acquired Volga-Neft pursuant to a Share Purchase Agreement (the "SPA"), and disclosed such acquisition in an 8-K filed with the SEC on October 6, 2006.[11]  Star Energy thereafter contributed approximately $3 million to the working capital of Volga-Neft. *See* Second Am. Compl. ¶ 23.

Following Star Energy's acquisition of Volga-Neft, Salnikov communicated to representatives of Star Energy that RSM Top-Audit was conducting an audit of Volga-Neft's financial statements under U.S. GAAP for filing with the SEC. *See* Second Am. Compl. ¶ 24. Star Energy's outside auditors, SF Partnership, LLP ("SF Partnership"), thereafter requested various materials and information from RSM Top-Audit relating to its purported audit of Volga-Neft, in connection with SF Partnership's audit of the consolidated financial statements of Star Energy, which RSM Top-Audit failed to provide. *See* Second Am. Compl. ¶ 26.

On November 15, 2006, Saul Muskat, the audit engagement partner at SF Partnership, and Star Energy's SEC counsel, received by email "U.S. GAAP Financial Statement" for Volga-Oil for the period ended October 6, 2006, and the following day received by email an auditor's report or "final opinion from RSM" signed by RSM Top-Audit.[12]  *See* Second Am. Compl. ¶ 27. The audit opinion represents that the financial statements were audited in accordance with U.S. GAAS and were prepared in conformity with U.S. GAAP.

---

[11]  A copy of the Star Energy Form 8-K dated October 6, 2006 is attached as Exhibit G to the Sidorsky Decl.

[12]  Copies of the November 15, 2006 email attaching the purported U.S. GAAP Financial Statement for Volga-Oil and the November 16, 2006 email attaching the final opinion from RSM are attached as Exhibit H to the Sidorsky Decl.

Star Energy thereafter, on or about December 8, 2007, filed an amended Form 8-K with the SEC, which included the auditor's report of RSM Top-Audit on the accompanying Volga-Neft financial statements as of October 6, 2006 and December 31, 2005.[13] *See* Second Am. Compl. ¶ 29.

F. The False December 31, 2006 Financial Statements and the RSM Top-Audit Certification Received by Star Energy

On December 13, 2006, representatives of Star Energy met with Salnikov, Safarov and Loss at RSM Top-Audit's offices to discuss the preparation of GAAP financial statements of Volga-Neft for the year ended December 31, 2006, to be audited by RSM Top-Audit, and Star Energy was subsequently led to believe that RSM Top-Audit was conducting the requested audit. *See* Second Am. Compl. ¶ 30. Moreover, SF Partnership was required to review the audit workpapers of RSM Top-Audit in connection with SF Partnership's report on the consolidated financial statements of Star Energy, to be filed with the SEC on Star Energy's Form 10-KSB. *See* Second Am. Compl. ¶ 30. SF Partnership therefore made multiple requests for RSM Top-Audit's work papers, which were not produced, and the documentation that was produced did not balance or did not support the balance sheet provided by RSM Top-Audit to SF Partnership. *See* Second Am. Compl. ¶ 31-34.

On or about April 3, 2007, Star Energy, SF Partnership and Star Energy's SEC counsel received by email what purported to be audited financial statements of Volga-Neft for the year ended December 31, 2006, with an auditor's report dated March 12, 2007 signed by RSM Top-Audit, which represented that the audit had been conducted in accordance with the standards of

[13] A copy of the Star Energy Form 8-K/A dated December 7, 2006 is attached as Exhibit I to the Sidorsky Decl.

the Public Company Accounting Oversight Board (United States) and that the financial

statements were presented in conformity with U.S. GAAP.[14]  *See* Second Am. Compl. ¶ 35.

        G.      RSMi's Exercise of Control in Connection with the
                  Disavowal of the False Financial Statements and
                  Cover-up of RSM Top-Audit's Fraudulent Conduct

On April 12, 2007, Rebecca Campbell, the audit manager on the Star Energy engagement

for SF Partnership, received an email from RSM Top-Audit announcing that RSM Top-Audit

"has NEVER audited the financial statements of Volga-Neft LLC"; that the only services

performed for Volga-Neft were preparations for a business plan presentation; and that the

auditor's report signed and sealed supposedly on behalf of RSM Top-Audit is "a false one."[15]

*See* Second Am. Compl. ¶¶ 35-36.

Mr. Margulis of Troutman Sanders promptly sent a series of urgent emails to Jean M.

Stephens, the Chief Executive Officer of RSMi, explaining that as a result of RSM's disavowal

of the RSM Top-Audit auditor reports, Star Energy's auditors had been unable to file the

consolidated financial statements and their auditor's report on Form 10-KSB by the April 17,

2007 deadline, and requested her urgent attention to the matter.[16]  In an email to Margulis dated

April 17, 2007, Stephens responded that "our office in Russia is closed" and that she "will need

some time to get the facts in order." *See* Second Am. Compl. ¶ 41.

The Second Amended Complaint further alleges that Stephens, exercising RSMi's

control over RSM Top-Audit, then summoned Loss to the London headquarters from Moscow to

provide an explanation, who immediately traveled to London for the meeting. *See* Second Am.

---

[14]  A copy of the April 3, 2007 email attaching the auditor's report and accompanying purported audited financial statements as of December 31, 2006 is attached as Exhibit J to the Sidorsky Decl.

[15]  A copy of the April 13, 2007 email to Campbell is attached as Exhibit K to the Sidorsky Decl.

[16]  A copy of the email exchange between Marguilis and Stephens is attached as Exhibit L to the Sidorsky Decl.

Compl. ¶ 41. Stephens instructed Loss to engage Hogan & Hartson as RSM Top-Audit's attorneys and directed Loss to draft a response to Margulis, and to provide it to Stephens beforehand for her review. *Id.* Loss also drafted a letter report to Stephens, dated April 18, 2007, "in response to you inquiry" in which she "reaffirm[ed] that nobody at RSM Top-Audit has ever audited the financial statements of Limited Liability Company Volga-Neft ("Volga-Oil")." The letter concludes that: "We are most indignant about the conduct of unknown to us persons who have used the bona fides of RSM Top-Audit and the fact that our company is accredited with SEC, forged the signature and our seal and produced falsified documents. This is evident fraudulent practice to which neither RSM Top-Audit, nor RSM International are related."[17]

On April 20, 2007, Loss sent a response letter to Margulis as "the official reply of RSM Top-Audit to your query addressed to Jean Stephens," adding to the attached April 18, 2007 letter from Loss to Stephens. The April 20, 2007 letter claimed that Salnikov did not have the right to sign any documents related to audit, that the August 22, 2007 certification allegedly signed by Salnikov is a "falsified document," and that "[w]e consider the whole situation . . . to be an egregious forgery aimed at misleading SEC and the citizens of the US using the bona fides of RSM Top-Audit."[18] *See* Second Am. Compl. ¶ 42.

RSMi approved and ratified the response of Loss to Star Energy's counsel that attempted to disavow any knowledge or participation by RSM Top-Audit in the false financial statements, claimed that the audit reports signed and sealed by RSM Top-Audit were forgeries, and also claimed that the certification signed by Salnikov on firm letterhead was falsified, with no

---

[17] A copy of the April 18, 2007 letter from Loss to Stephens is attached as Exhibit M to the Sidorsky Decl.

[18] A copy of the April 20, 2007 letter from Loss to Margulis is attached as Exhibit N to the Sidorsky Decl.

apparent independent investigation or critical scrutiny of any kind despite the extremely alarming nature of such claims. Indeed, RSMi accepted and approved of the issuance of the disavowal by RSM Top-Audit notwithstanding the evidence outlined above of involvement by Salnikov and Loss in the preparation of the false financial statements, and the inherent implausibility of Loss's claims that persons "unknown" to RSM Top-Audit had issued forged audit reports using RSM Top-Audit's seal and falsified the certification on RSM Top-Audit's letterhead. In sum, RSMi effectively ratified the fraudulent conduct of its agent when it joined in RSM Top-Audit's cover-up by directing Loss to respond to Star Energy and approving Loss's response that falsely disavowed any knowledge or involvement by Salnikov, Loss and RSM-Top Audit in the fraudulent scheme against Star Energy.[19] *See* Second Am. Compl. ¶ 4.

Star Energy subsequently agreed to rescind the SPA dated October 6, 2006 but has incurred damages in excess of $2 million, prior to trebling. *See* Second Am. Compl. ¶¶ 4, 46.

H. Star Energy's Claim Against RSMi for Respondeat Superior

Star Energy has asserted a claim against RSMi for respondeat superior based on the alleged fraudulent conduct of RSM Top-Audit, Salnikov and Loss. Second Am. Compl. (Fifth Claim). Star Energy alleges that RSMi exerted sufficient control over RSM Top Audit to create a principal-agent relationship because, *inter alia*, RSMi permits RSM Top-Audit to use the "RSM" name as a member firm and allows it to perform audits and other services utilizing its reputation; RSMi purports to set, control and enforce the standards by which RSM Top-Audit performs those services, including issuance of the worldwide audit manual, and RSM Top-Audit is required to comply with those standards; RSM Top-Audit had actual authority to perform

[19] Star Energy filed a Form 8-K dated May 10, 2007, reporting that the financial statements previously filed for Volga-Neft should no longer be relied upon, and filed a Form 8-K/A dated July 31, 2007, reporting the events leading up to the non-reliance on the Volga-Neft financial statements. *See* Sidorsky Decl., Exhs. O and P.

audits and other services as an "RSM" firm because it is a member firm approved by RSMi; RSM Top-Audit placed the name of RSMi on each page of the Business Plan of Volga-Neft that it transmitted to Star Energy and issued a certification to Star Energy in connection with its acquisition of Volga-Neft on behalf of RSMi, and RSM Top-Audit was acting within the scope of its agency relationship with RSMi when it prepared the Business Plan, financial statements, and audits; and RSMi exercised control over RSM Top-Audit in connection with its disavowal of any knowledge or involvement with the financial statements and audit reports for Volga-Neft and ratified RSM Top-Audit's cover-up of its fraudulent conduct.[20] *See* Second Am. Compl. ¶¶ 70-79.

**POINT I**

**PLAINTIFF HAS ADEQUATELY PLED AN AGENCY RELATIONSHIP BETWEEN RSMI AND RSM TOP-AUDIT SO AS TO STATE A CLAIM AGAINST RSMI BASED ON VICARIOUS LIABILITY**

The Second Amended Complaint pleads ample allegations of specific fact to support the existence of a principal-agent relationship between RSMi and RSM Top-Audit.[21] As set forth in

---

[20] Star Energy has asserted claims against RSM Top-Audit, Loss, Salnikov and Safarov under RICO for violations of 18 U.S.C. § 1962(c) and § 1962(d), for common law fraud, and for aiding and abetting common law fraud. Star Energy has also asserted a claim against RSM Top-Audit for respondeat superior based on the misconduct of Salnikov and Loss.

[21] The allegations of a principal-agent relationship for purposes of pleading a claim of vicarious liability are governed in this case by Fed. R. Civ. P. 8. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005). Under Fed. R. Civ. P. 12(b)(6), to withstand a motion to dismiss for failure to state a claim, the plaintiff need only allege sufficient facts giving rise to the causes of action to put the defendant on notice of the essential elements of the plaintiff's causes of action. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993); *Bullard v. City of New York*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003). *See also Bell Atlantic Corp. v. Twombly*, No. 05-1126, 2007 U.S. LEXIS 5901 (May 21, 2007) (factual allegations must be plausible enough to raise a right to relief above the speculative level on the assumption that all the complaint's allegations are true). When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all the factual allegations of the complaint as true and construe the complaint liberally in the light most favorable to the plaintiff. *Pena v. Deprisco*, 432 F.3d 98, 102 (2d Cir. 2005); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). Thus, the purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) ("[A]t the 12(b)(6) stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the

*(continued on next page)*

*Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1546 (S.D.N.Y. 1991), the three elements required to establish an agency under New York law are: "First, there must be a manifestation by the principal that the agent shall act for him. Second, the agent must accept the undertaking. Lastly, there must be an understanding between the parties that the principal is to be in control of the undertaking." (citations omitted). Thus, "'[t]here can be no agency relationship where the alleged principal has no right of control over the alleged agent.'" *Id.* (quoting *Mazart v. State*, 441 N.Y.S2d 600, 605, 109 Misc.2d 1092 (NY Ct. Cl. 1981)). The court in *BasicBooks* went on to observe that "every detail need not be determined by the alleged principal. An agency may exist where the principal retains the right 'to make management and policy decisions affecting the agent.'" *Id. See also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) ("element of control often is deemed the essential characteristic of the principal-agent relationship").

RSMi clearly had the right to exercise control over the activities and conduct of RSM Top-Audit in terms of retaining the right to make management and policy decisions affecting RSM Top-Audit, and did exercise such actual control. Thus, RSMi controlled RSM Top-Audit's eligibility for membership and ability to use the RSM brand name, RSMi dictated and enforced auditing standards that governed the performance of RSM Top-Audit's audit work, including promulgating the audit manual and policies that enabled RSM Top-Audit to represent that it could conduct audits and provide services to U.S. public companies such as Star Energy in

---

*(continued from previous page)*

claims.") (citations omitted); *Ryder Energy Dist. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (the function of a motion to dismiss "is merely to assess the legal feasibility of the complaint") (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). Moreover, the Court may only consider the facts alleged in the complaint, exhibits either attached to the complaint or incorporated by reference therein, matters of which judicial notice may be taken, and "documents of which [the Plaintiff] has notice and on which [he] relied in bringing [his] claim or that are integral to [the] claim." *Enron Corp. v. Int'l Fin. Corp.*, 343 B.R. 75, 77 (Bankr. S.D.N.Y. 2006); *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus, v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).

accordance with the requirements of U.S. GAAP, and RSMi directed and approved the response of RSM Top-Audit to Star Energy's counsel after RSM Top-Audit's fraudulent conduct came to light.

Not surprisingly, the case law in this district squarely supports the sufficiency of such factual allegations for purposes of pleading an agency relationship. In its Memorandum, RSMi conveniently overlooks the holding in *Cromer Fin. Ltd. v. Berger*, 00 Civ. 2284 (DLC), 2002 U.S. Dist. LEXIS 7782 (S.D.N.Y. May 2, 2002). In *Cromer*, the court held, based on very similar factual allegations, that the plaintiffs in a securities fraud class action had sufficiently alleged vicarious liability on an agency theory against Deloitte Touche Tohmatsu International ("Deloitte" or "DTT"), a Swiss verein headquartered in New York that served as the umbrella organization for the various Deloitte member firms. The court found that plaintiffs had sufficiently alleged that Deloitte Touche Bermuda ("DTB") and its audit partner had actual authority to act on behalf of Deloitte, and that the Bermuda audit partner acted as an agent and representative of the international network when he signed the audit opinions at issue. *Id.* at * 14-15.

In finding that a principal-agent relationship had been sufficiently pled between Deloitte and its Bermuda member firm, the court relied on the facts that Deloitte in its marketing held itself out as a leading unified international accounting firm and that Deloitte had the capacity to promulgate relevant professional standards for its member firms and the power and authority to exercise oversight of those member firms. *Id.* at * 6. Furthermore, DTB stated in its audit proposal that it is "part of Deloitte Touche Tohmatsu International" and the audit reports bore the name and logo of DTT as well as of DTB. *Id.* at * 8.

The court in *Cromer* explained that an agent's authority may be apparent, actual or implied and that actual authority "may be either express or implied from the parties' words and

conduct as construed in light of the surrounding circumstances." *Id.* at * 11 (citations omitted).

The court concluded that implied actual authority had been sufficiently pled, stating:

> . . . the plaintiffs' allegations of agency rest sufficiently on Deloitte's organization of its own business operations and the way it chose to use its member firms generally, and DTB and [its audit partner] specifically, to perform the audit work that Deloitte advertised that it was equipped to do around the world. It is fair to infer, in the context of pleading standards, that the representations made to third parties bore a relationship to the way Deloitte actually conducted its business. The allegations in the amended pleading, which rely on a variety of sources of information and not just marketing materials, are sufficient to infer that the words of and conduct by Deloitte *vis-à-vis* [the audit partner] were effective in conveying to [the audit partner] his actual authority to act as Deloitte's agent.

*Id.* at * 14-15. Thus, the court in *Cromer* expressly recognized that marketing statements

directed to third parties touting seamless services around the globe and across borders, the ability

to set and oversee professional standards governing the conduct of the audit work, and the use of

the global network's name on relevant documents are all indicia of an agency relationship, and

when taken together were sufficient to satisfy the requirements for alleging an agency

relationship between Deloitte and its Bermuda member firm at the pleading stage.

In this case, just as in *Cromer*, the allegations relating to the actual authority of RSM

Top-Audit, as well as of Loss and Salnikov as principals or senior employees, to act on behalf of

RSMi in conducting audits, issuing reports, and preparing business plans, is based on a variety of

sources. The Second Amended Complaint alleges that RSM Top-Audit had actual authority to

use the RSM brand name and promote itself as part of RSMi in providing accounting and

auditing services and RSMi knew that RSM Top-Audit promoted itself as RSMi's exclusive

representative in the Russian Federation. Moreover, RSMi provided RSM Top-Audit with

access to and authorized its use of RSMi's worldwide audit manual, policies, technical support

and training, thereby enabling RSM Top-Audit to qualify to have its audit reports filed with the

SEC and to provide audit and accounting services to public companies in the United States such

as Star Energy, with the full knowledge and awareness of RSMi. *See* Second Am. Compl. ¶¶ 70-74.

Furthermore, RSM-Top Audit specifically held itself out in the Volga-Neft Business Plan provided to Star Energy as the representative or agent of RSMi in the Russian Federation, with the right to use the RSM International brand name, and relying on RSMi international standards in its work, while describing RSMi as a global firm able to provide services around the work based on uniform standards and methodology applied throughout the integrated organization. The RSMi name appears above that of RSM Top-Audit on every page of the Business Plan, which was a key document in the perpetration of the fraud against Star Energy. Moreover, Salnikov also signed the August 22, 2007 certification for RSM Top-Audit on behalf of RSMi, and RSM Top-Audit is identified as an independent member of RSMi in various documents, including the August 22, 2007 certification.[22] Thus, as in *Cromer*, it can reasonably be adduced from the factual allegations of the Second Amended Complaint that RSM Top-Audit, Loss and Salnikov had actual authority, either express or implied, to act on behalf of RSMi in conducting audits, preparing business plans, and issuing opinions.

In its Memorandum, RSMi also seeks to gloss over the more recent decision in *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), relegated to a footnote, which convincingly supports the sufficiency of the allegations of principal-agent relationship in this case. In *Parmalat*, the district court held that plaintiffs, purchasers of Parmalat securities, had adequately alleged both that Deloitte & Touche S.p.A. ("Deloitte Italy") audited Parmalat's financial statements as the agent of Deloitte Touche Tomhatsu ("DTT"), and that Grant Thornton

---

[22] RSMi has not disputed or disavowed Salnikov's authority to prepare the Volga-Neft Business Plan on behalf of RSM Top-Audit using the RSMi name and while RSM Top-Audit claims that the August 22, 2007 certification is a forgery, that assertion is subject to dispute and cannot be determined on a motion to dismiss.

S.p.A. ("GT-Italy") was controlled by Grant Thornton International ("GTI") and was its agent in connection with its audit work for Parmalat.

With respect to the Deloitte defendants, the court noted that plaintiffs alleged that DTT, the global umbrella organization for the Deloitte member firms, took actions in connection with disagreements among Deloitte's Italian and Brazilian auditors on the Parmalat audit, allegedly removing one of the Brazilian auditors from the engagement. *Id.* at 293. The court pointed out that the purported disclaimers contained in Deloitte's marketing materials were not dispositive of whether an agency relationship existed, and the fact that auditing services were provided by Deloitte's member firms "does not bear on whether the firms did so as agents of DTT." *Id.* at 294. *See also Cromer*, 2002 US. Dist. LEXIS 7782, at *13 (explaining that Deloitte's contention that it is actually not a single international accounting firm, "even if valid and effectively conveyed, does not exclude the creation of an agency relationship or address the sufficiency of the complaint's allegations of agency.").[23]

Similarly, Judge Kaplan in *Parmalat* found that plaintiffs had sufficiently alleged an agency relationship between GTI, the international umbrella network, and GT-Italy, based on allegations of exercise of control by GTI over GT-Italy, including that GTI investigated and disciplined the Italian member firm and ultimately expelled it from the group.[24] *Id.* at 300-01.

---

[23] Here as well, any purported disclaimers of a single worldwide firm or references to independent member firms are not determinative of whether an agency relationship existed between RSMi and RSM Top-Audit. The court in *Parmalat* concluded that it "cannot now say that no trier of fact reasonably could infer that Deloitte Italy or other member firms auditing Parmalat were agents of DTT" and that "the issue here is not whether plaintiffs have proved the existence of an agency relationship, merely whether they should have the chance to do so." *Id.* at 295.

[24] The court in *Parmalat* also distinguished *In re Worldcom Sec. Litig.*,No. 02 Civ. 3288 (DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613 (GBD), 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) and *Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.)*, 230 F. Supp. 2d 152 (D. Mass. 2002), the very cases relied on by RSMi here.

Here, as in *Parmalat,* it can be reasonably inferred from the allegations in the Second Amended Complaint with respect to specific actions taken by RSMi relating to RSM Top-Audit's denial of participation in the fraud against Star Energy, that RSMi had the authority to investigate and discipline RSM Top-Audit.[25] Specifically, RSMi was able to obtain information from "our office in Russia," require Loss to come to London to explain RSM Top-Audit's conduct, and then arrange for Loss to write to Star Energy's counsel in response to his communications with Stephens at RSMi's headquarters. *See* Second Am. Compl. ¶ 41. In sum, it is reasonable to conclude that Loss and RSM-Top Audit promptly provided information to Stephens in response to her inquiries, hired counsel selected by her, and wrote to Star Energy's counsel because RSMi exercised control over RSM Top-Audit and that RSMi could, if it chose to do so, discipline Salnikov, Loss, and RSM Top-Audit, including expelling RSM Top-Audit from membership in RSMi for it breach of audit and ethical standards. Thus, based on these allegations and the allegations throughout the Second Amended Complaint regarding RSMi's authority to determine membership requirements and to establish, monitor and enforce worldwide auditing and ethical standards, the element of control for purposes of an agency relationship has been adequately pled.

Accordingly, the Second Amended Complaint more than adequately alleges that there was an actual principal-agent relationship between RSMi and RSM Top-Audit, such that RSMi is vicariously liable for the tortious conduct of RSM Top-Audit, and of Loss and Salnikov as its authorized principals or employees.[26] *See Parmalat*, 375 F. Supp. 2d at 302 ("As principals,

[25] RSMi's general authority to discipline its member firms is reflected in its ability to establish membership requirements, control use of the RSM brand name, and set worldwide standards which members are required to follow or face sanction or remedial action. *See* Second Am. Compl. ¶ 39.

[26] RSMi's attempt to analogize its relationship with RSM Top-Audit as akin to the American Bar Association's accreditation of law schools serves to underscore the weakness of its position. RSMi was not accrediting various

*(continued on next page)*

[accounting firm defendants] would be responsible for the actions of their agents and the knowledge and, consequently *scienter*, of their agents is imputed to them.").

Finally, the cases cited by RSMi in its Memorandum are readily distinguished and plainly inapplicable given the specific factual allegations supporting an agency relationship in this case. Thus, in *Worldcom, Inc. Sec. Litig.*, 2003 WL 21488087, at *10, the complaint against the Arthur Andersen worldwide organization, Andersen Worldwide Societe Cooperative ("AWSC"), was dismissed because it contained only the bare allegation that AWSC is an "umbrella organization for its members worldwide," without alleging that Andersen in the U.S. was an agent of AWSC. Similarly, in *Nuevo Mundo*, 2004 WL 112948, at *8, plaintiffs sought to hold the Andersen and PricewaterhouseCoopers ("PWC") member firms in the United States liable for the actions of the Andersen and PWC affiliated firms in Peru, while failing to allege any facts showing control by the U.S. member firms over the accounting services provided by the Peruvian entities. In the other cases cited by RSMi, the plaintiffs relied solely on the "one-firm" or unified company theory, rather than alleging specific facts evidencing actual control over the individual member firm so as to plead an agency relationship.[27] In the instant case, plaintiff has not sought to hold

---

*(continued from previous page)*

accounting firms in Russia but rather authorized RSM Top-Audit to use the RSM brand name as its exclusive representative in Russia and to promote itself as part of RSMi and therefore able to provide services to public companies in the U.S.; RSMi oversaw RSM Top-Audit's conduct of audit work through its global audit committee; RSM Top-Audit relied on the worldwide audit manual in conducting its audit work and was required to implement and adhere to RSMi's specific audit standards and policies in performing audits; and RSMi was able to obtain information from and direct the response of "our office in Russia."

[27] *See In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003) (plaintiffs "rely solely on the 'one-firm,' unified-company theory, which has been rejected by courts in other contexts."); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 662-63 (S.D.N.Y. 1997) (dismissing allegations of personal jurisdiction in employment discrimination case based on public relations materials suggesting that KPMG is a single, global firm); *Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1254 (S.D.N.Y. 1984) (finding accounting firm was not single, worldwide entity for purposes of personal jurisdiction and agency theory had not been alleged). *See also In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 571-72 (D.N.J. 2005) (rejecting "one firm" theory of liability applied to accounting firms); *Rocker Mgmt., LLC v. Lernout & Hauspie Speech Prods N.V.*, No. Civ.A. 00-5965 (JCL), 2005 WL 1365772 (D.N.J. June 8, 2005) (same); *Skidmore Energy, Inc. v. KPMG*, No. Civ.A. 3:03CV2138-B, 2004 WL 3019097, at *4 (N.D. Tex. Dec. 28, 2004) (same); *Filler v. Lernout (In re Lernout &*

*(continued on next page)*

RSMi vicariously liable based on a single firm or partnership theory, or alleged that RSM Top-Audit is the alter ego of RSMi, but rather has pled specific facts sufficient to establish a cause of action for respondeat superior liability based on a principal-agency relationship.

**POINT II**

**RSMI IS SUBJECT TO PERSONAL JURISDICTION IN NEW YORK**

Plaintiff's allegations establishing a principal-agency relationship between RSMi and RSM Top-Audit also serve to support the exercise of personal jurisdiction over RSMi. Indeed, the New York long-arm statute expressly provides that personal jurisdiction may be exercised over a non-domiciliary defendant who acts through an agent and it is well-established under New York law that a court "may exercise jurisdiction over a defendant who acted through an agent even if that defendant never physically entered New York." *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000). Moreover, RSMi does not dispute that RSM Top-Audit is subject to personal jurisdiction in New York pursuant to NY CPLR § 302(a)(3)(ii).[28]

To establish that an out-of-state defendant acted through an agent, the plaintiff need "only convince the court that [the corporation] engaged in purposeful activities in this State in relation to [plaintiff's] transaction for the benefit of and with the knowledge and consent of the [] defendants and that they exercised some control over [the corporation] in the matter." *Karabu*

---

*(continued from previous page)*

*Hauspie Sec. Litig.*), 230 F. Supp. 2d 152, 173 (D. Mass. 2002) (finding no apparent authority on part of member firms and no specific allegations of agency relationship).

[28] CPLR 302(a)(3)(ii) provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he . . .
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

*Corp. v. Gitner*, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 199 (1988)). In this case, Star Energy has pled in detail the existence of an agency relationship. RSMi's attempt to narrow the scope of jurisdiction by contending that it did not have actual knowledge of RSM Top-Audit's alleged fraudulent conduct at the time it occurred is unavailing.

The Second Amended Complaint alleges, and it cannot be seriously disputed, that RSMi knew that RSM Top-Audit was authorized to provide auditing and accounting services of the type at issue in this case to public companies listed on the New York Stock Exchange or other U.S. exchanges by virtue of its registration with the PCAOB, and RSMi knew that RSM Top-Audit was in fact holding itself out as providing such services to public companies based in New York as an authorized agent and representative of RSMi. *See* Second Am. Compl. ¶ 40. Moreover, RSMi provided RSM Top-Audit with the worldwide audit manual, policies and training that enabled it to purport to provide auditing services to Volga-Neft and Star Energy in accordance with PCAOB standards and under U.S. GAAP, and RSMi was responsible for overseeing such services and enforcing quality control, but failed to police or prevent its agents from engaging in the alleged fraudulent conduct. *See* Second Am. Compl. ¶¶ 9, 70-71. Thus, plaintiff has sufficiently averred personal jurisdiction over RSMi based on the tortious conduct of its agents, RSM Top-Audit, Loss and Salnikov. *See Kreutter*, 71 N.Y.2d at 473, 467, 527 N.Y.S.2d at 202.

Furthermore, RSMi effectively ratified the fraudulent conduct of RSM Top-Audit, Salnikov and Loss when it joined in their cover-up by approving the letter from Loss to Star Energy's counsel falsely disavowing or denying any knowledge or involvement by RSM Top-Audit in the admittedly fraudulent conduct against Star Energy. *See* Second Am. Compl. ¶ 4; *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 100

(2d Cir. 2003) ("New York law recognizes the well-established principle of ratification, which imputes an agent's conduct to a principle who 'condones those acts and accepts the benefits of them.'"); *Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entm't Servs.*, No. 93 Civ. 2680 (RPP), 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996).

Thus, RSMi's subsequent ratification of the fraudulent conduct of its agents is a further basis for exercise of personal jurisdiction over RSMi under CPLR 302(a)(3)(ii). *See Reiss v. Societe Centrale due Groupe des Assurances Nationales*, 185 F. Supp. 2d 335, 339-40 (S.D.N.Y. 2002) (authorizing jurisdiction-related discovery based on allegations of retroactive authority of agent as a result of subsequent ratification by principal); *see also Bank of Montreal v. Mitsui Manufacturers Bank*, No. 85 Civ. 1519 (JFK), 1987 U.S. Dist. LEXIS 282, at * 5-6 (S.D.N.Y. Jan. 21, 1987) (personal jurisdiction over an out-of-state defendant was found based on the performance of "purposeful acts with persons or entities in New York regarding the contract, albeit preliminary or subsequent to its execution."); *Applied Hydro-Pneumatics, Inc. v. Bauer Mfg.*, 68 A.D.2d 42, 46, 416 N.Y.S.2d 817, 820 (2d Dep't 1979).

Accordingly, plaintiff has pled facts sufficient to make a prima facie showing of personal jurisdiction over RSMi under CPLR 302(a)(3)(ii) and RSMi's motion dismiss pursuant to Fed. R. Civ. P. 12(b)(2) should be denied.[29]

---

[29] While plaintiff has pled at length specific facts showing an agency relationship to support the exercise of personal jurisdiction, plaintiff should be given leave to obtain jurisdictional discovery in the event that the Court were to consider dismissing the Second Amended Complaint. *See Cicalo v. Harrah's Operating Co.*, No. 06 Civ 221 (PKL), 2008 U.S. Dist. LEXIS 33806, at *13-15 (S.D.N.Y. Apr. 24, 2008) (in case where jurisdiction was alleged based on agency relationship, court distinguished *Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1998) and ordered the parties to conduct limited and expedited discovery regarding jurisdictional issues when plaintiff had made a threshold showing of personal jurisdiction); *Hollins v. United States Tennis Ass'n*, 469 F. Supp. 2d 67, 70-71 (E.D.N.Y. 2006) (ordering jurisdictional discovery where plaintiff "made a sufficient start toward establishing personal jurisdiction"). *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (authorizing jurisdictional discovery where allegations constituted "arguable" jurisdictional basis, so plaintiff could develop facts in support of prima facie showing). In this case, while Star Energy of course has in its possession copies of communications between its representatives and RSMi and RSM Top-Audit, it has not obtained discovery of any internal email communications between RSMi and RSM Top-Audit relating to the events at issue or RSMi's knowledge of RSM Top-Audit's performance of accounting and auditing services for use in the United States and

*(continued on next page)*

**CONCLUSION**

For all of the reasons stated above, defendant RSMi's motion to dismiss the Second Amended Complaint should be denied.

Dated: New York, New York
May 28, 2008

Respectfully submitted,

BUTZEL LONG,
a professional corporation

By: /s/ Robert Sidorsky
Martin P. Russo (MR 4164)
(russo@butzel.com)
Robert Sidorsky (RS 2490)
(sidorsky@butzel.com)
Alison B. Cohen (AC 7702)
(cohen@butzel.com)
380 Madison Avenue
New York, New York 10017
(212) 818-1110
(212) 818-0494 (fax)

Attorneys for Plaintiff
Star Energy Corporation

---

*(continued from previous page)*

filing with the SEC. Plaintiff also has not obtained discovery of such pertinent information for jurisdictional purposes as the interfirm agreement between RSMi and RSM Top-Audit, the worldwide audit manual, the scope of the authority of the global audit committee, inspections or reviews by RSMi of RSM Top Audit's audit work, or the documents relating to any investigation or possible disciplinary action against RSM Top-Audit, Salnikov or Loss by RSMi.

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on May 28, 2008 he caused a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendant RSM International Limited's Motion to Dismiss and the Declaration of Robert Sidorsky, Esq. in Opposition to Defendant RSM International Limited's Motion to Dismiss and the accompanying Exhibits thereto, to be served by Federal Express upon counsel for the defendants, as follows:

Thomas H. L. Selby, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Attorneys for RSM Internatonal Limited

Anna V. Brown, Esq.
Marks & Sokolow, LLC
1835 Market Street
Suite 625
Philadelphia, PA 19103
Attorneys for RSM Top-Audit, Elena Loss and Sergey Salnikov

DATED: New York, New York
May 28, 2008

/s/ Robert Sidorsky
Robert Sidorsky