UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
STAR ENERGY CORPORATION,                          :

                                       Plaintiff,  :    08 Civ. 00329 (DC)

                                                   :

                 - against -                       :

                                                   :

RSM TOP-AUDIT, RSM INTERNATIONAL                   :
LIMITED, ELENA P. LOSS, SERGEY                     :
SALNIKOV, ARMENAK SAFAROV, and JOHN               :
DOES 1-5,                                          :

                                                   :

                                      Defendants.  :
-------------------------------------------------------------x

## DECLARATION OF ROBERT SIDORSKY, ESQ.
## IN OPPOSITION TO DEFENDANT RSM
## INTERNATIONAL LIMITED'S MOTION TO DISMISS

Robert Sidorsky, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am of counsel to the firm of Butzel Long, a professional corporation, counsel for

Plaintiff Star Energy Corporation ("Star Energy") in the above-captioned action.  I submit this

Declaration in opposition to the motion to dismiss by defendant RSM International Limited

("RSMi") and for the purpose of placing before the Court the following documents, which are

referred to in the Second Amended Complaint filed herein or are copies of documents filed by

Star Energy with the Securities and Exchange Commission ("SEC").

2.      Attached hereto as Exhibit A is a true copy of the Second Amended Complaint,

dated April 16, 2008.

3.      Attached hereto as Exhibit B is a true copy of an excerpt from the website of

RSMi, *www.rsmi.com.*

4.      Attached hereto as Exhibit C is a true copy of an excerpt from the website of Defendant RSM Top-Audit, *www.top-audit.ru*.

5.      Attached hereto as Exhibit D is a true copy of a Business Plan for Limited Liability Company "Volga-Oil" in English.

6.      Attached hereto as Exhibit E is a true copy of a Business Plan for Limited Liability Company "Volga-Oil" in Russian.

7.      Attached hereto as Exhibit F is a true copy of an email dated August 28, 2006 to Howard L. Margulis, Esq., attaching what purports to be a certification from RSMi by RSM Top-Audit, dated August 22, 2006.

8.      Attached hereto as Exhibit G is a true copy of a Form 8-K for Star Energy Corporation dated October 6, 2006, which was filed with the SEC.

9.      Attached hereto as Exhibit H is a true copy of an email dated November 15, 2006 to Saul Muskat and David Lubin, attaching what purports to be Volga-Oil Company U.S. GAAP Financial Statement, as of October 6, 2006, and an email dated November 16, 2006 to Saul Muskat, David Lubin, Patrick Kealy and Marcus Segal, attaching what purports to be an Auditors' Report bearing the seal of RSM Top-Audit.

10.      Attached hereto as Exhibit I is a true copy of a Form 8-K/A (Amendment No. 1) for Star Energy Corporation dated December 7, 2006, which was filed with the SEC.

11.      Attached hereto as Exhibit J is a true copy of an email dated April 3, 2007 to Marcus Segal, Patrick Kealy, Saul Muskat and Terence Chan, attaching what purports to be Volga-Neft Limited Liability Company Financial Statements as of December 31, 2006 and December 31, 2005 with an Auditors' Report dated March 12, 2007, bearing the seal of RSM Top-Audit.

2

12.    Attached hereto as Exhibit K is a true copy of an email dated April 13, 2007 to Rebecca Campbell that purports to be from *ASoskin@top-audit.ru*, signed by Roman Lerner.

13.    Attached hereto as Exhibit L is a true copy of emails dated April 13, 2007 and April 17, 2007 between Howard L. Margulis, Esq. and Jean Stephens, Chief Executive Officer of RSMi.

14.    Attached hereto as Exhibit M is a true copy of a letter dated April 18, 2007 from Elena Loss on behalf of RSM Top-Audit to Jean Stephens.

15.    Attached hereto as Exhibit N is a true copy of a letter dated April 20, 2007 from Elena Loss on behalf of RSM Top-Audit to Howard L. Margulis, Esq.

16.    Attached hereto as Exhibit O is a true copy of a Form 8-K for Star Energy Corporation dated May 10, 2007, which was filed with the SEC.

17.    Attached hereto as Exhibit P is a true copy of a Form 8-K for Star Energy Corporation dated July 31, 2007, which was filed with the SEC.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: New York, New York
        May 28, 2008

By:  /s/ Robert Sidorsky
     Robert Sidorsky (RS 2490)

3

000139269\0001\149937-1

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

STAR ENERGY CORPORATION

                    Plaintiff,

-against-

RSM TOP-AUDIT, RSM INTERNATIONAL LIMITED,
ELENA P. LOSS, SERGEY SALNIKOV, ARMENAK
SAFAROV,  and JOHN DOES 1-5.

                    Defendants.

-------------------------------------------------------------- X



**Civ. Action, File. No. 08-00329**

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## Nature of the Action

1.      This action arises out of an ongoing and continuous pattern of racketeering in Russia which has targeted the financial markets of the United States of America.  The defendants associated-in-fact and have conspired to obtain capital through multiple publicly traded U.S. entities by engaging in organized and systemic fraud.  Specifically, the participants in the RICO conspiracy acted in concert as an enterprise (the "Salnikov Criminal Enterprise") with the objective of attracting U.S. investment to Russian companies by falsifying financial statements and having RSM Top-Audit use its PCAOB certification and status as a member of RSM International Limited ("RSM International") to defraud acquiring companies and their U.S. shareholders.

2.      Plaintiff Star Energy Corporation ("Star Energy"), a publicly traded U.S. company, fell victim to the illegal activity of the Salnikov Criminal Enterprise when it was approached by persons associated with the enterprise and offered the opportunity to acquire the stock of Volga-Neft, a Russian oil company.  Using RSM International and RSM Top-Audit as a vehicle, the members of the Salnikov Criminal Enterprise created and presented to

Star Energy a business plan and false financial statements which purported to be audited and compliant with Generally Accepted Accounting Principles ("GAAP"). Relying on the reputation of RSM International and its duty to police its members, the publicly traded Star Energy purchased Volga-Neft Limited Company ("Volga-Neft") for millions of dollars in stock and contributed several million dollars to working capital. As is set forth more fully below, the financial statements created by the Salnikov Criminal Enterprise and certified by RSM International through RSM Top-Audit grossly overvalued the assets of Volga-Neft.

3.     Thereafter, through Volga-Neft, the Salnikov Criminal Enterprise continued to seek additional funds from Star Energy. To achieve this goal, members of the Salnikov Criminal Enterprise created false "audited" Volga-Neft financial statements for the fiscal year 2006 and attempted to pass the same on to Star Energy for filing with the Securities and Exchange Commission. With respect to Star Energy, the scheme fell apart when the company's auditors noticed inconsistencies in the Volga-Neft financial statements and began to press RSM Top-Audit for work papers and inventory verification.

4.     Seeing the writing on the wall, the Salnikov Criminal Enterprise caused RSM Top-Audit to disavow the audit. RSM Top-Audit and its parent, RSM International, then began to engage in a cover-up of the firm's role in the Salnikov Criminal Enterprise. In the meantime, the Salnikov Criminal Enterprise directly interfered with the progress of two separate legitimate auditing firms hired at Star Energy's request to perform an audit of Volga-Neft which would be compliant with U.S. securities laws. To minimize exposure and in the hope of continuing its pattern of racketeering activity, the Salnikov Criminal Enterprise arranged for Volga-Neft to rescind the acquisition by Star Energy. Nevertheless, as a result of the aforementioned conduct, Star Energy suffered significant financial and reputational injury. By this lawsuit, Star Energy seeks to recover for its losses.

**Jurisdiction And Venue**

5.      The Court has proper jurisdiction under Title 18, United States Code, and particularly Section 1964 thereof, and under Title 28, United States Code, Section 1332. The amount in controversy exceeds, exclusive of interest and costs, $75,000.

6.      Venue is proper in this Court under Title 18, United States Code, and particularly Section 1965 thereof, and under Title 28, United States Code, Section 1391(d).

**Parties**

7.      Plaintiff Star Energy Corporation is a corporation duly organized and existing under the laws of the State of Nevada, with its principal place of business in the Southern District of the State of New York. Star Energy is an oil and gas exploration company which seeks out investment and acquisition opportunities in areas of the world that are considered emerging markets. The company's goal is to provide Western investors with access to a portfolio of natural resource licenses and operating companies in such emerging markets. Star Energy is a reporting public company and its common stock is traded on the NASDAQ Over-the-Counter Bulletin Board (ticker symbol SERG).

8.      Upon information and belief, Defendant RSM Top-Audit is a company duly organized and existing under the laws of Russia, with its principal place of business in Moscow, Russia. RSM Top-Audit purports to be a legitimate Russian auditing and consultancy firm servicing clients in the oil, and oil and gas industries. According to its website, RSM Top-Audit is RSM International's only representative in Russia since 1997, it is authorized to audit public companies listed on the NYSE, and its signature on an auditor's report is recognized by the U.S. Securities and Exchange Commission. RSM Top-Audit represents on its website that it is engaged in international commerce by providing services to companies in foreign countries, the Commonwealth of Independent States, as well as serving

3

the Russian market. Upon information and belief, RSM Top-Audit derives substantial revenue from interstate or international commerce. At all times relevant hereto, RSM Top-Audit was a person comprising part of the Salinkov Criminal Enterprise and committed acts outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state.

9.     Upon information and belief, Defendant RSM International Limited is a company duly organized and existing under the laws of the United Kingdom of Great Britain, with its principal place of business in London, England. RSM International is a worldwide network of professional services firms which purport to provide tax, accounting, consulting, and specialist advisory services to companies around the world under the "RSM" brand. Upon information and belief, RSM International derives substantial revenue from interstate or international commerce. According to RSM International's website, it requires member firms to meet high quality standards in order to use the "RSM" brand, and member firm compliance is monitored. As described more fully herein, RSM had significant control over the activities of RSM Top-Audit and a principal-agent relationship existed. By allowing RSM Top-Audit to use its name and failing to police its conduct, RSM International empowered the Salnikov Criminal Enterprise with the endorsement of a "top-ten" international accounting firm. At all times relevant hereto, RSM International, itself or through its agent RSM Top-Audit, committed acts outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state.

10.     Upon information and belief, Defendant Elena P. Loss is an individual residing in Russia. At all times relevant hereto, Ms. Loss was an owner, Chairman of the Board and the highest ranking employee of RSM Top-Audit. Ms. Loss also was a person comprising part of

4

the Salinkov Criminal Enterprise and committed acts herself, or through RSM Top-Audit, outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state. Upon information and belief, Ms. Loss derives substantial revenue from interstate or international commerce.

11.    Upon information and belief, Defendant Sergey Salnikov is an individual residing in Russia. At all times relevant hereto, Mr. Salnikov was employed by RSM Top-Audit as the Head of Investment Audit and was heralded as an expert in transactions involving a U.S. public company's acquisition of Russian companies. Mr. Salnikov also was a person comprising part of the Salinkov Criminal Enterprise and committed acts himself, or through RSM Top-Audit, outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state. Upon information and belief, Mr. Salnikov derives substantial revenue from interstate or international commerce.

12.    Upon information and belief, Defendant Armenak Safarov is an individual residing in Russia. Mr. Safarov posed as Volga-Neft's consultant in connection with raising capital through the U.S. equity markets and was the "attorney-in-fact" for Volga-Neft in connection with Star Energy's acquisition of the company. At all times relevant hereto, Mr. Safarov was a person comprising part of the Salinkov Criminal Enterprise and committed acts himself, or through RSM Top-Audit, outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state. Upon information and belief, Mr. Safarov derives substantial revenue from interstate or international commerce.

5

13.    Defendants John Does 1-5, are persons whose identity presently is unknown to Star Energy, but who were persons comprising part of the Salinkov Criminal Enterprise and each committed acts himself, or through RSM Top-Audit, outside the State of New York which caused injury in the Southern District of the State of New York, and expected or should have reasonably expected the acts to have consequences in the state. Upon information and belief, John Does 1-5 derive substantial revenue from interstate or international commerce.

### Factual Allegations

14.    In or about 2005, Defendants Salnikov, Safarov, Loss, RSM Top-Audit and John Does 1-5 did meet and conspire to perpetrate a pattern of racketeering activity targeting the U.S. equity markets. The individual participants agreed to form the Salnikov Criminal Enterprise which would fraudulently market certain natural resource assets located in Russia to publicly traded U.S companies. The Salnikov Criminal Enterprise viewed the U.S. equity markets as a source to obtain interest free money which never would have to be paid back.

15.    Defendant Safarov acted as a "consultant" to the Russian natural resource companies and would locate potential U.S. investors. In the interim, they would meet with Salnikov, Loss and other RSM Top-Audit personnel to prepare a business plan and create financial statements that appeared to be reliable and purported to be audited in accordance with GAAP. Once a U.S. corporate investor was located, the consultants introduced the U.S. corporate investor to the Russian company by utilizing the false RSM Top-Audit materials which often prominently stated "RSM International!" on every page. At no time did any of the defendants disclose that the assets reflected in the financial statements were overstated, or that in certain cases they were "shared" with several affiliated companies under common control.

16.     One of the first companies targeted by the Salnikov Criminal Enterprise was a publicly traded U.S. company named Bio-Tracking Security Inc. ("Bio-Tracking"). RSM Top-Audit through Salnikov and Loss prepared business plans and/or financials for Nord Oil and North-West Oil Group which, upon information and belief, were relied upon by Bio-Tracking in acquiring the entities. Bio-Tracking has made SEC filings that include financial statements for Nord Oil and North-West Oil Group which purport to have been audited by RSM Top-Audit. Upon information and belief, RSM Top-Audit now disavows having prepared these purportedly audited financial statements, but neither RSM Top-Audit nor RSM International have informed Bio-Tracking or reported the disavowel to the SEC.

17.     In or about early 2006, the Salnikov Criminal Enterprise determined to raise capital in the United States equity markets by proposing to sell Volga-Neft. Volga-Neft is a limited liability company duly organized and existing under the laws of Russia, with its principal place of business in Samara, Russia. Volga-Neft claims that it sells crude oil it has purchased from local oil developers to local oil exporters, wholesalers, and distributors. It also purports to process crude oil purchased from local oil developers, selling the processed petroleum products in the local market to oil exporters, wholesalers, and distributors. Safarov, Salnikov, Loss, John Does 1-5, Volga-Neft and other Top-Audit personnel met in Moscow, Russia and determined to construct a business plan with fraudulent financials. While Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, prepared the business plan and the financials, Safarov identified Star Energy as a suitable victim.

18.     Upon information and belief, by the time Safarov approached Star Energy, the Salnikov Criminal Enterprise had engaged or were continuing to engage in the same pattern of racketeering activity utilizing other Russian companies, including Zabaikalgeoprom, Trans-Oil Limited Liability Company, Univer Company and Nessa AD.

7

19.    The Salnikov Criminal Enterprise through RSM Top-Audit, aided and abetted by Salnikov, Loss, Safarov and John Does 1-5, then presented the Volga-Neft business plan to Star Energy. There were two versions of the business plan, one in English and the other in Russian. Both versions, however, contained prominent footer at the bottom center of each page which read "RSM International" directly above "RSM Top-Audit" on every page. The numbers reflected in the financial sections of these business plans were false. The business plan was transmitted to Star Energy by electronic mail.

20.    Thereafter, Star Energy engaged in communications with RSM Top-Audit through Salnikov, regarding the financials of Volga-Neft. Negotiations ensued and Star Energy agreed to purchase Volga-Neft. Many of the negotiations were conducted by telephone.

21.    Prior to closing the deal with Volga-Neft, Star Energy demanded that RSM International's agent, RSM Top-Audit, certify the financials they had presented and issue an opinion regarding the transaction. On or about August 15, 2006, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, forwarded to Star Energy a letter on RSM Top-Audit letterhead which identified RSM International in the lower left-hand corner and was signed by Nina Dantser as the Head of Audit Department. The letter was transmitted to Star Energy by electronic mail. Thereafter, Star Energy's attorneys communicated by telephone with Salnikov about changes they wanted to the letter.

22.    On or about August 22, 2006, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, forwarded a second such certification to Star Energy by electronic mail. That certification was drafted on RSM Top-Audit letterhead which identified RSM International in the lower left-hand corner and was signed "RSM International" by "RSM Top-Audit" by Salnikov as Head of Investment Audit Unit. The first words of the

8

Certification Letter read "RSM Top Audit, a member firm of the RSM International Audit Organization." The Salnikov Criminal Enterprise intended that Star Energy rely upon the certification which was false. Star Energy accepted the certification and relied upon the same.

23.     Based upon the business plan's financials, the representations made by Volga-Neft, and the RSM International certification issued by its agent RSM Top-Audit, Star Energy acquired Volga-Neft pursuant to a stock purchase agreement on October 6, 2006. Thereafter, Star Energy contributed approximately $ 3 million to the working capital of Volga-Neft.

24.     After October 2006 and continuing through April 2007, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, communicated in person, by telephone and by e-mail with representatives of Star Energy regarding Volga-Neft's financial statements and GAAP. Salnikov represented to Star Energy that he was an experienced auditor and that RSM Top-Audit was conducting an audit of Volga-Neft for filing with the U.S. Securities and Exchange Commission.

25.     On or about November 10, 2006, the Salnikov Criminal Enterprise through Salnikov, aided and abetted by Loss, Safarov, and John Does 1-5, provided Star Energy with a "Report of Independent Registered Accounting Firm" which stated that RSM Top-Audit had audited the accompanying balance sheets and the related statements of income, stockholders' equity and cash flows and that, in the opinion of RSM Top-Audit, the financial statements presented fairly, in all material respects, the financial position of Volga-Neft and the results of its operations and cash flows for the ten months and year ended October 6, 2006 and December 31, 2005 in conformity with GAAP. This report was transmitted by electronic mail.

26.     In or about the middle of November 2006, Star Energy hired SF Partnership LLP ("SF Partnership") to serve as its auditors in connection with the preparation and anticipated filing of consolidated financial statements for Star Energy and Volga-Neft. RSM

9

Top-Audit, through Salnikov, and aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, continued to purport to serve as Volga-Neft's outside auditing firm during this time. Over the course of the next five months, SF Partnership requested various materials in connection with the purported audit of Volga-Neft to assist in SF Partnership's preparation of the consolidated financial statements. RSM Top-Audit repeatedly failed to provide the requested materials.

27.    On or about November 15, 2006, SF Partnership received by electronic mail financial statements which purported to be U.S. GAAP compliant financial statements for Volga-Neft prepared by Salnikov and RSM Top-Audit and aided and abetted by Loss, Safarov, and John Does 1-5. The next day, SF Partnership received another electronic mail which purported to attach the "final opinion from RSM" on Volga-Nefts 2006 and 2005 financials. The attachment consisted of an auditor's report for the periods ended October 6, 2005 and October 6, 2006.

28.    On November 29, 2006, SF Partnership sent an electronic mail to Salnikov at RSM Top-Audit seeking clarification of several items contained in audit. On December 6, 2006, SF Partnership received documents from Salnikov, who was aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, which he represented were updated financial statements of Volga-Neft for the period ended December 31, 2005, as well as balance sheet numbers for the period ended October 6, 2006.

29.    Relying on the RSM Top-Audit opinion, Star Energy filed an amended Form 8-K with the Securities & Exchange Commission on December 8, 2006 and attached the Volga-Neft financial statements.

30.    On December 13, 2006, representatives of Star Energy met with Salnikov, Safarov, and Loss at RSM Top-Audit's offices to discuss a GAAP compliant audit of the

Volga-Neft financial statements through December 31, 2006. Following the meeting, the Salnikov Criminal Enterprises caused Star Energy to believe that RSM Top-Audit was conducting the requested audit. Specifically, Salnikov, aided and abetted by RSM Top-Audit, Loss, Safarov, and John Does 1-5, had telephone and electronic communications with representatives of Star Energy about the progress of the audit.

31.    Following the end of its fiscal year, Star Energy was required to file a Form 10-KSB containing consolidated financial statements of Star Energy and Volga-Neft for the period ending December 31, 2006. Unlike the amended Form 8-K, the anticipated Form 10-KSB was to include an audit opinion issued by SF Partnership in connection with the consolidated financial statements of Star Energy and Volga-Neft. Accordingly, SF Partnership was required to review RSM Top-Audit's work papers and back-up documentation for the audit work.

32.    SF Partnership began requesting materials from RSM Top-Audit which should have been obtained in connection with the audit of Volga-Neft. In particular, SF Partnership was  seeking documentation of Volga-Neft's inventory because it was the largest item on Volga-Neft's balance sheet.   SF Partnership made several requests for documents, but RSM Top-Audit did not provide satisfactory responses. No work papers were produced. In addition, the only the information that RSM Top-Audit provided to SF Partnership through Salnikov was a series of draft financial statements that did not balance correctly.

33.    In February 2007, representatives of Star Energy travelled to Samara to meet with Volga-Neft. Mr. Safarov was present at Volga-Neft during this visit. In Samara, the Star Energy representatives were shown various pieces of equipment from a distance, but there was no way for them to verify that the equipment belonged to Volga-Neft. At that time, Star Energy provided Volga-Neft with a list of items that SF Partnership had requested in

connection with the Volga-Neft audit, but those items were never produced. Upon information and belief, the argument shown to Star Energy representatives was not the sole property of Volga-Neft.

34.    Throughout March and April 2007, the Salnikov Criminal Enterprise continued to resist SF Partnership's requests for documents and information. SF Partnership made multiple requests for RSM Top-Audit's working papers in connection with the Volga-Neft audit. In general, when documents were produced, it took an unusually long time for RSM Top-Audit to collect and send them to SF Partnership. SF Partnership later determined that any documents it did receive were not auditors' work papers; rather, they were a random assortment of invoices, spreadsheets, and various other items which did not tie into the numbers set forth on the balance sheet that RSM Top-Audit had provided to SF Partnership.

35.    On or about April 2, 2007, SF Partnership received by electronic mail what purported to be the final version of the audited December 31, 2006 Volga-Neft financial statements from RSM Top-Audit, which was aided and abetted by Salnikov, Safarov, Loss, and John Does 1-5. On April 12, 2002, SF Partnership again attempted to obtain information from RSM Top-Audit regarding the Volga-Neft statements. By letter dated April 13, 2007, Loss on behalf of RSM Top Audit and aided and abetted by Salnikov, Safarov, and John Does 1-5, denied that RSM Top-Audit ever conducted an audit of Volga-Neft.

36.    Shortly after RSM Top-Audit's disavowal, SF Partnership had a telephone call with "Konstantine" translating for Salnikov (purportedly from the offices of RSM Top-Audit), aided and abetted by Safarov, Loss, and John Does 1-5, and was told that the disavowal was made in error. SF Partnership was promised a notarized letter retracting disavowal. No such document was ever received by SF Partnership.

12

37.    Upon information and belief, RSM Top-Audit is an agent of RSM International. RSM International takes credit for the audits performed by its affiliates and boasts through its website that it audits and renders professional services to several thousand leading international companies. It also controls the auditing actions of its member firms through the use of a common manual of auditing which is maintained by joint technical teams in the United States of America, United Kingdom of Great Britain and France.

38.    RSM International member firms apply a single methodological system to their auditing as dictated by RSM International. This method, dubbed the "RSM Audit Methodology," purports to be in compliance with International Standards on Auditing and is regularly updated by RSM International for new technical pronouncements and efficiency changes in best practices. RSM International considers training to be critical across the network to ensure consistency, objectivity and the highest levels of client service. It provides training on the audit manual and other related policies through training courses run on-site, written training materials issued to firms and by global web-conferencing.

39.    To manage quality control, the central RSM Transnational Assurance Services Executive Committee supervises the compliance of RSM member-firms. Upon information and belief, RSM International periodically audits the work of its members to ensure compliance with its strict procedures and has the power to force the member to change its conduct under the threat of sanction or remedial action. In addition, RSM International dictates the attributes of each member firm before the firm is allowed to bear the name "RSM". When advertising, RSM International pools the earnings of its member firms for purposes of inducing companies to retain its agents. It advertises itself as one combined organization and admits that it derives substantial revenue from international commerce. As part of its sales materials, it boasts that "RSM International has member firms in over 64

13

countries and is represented in each of the top 40 major business centres throughout the world. The combined organisation has more than 24,500 professionals in more than 660 offices and generates total fee income exceeding US $3.06 billion, placing it amongst the Top Seven international accounting organisations [sic] world-wide."

40.    RSM International invites companies to contact its member firms through an on-line directory on its website. RSM International provides contact information for RSM Top-Audit on its website, including a direct link to the RSM Top-Audit website. Based upon the information provided on the RSM Top-Audit website, the application procedures to become an RSM International member firm and audit of RSM Top-Audit's procedures, RSM International knew or should have known that RSM Top-Audit would perform services that affected persons in the United States of America and specifically New York. RSM Top-Audit states on its website that it is authorized to audit public companies listed on the NYSE, and its signature on an auditor's report is recognized by the U.S. Securities and Exchange Commission. Similarly, RSM International boasts that its member firms have experience providing auditing and professional services to publicly listed companies. RSM International made a discernable effort to directly or indirectly serve the New York financial market and expected or reasonably should have expected that acts of its agent RSM Top-Audit would have consequences in the State of New York.

41.    Star Energy's counsel promptly wrote to Jean Stephens, the Chief Executive Officer of RSM International to seek an explanation of its agent's disavowel. Exercising RSM International's control over RSM Top-Audit, Stephens summoned Loss to the London headquarters from Moscow. Loss immediately travelled to London for the meeting. Upon information and belief, Stephens explored the factual circumstances with Loss, and recognizing the culpable conduct of RSM International's agent instructed Loss to engage

14

Hogan & Hartson as attorneys for RSM Top-Audit. Stephens also directed Loss to draft a responsive letter and provide it to her at RSM International for review before sending it to Star Energy's counsel. Loss prepared a letter, aided and abetted by Salnikov, Safarov, and John Does 1-5, and after approval from Stephens of RSM International, forwarded the same to Star Energy's counsel by electronic mail.

42.    The response letter, dated April 20, 2007, stated that it was the "official reply of RSM Top-Audit to [Star Energy's] query addressed to Jean Stephens, Chief Executive Officer of RSM International" and was made "upon the request of Jean Stephens, Head of RSM International."

43.    As a result of RSM's disavowal of Volga-Neft, Star Energy sough a legitimate replacement auditor to conduct an audit of Volga-Neft. Star Energy hired UHY Advisors ("UHY") which began working at Volga-Neft in or around May 2007. UHY was actually present at Volga-Neft and commenced work on items such as inventory inspection. UHY ceased working on the Volga-Neft audit shortly after it started, however, because Volga-Neft could not provide the documents UHY requested. The unsatisfied requests sought basic items that would be expected of any company that had been audited. It became apparent that no observation of physical inventory had ever occurred in the past and that Star Energy may have been defrauded.

44.    Moreover, during the course of the attempt to re-audit Volga-Neft's financial statements following the RSM disavowal, it appeared that Volga-Neft's 2006 revenues were substantially lower than had previously be represented by the Salnikov Criminal Enterprise through the RSM Top Audit Certified Business Plan.

45.    SF Partnership's inability to obtain the necessary documentation from RSM Top-Audit prevented Star Energy from timely filing its Form 10-KSB.

46.    To relieve itself of the burden of filing consolidated audited financial statements that included Volga-Neft, Star Energy agreed to a rescission of the stock purchase agreement dated October 6, 2006.

### First Claim

(RICO- Violation of 18 U.S.C. § 1962(c), Against RSM Top-Audit,
Loss, Salnikov, Safarov, and John Does 1-5)

47.    Star Energy repeats and realleges each of the allegations contained on paragraphs 1 through 44, as if fully set forth herein.

48.    At all times relevant to this Complaint, the defendants RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 were "persons" within the meaning of 18 U.S.C. § 1961(3) since they were individuals capable of holding a legal or beneficial interest in property (the "RICO Persons"). The RICO Persons were associated-in-fact to form the Salnikov Criminal Enterprise within the meaning of 18 U.S.C. § 1961(4). Each RICO Person committed acts outside the State of New York which caused injury in the Southern District of the State of New York. The Salnikov Criminal Enterprise was based in Russia and engaged in foreign commerce in the furtherance of committing criminal acts for the purpose of obtaining capital from multiple publicly traded U.S. entities. Each of the RICO Persons defined above associated with and participated in the affairs of the Salnikov Criminal Enterprise through the activities described in the preceding paragraphs.

49.    As alleged in greater detail in the preceding paragraphs, each of the RICO Persons conducted, participated in and aided and abetted the Salnikov Criminal Enterprise's racketeering activities through multiple acts of wire fraud in violation of 19 U.S.C § 1343. In each instance of wire fraud, the RICO Persons transmitted or caused to be transmitted, by means of wire in interstate or foreign commerce, writings, signals or sounds comprising false statements for the purpose of executing a scheme to defraud Star Energy.

50.     As alleged in greater detail in the preceding paragraphs, the foregoing racketeering activities by the RICO Persons constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  For example, and without limiting the preceding allegations in this Complaint, the RICO Persons' pattern of racketeering activities include:

a.   The acts of wire fraud committed by the RICO Persons as alleged in the preceding paragraphs constituted multiple acts of racketeering activity within the past ten years.

b.   The Salnikov Criminal Enterprise was formed with the purpose of conducting racketeering activities and such activities comprise its ongoing business.  It engaged in similar racketeering activities with respect to other Russian companies seeking to obtain capital through publicly traded U.S. entities.  By way of example, the Salnikov Criminal Enterprise targeted a publicly traded U.S. company named Bio-Tracking Security Inc. ("Bio-Tracking").  RSM Top-Audit through Salnikov and Loss prepared business plans and/or financials for Nord Oil and North-West Oil Group which, upon information and belief, were relied upon by Bio-Tracking in acquiring the entities.  Bio-Tracking has made SEC filings that include financial statements for Nord Oil and North-West Oil Group which purport to have been audited by RSM Top-Audit.  Upon information and belief, RSM Top-Audit now disavows having prepared these purportedly audited financial statements, but neither RSM Top-Audit nor RSM International have informed Bio-Tracking or reported the disavowel to the SEC.

c.   The Salnikov Criminal Enterprise engaged in similar racketeering activities utilizing other Russian companies, including Zabaikalgeoprom, Trans-Oil Limited Liability Company, Univer Company and Nessa AD.

d.   The very nature of these acts of racketeering imply a threat of continued criminal activity.  The RICO Persons regularly engaged in preparing so-called business plans and

17

creating fraudulent financial statements for Russian natural resource companies to lure

U.S. publicly traded entities to invest in these Russian oil companies.

51.    In summary, the RICO Persons conducted and participated in the Salnikov

Criminal Enterprise's ongoing business through a pattern of racketeering activity, in violation

of 18 U.S.C. § 1962(c).

52.    As alleged in greater detail in the preceding paragraphs, Star Energy was

directly injured in its business and property by reason of the violation of 18 U.S.C. § 1962 set

forth above, and therefore, is entitled to damages pursuant to 18 U.S.C. § 1964 (c) in an

amount to be determined, but that exceeds $ 2 million, trebled, plus interest and attorneys'

fees.

## Second Claim

(RICO Conspiracy- Violation of 18 U.S.C. § 1962(d), Against RSM Top-Audit,
Loss, Salnikov, Safarov, and John Does 1-5)

53.    Star Energy repeats and realleges each of the allegations contained in

paragraphs 1 through 50 as if fully set forth herein.

54.    At all times relevant to this Complaint, the RICO Persons were "persons"

within the meaning of 18 U.S.C. § 1961(3).

55.    As alleged in greater detail in the preceding paragraphs, the RICO Persons

intended to, and agreed to, conspire with each other and with others, known and unknown, to

violate 18 U.S.C. § 1962 (c), all in violation of 18 U.S.C. § 1962 (d).

56.    The RICO Persons intended to, agreed to, conspired to further, and did in fact

further, the criminal conduct of the Salnikov Criminal Enterprise's ongoing affairs through a

pattern of racketeering activity.

57.    As alleged in greater detail in the preceding paragraphs, Star Energy was

directly injured in its business and property by reason of the violations of 18 U.S.C. § 1962 set

forth above, and therefore, is entitled to damages pursuant to 18 U.S.C. § 1964 (c) in an amount to be determined, but that exceeds $ 2 million in compensatory damages, trebled, plus interest and attorneys' fees.

### Third Claim

(Common Law Fraud Against RSM Top-Audit,
Loss, Salnikov, Safarov, and John Does 1-5 )

58.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 55 as if fully set forth herein.

59.    At all times relevant to this Complaint each of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 made an omission, misrepresentation, or false statement of material fact to Star Energy with respect to Volga-Neft's financial statements and business plan and RSM Top-Audit's preparation of Volga-Neft's audited financial statements. Each one of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 made statements with knowledge of their falsity and with the intent to defraud Star Energy.

60.    Star Energy reasonably relied upon the omissions and misrepresentations when it agreed to acquire Volga-Neft, when it filed its amended Form 8-K on or about December 8, 2006, and when it sought to rely on the RSM Top-Audit Report of Volga-Neft in connection with the filing of a Form 10-KSB with the Securities & Exchange Commission.

61.    Star Energy was damaged due to its reliance upon the omissions and misrepresentations made by RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5, in an amount to be determined, but that exceeds $2 million in compensatory damages, plus interest and costs.

## Fourth Claim

(Respondent Superior Against RSM TOP-AUDIT)

62. Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

63. Salnikov's and Loss's actions in creating a business plan for Volga-Neft to position it for acquisition by a U.S. public entity, targeting and soliciting Star Energy to acquire Volga-Neft was within the scope of their employment with RSM Top-Audit.

64. Salnikov's representations to Star Energy that RSM Top-Audit was capable of conducting a GAAP compliant audit of Volga-Neft, and that RSM Top-Audit was in fact conducting a GAAP compliant audit of Volga-Neft was within the scope of his employment with RSM Top-Audit.

65. Salnikov and Loss were acting within the scope of their employment in that the preparation of business plans, financial statements, and audits are the type of services RSM Top-Audit purports to perform on a regular basis and it actively markets and sells such services to clients.

66. It was reasonably foreseeable that Salnikov and Loss would participate in the fraudulent scheme under the apparent authority of RSM Top-Audit as described in the preceding paragraphs.

67. RSM-Top Audit, through the use of due diligence, knew or should have known of the conduct of Salnikov and Loss.

68. As a direct result thereof, Star Energy is damaged in the amount to be determined, but that exceeds $2 million in compensatory damages, plus interest and costs.

## Fifth Claim

### (Respondeat Superior- RSM International)

69.     Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

70.     RSM Top-Audit purports to be a member firm and agent of RSM International. It also purports to be a member firm in good standing with RSM International.  According to RSM Top-Audit, "RSM is one of the few international organizations with a common worldwide manual of auditing.  The RSM International manual of auditing is maintained by joint technical teams in the USA, UK and France.  RSM Transnational Assurance Services Executive Committee manages the quality control process between RSM member-firms. As a consequence RSM International audits are undertaken to common international standards and comply with the International Standards on Auditing."

71.     RSM International purports that it requires member firms to meet high quality standards in order to use the "RSM" brand and purports that member firm compliance is monitored.  Specifically, RSM International states that "RSM is committed to meeting international standards as well as playing an active role within the wider auditing profession. This is primarily done through a global audit committee that is responsible for setting the policies and procedures that all our member firms need to implement and for monitoring the quality of the firms through an ongoing program of inspections."

72.     RSM Top-Audit purports to be authorized to audit public companies listed on the NYSE and that its signature on an auditor's report is recognized by the U.S. Securities and Exchange Commission.

73.     RSM International exerts sufficient control over RSM Top Audit to create a principal-agent relationship.  RSM International permits RSM Top-Audit to use the "RSM"

name as a member firm and allows it to perform audits and other services utilizing its reputation. RSM International purports to control the standards by which RSM Top-Audit performs these services.

74.    RSM Top-Audit has actual authority to perform audits and other services as an "RSM" firm because it is a member firm approved by RSM International.

75.    RSM Top-Audit was acting within the scope of its agency relationship with RSM International when it prepared the business plan, financial statements, and audits. Such services are the type RSM International member firms purport to perform on a regular basis and which it actively markets and sells to clients.

76.    It was reasonably foreseeable that RSM Top-Audit, Salnikov and Loss would participate in the fraudulent scheme under the actual authority of RSM International as described in the preceding paragraphs.

77.    RSM International, through the use of due diligence, knew or should have known of the conduct of RSM Top-Audit, Salnikov and Loss.

78.    As the principal, RSM International is responsible for the fraudulent acts of its agents RSM Top-Audit and its employees Salnikov and Loss.

79.    As a direct result thereof, Star Energy was damaged in an amount to be determined, but which exceeds $2 million in compensatory damages, plus interest and costs.

### Sixth Claim

(Aiding and Abetting Common Law Fraud-
RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 )

80.    Star Energy repeats and realleges each of the allegations contained in paragraphs 1 through 77 as if fully set forth herein.

81.    Star Energy was defrauded by each of RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5 with respect to the business plan, financials and the preparation of Volga-Neft's audited financial statements.

82.    Each of RSM-Top Audit, Loss, Salnikov, Safarov, and John Does 1-5 had actual knowledge of the fraud committed on Star Energy.

83.    RSM-Top Audit, Loss, Salnikov, Safarov, and John Does 1-5 provided substantial assistance to each other in carrying out the fraudulent acts.

84.    Star Energy was damaged due to the aiding and abetting of the fraud by RSM Top-Audit, Loss, Salnikov, Safarov, and John Does 1-5, in an amount to be determined, but hat exceeds $2 million in compensatory damages, plus interest and costs.

W H E R E F O R E, Plaintiff Star Energy Corporation demands judgment as follows:

a)    On the first claim for relief, two million dollars ($2,000.000) in compensatory damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

b)    On the first claim for relief, treble damages for a total compensatory amount of six million dollars ($6,000,000) plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

c)    On the first claim for relief, attorneys fees in an amount to be determined against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

d)    On the second claim for relief, two million dollars ($2,000.000) in compensatory, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

e)    On the second claim for relief, treble damages for a total compensatory amount of six million dollars ($6,000,000) plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

f)   On the second claim for relief, attorneys fees in an amount to be determined against

RSM Top-Audit, Salnikov, Safarov, Loss, and John Does 1-5;

g)   On the third claim for relief, two million dollars ($2,000,000) in compensatory

damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and

John Does 1-5;

h)   On the fourth claim for relief, two million dollars ($2,000,000) in compensatory

damages, plus interest and costs against RSM Top-Audit.

i)   On the fifth claim for relief, two million dollars ($2,000,000) in compensatory

damages, plus interest and costs against RSM International.

j)   On the sixth claim for relief, two million dollars ($2,000,000) in compensatory

damages, plus interest and costs against RSM Top-Audit, Salnikov, Safarov, Loss, and

John Does 1-5.


Dated:  New York, New York
        April 16, 2008

                                        NIXON PEABODY LLP

                            By:         _____
                                        Martin P. Russo (MR 4134)
                                        Alison B. Cohen (AC 7702)
                                        437 Madison Avenue
                                        New York, New York 10022
                                        (212) 940-3000
                                        (212) 940-3111 (fax)

                                        *Attorneys for Plaintiff Star Energy
                                        Corporation*

# EXHIBIT B



**RSM** International

HOME | WHY WORK WITH US | SERVICES | INDUSTRIES

Contacts | Become a member | Press | Publications | Member Login

You are here: Home - Why work with us - Fast Facts

Search the site | Go

## WHY WORK WITH US

**Worldwide offices**

Choose a country

| London | 15:34 | New York | 10:34 |
| Hong Kong | 22:34 | Tokyo | 23:34 |
| Worldwide time zones | | | |

**Did you know?**
There are more than 2,700 languages spoken in the world. In Indonesia alone, 365 different languages are spoken

Contact Us
Fast Facts
Organisational Structure
Publications

**Fast Facts**

Number of Offices - 662

**Staff:**

- Partners - 2,411
- Professional Staff - 17,013
- Administrative Staff - 5,469
- Total Staff - 24,893

**Fee Income:**

- Americas - US$2,405.4 million
- Europe - US$455.3 million
- Asia Pacific - US$171 million
- Africa and Middle East - $31.3 million
- Worldwide - US$3.06 billion

Sitemap | Privacy | Terms & conditions | Careers | Print this page | Email this page

Site by [illegible]



## RSM International

HOME    WHY WORK WITH US    SERVICES    INDUSTRIES

Contacts    Become a member    Press    Publications    Member Login

You are here: Home > Why work with us

Search the site

# WHY WORK WITH US

**Worldwide offices**

Choose a country

Contact Us

Fast Facts

Organisational Structure

Publications

### Why Work With Us

RSM International is a worldwide network of independent professional services firms, providing tax, accounting, consulting, and specialist advisory services to ambitious growing organisations around the globe. RSM International is represented by affiliate independent members in 64 countries. The combined organisation has almost 25,000 professionals in more than 660 offices and generates total fee income exceeding US $3.06 billion, placing it amongst the Top Seven international accounting organisations world-wide.

London        15:36    New York    10:36
Hong Kong    22:36    Tokyo        23:36
Worldwide time zones

**Did you know?**
The Eiffel Tower has over 2.5 million rivets, 15,000 iron pieces, over 40 tonnes of paint and has 1792 steps to the top.

Member firms of RSM International are driven by a common vision of providing high quality professional services, both in their domestic markets and in serving the international professional service needs of their client base. Member firms are recruited based on their commitment to apply high skills and world-class standards and to share a common work ethic of innovative thinking to develop and deliver high quality and timely results for their clients. Member firms must meet a number of membership requirements before being permitted to adopt the 'RSM' prefix as part of their firm-name and this is a key differentiator for RSM International.

RSM International member firms have extensive experience with all sizes of clients and types of assignments, ranging from large publicly listed and public sector clients through to owner-managed, director controlled businesses. They are well-established practices of high local standing, often ranking within the Top Ten in their own locality. In addition to the traditional service lines of audit & assurance, accounting and tax, RSM International member firms also provide a diverse range of business solutions and consulting services, including corporate finance and transaction support, cross-border tax and expatriate services, corporate governance and risk assurance services and business restructuring, outsourcing and general management consultancy.

Site map    Privacy    Terms & conditions    Careers    Print this page    Email this page



**SERVICES**

**Worldwide offices**

Choose a country

Accounting & Corporate Secretarial
Services

**Audit**

Consultancy

Corporate Advisory Services

IFRS

Other Attestation Engagements

Risk Assurance Services

Tax

**Audit**

Our member firm's approach to audit requires
the rigorous standards of professional
competence, independence and objectivity
that clients rightly demand, yet still recognises
that the auditor is uniquely placed to make a
constructive contribution to the client's
business.

**Our approach**

The RSM Audit Methodology blends technical competencies with a detailed knowledge of the
client, its markets and the industry sector. Using this methodology our members offer a tailored
audit approach with a strong emphasis on early planning and how your business functions. This
enables them to identify key audit components and tailor their procedures to the unique aspects,
size and nature of your business.

The RSM audit approach, which complies with international auditing standards, involves:

- Obtaining an understanding of the client's business from both an accounting and business
  perspective
- Assessing the risk of material misstatements and the controls in place to prevent these
  risks
- Selecting appropriate analytical and substantive audit procedures to obtain evidence
- Conducting formalised review procedures to ensure that the chosen procedures are carried
  out and that the correct conclusions are drawn
- Forming an opinion and reporting under the applicable laws and standards
- Communicating with management on an ongoing basis throughout the audit.

The benefit to you as the client is an effective, cost efficient, independent audit, performed in a
timely manner by experienced professionals.

When the audit report is delivered, the client and its shareholders can be confident that the report
objectively and independently comments on the financial records and information systems
employed. Wherever appropriate, our members will also provide management with imaginative
and pragmatic advice that adds value to the business assurance requirement.

**Quality**

The RSM Audit Methodology is in compliance with International Standards on Auditing (ISA'S)
and is regularly updated for new technical pronouncements and efficiency changes in best
practices. This methodology is supported by other global policies relating to:

- Ethics and Independence
- Quality Assurance and risk containment
- Training and Continuing Professional Education (CPE).

Training is seen as critical across the network to ensure consistency, objectivity and the highest
levels of client service. All our member's conduct significant levels of training locally, in addition to
which RSM International also provides training on the audit manual and other related policies
through training courses run on-site, written training materials issued to firms and by global web-
conferencing.

RSM is committed to meeting international standards as well as playing an active role within the
wider auditing profession. This is primarily done through a global audit committee that is
responsible for setting the policies and procedures that all our member firms need to implement
and for monitoring the quality of the firms through an ongoing program of inspections.

London          16:50     New York     11:50
Hong Kong     23:50     Tokyo          00:50
Worldwide time zones
**Did you know?**
The yo-yo originated in the Philippines, where
it was used as a weapon in hunting

**Who should you contact?**

If you require audit services or want to discuss options with a partner in one of our member firms, then please contact the International Contact Partner in that country by using our on-line directory using the drop down box at the top of this page. Alternatively, you can contact the RSM Executive Office in London at RSM Communications

# EXHIBIT C

## Audit

RSM Top-Audit has extensive auditing experience with various industries including comprehensive audit of major companies with a large number of subsidiaries.



Proficiency

*Eugene Shokhor, Deputy General Director for Audit, RSM Top-Audit*

and in-depth knowledge of the client's industry problems effectively enable us to reduce labor input in the course of audits as compared to the other auditing firms who are not so well familiar with the industry specifics.

An important quality mark of audits conducted by RSM Top-Audit is a practically total absence of claims against the Group's clients on the part of tax and regulatory authorities. In case of disagreements with the rulings of tax authorities we succeeded in defending the clients' interests in the arbitration courts.

For audits we generally set up multidisciplinary task forces consisting of auditors, financial and business analysts, tax lawyers and lawyers specializing in civil, privatization, currency, corporate and labor laws.

This enables us to provide legal support and analysis of corporate finance as part of the audit work thereby substantially improving the auditing quality.

RSM Top-Audit standards provide not only for reportable accounting system conditions but also for the specific practical recommendations aimed at the optimization of tax accounting and financial accounting.

### Scope of services

**Audit and other assurance engagements** (including statutory audit, non-statutory audit, audit under international standards, special audit, i.e. comprehensive review of specific aspects of financial and business operations of the enterprise, tax audit);
**Restatement of Russian financial statements in accordance with the International Financial Reporting Standards (IFRS);**
**Methodology of consolidating the group's accounts under the Russian and international standards;**
**Development of requirements and design of internal control systems, including organization and control for stock count;**
**Comprehensive subscription client services in respect of financial accounting and**

reporting, tax accounting and accounting consultancy;
Setup of financial and tax accounting, maintenance of accounts and reconstruction of accounts;
Creation of accounting policies for the purpose of financial and tax accounting;
Consulting projects for the development of accounting policies for the purpose of financial and tax accounting, documentation flow and internal standards of financial and tax accounting;
Comprehensive analysis of accounting and integration of financial and management accounting;
Advice and development of the technical assignment as part of computerization of financial and tax accounting.

---

## Advantages for the Clients

Highly skilled professionals, broad industry experience, application of internal standards developed on the basis of the Russian and international audit standards.

Possibility to engage for audits the professionals from all the locations of RSM Top-Audit in over 20 major cities of Russia, including Nizhniy Novgorod, Tyumen, Izhevsk, Voronezh, Novosibirsk, Ufa and others.

RSM Top-Audit Firm has not suffered any court-imposed penalties arising from the claims against unskilled audit work.

Agreements for audit and consultancy services that RSM Top-Audit enters into provide for financial liabilities for the quality of work performed.

RSM Top-Audit enjoys the sign-off right of the international organization RSM International, whose auditor's reports are recognized by all international financial institutions.

RSM Top-Audit Auditing and Consulting Group is authorized to audit public companies listed on the NYSE. RSM Top-Audit's signature on the auditor's report will be recognized by the US Securities and Exchange Commission (SEC).

RSM Top-Audit Auditing and Consulting Group has a generally acknowledged Russian quality mark and is in the top 6 Russian firms which have been pre-qualified by the World Bank to audit non-revenue earning projects financed by the World Bank in the Russian Federation.

---

© 2005 **RSM Top Audit**
119017 Moscow, B.Ordinka street, 54 build. 2
E - mail@top-audit.ru
Tel./Fax: +7 (495) 363-2848, +7 (495) 981-4121

# I F R S

**Audit under international auditing standards**

**Restatement of the financial statements prepared under the Russian standards and their presentation under the international standards**

**Presentation of accounts prepared under the Russian standards in accordance with the local statutory requirements**

Audit under the international standards is performed in accordance with the uniform standards of RSM International accounting and consulting organization which is the 6th largest organization in the world for the fee income of its full member-firms.



*Nina Dantser, Head of Audit Department, RSM Top-Audit, ACCA*

RSM is one of the few international organizations with a common worldwide manual of auditing developed in full accord with the international auditing standards.

The RSM International manual of auditing is maintained by joint technical teams in the USA, UK and France. RSM Transnational Assurance Services Executive Committee (TASEC) manages the quality control process between RSM member-firms.

The headquarters of RSM International are located in London. RSM is represented in over 80 countries by over 90 member firms.

RSM audits over 500 companies listed on the international Stock Exchanges.

RSM International enjoys impeccable reputation in the business community. All international financial institutions recognize the audits and expert opinions produced by the organization.

## ALL OF OUR SERVICES ARE FOCUSED ON YOUR SUCCESS

© 2005 **RSM Top Audit**
119017 Moscow, B.Ordinka street, 54 build. 2

E - **mail@top-audit.ru**
Tel./Fax: +7 (495) 363-2848, +7 (495) 981-4121

# EXHIBIT D
**[To be filed manually]**

# EXHIBIT E
## [To be filed manually]

# EXHIBIT F

## Colon, Debra

| | |
|---|---|
| **From:** | SSalnikov@top-audit.ru |
| **Sent:** | Monday, August 28, 2006 9:41 AM |
| **To:** | Margulis, Howard L. |
| **Cc:** | myron@bluewater.ky |
| **Attachments:** | VolgaOil.pdf |

# RSM Top-Audit

АКГ «РСМ Топ - Аудит» 119017, г. Москва, ул. Б. Ордынка, д. 54 стр. 2 Тел / Факс: 7 (495)  363 2848 / 981 4121 www.top-audit.ru
Email: mail@top-audit.ru

August, 22, 2006
№ ЕП-1795

Star Energy Corporation
245 Park Avenue, 39th Floor
New York, NY 10167

Ladies and Gentlemen:

RSM Top-Audit, a member firm of the RSM International audit organization, is the independent auditor in the Russian Federation duly appointed by "Volga-Oil", a society with limited liability created according to the Civil Code of the Russian Federation and the Federal Law of the Russian Federation No. 14-ФЗ dated February 8, 1998, "About Societies with Limited Liability" (the "Society").

This certification is being provided to you at the request of the Society as a closing document in connection with the acquisition of shares in the Society by Star Energy Corporation ("Star") pursuant to the terms of the Stock Purchase Agreement dated as of the date hereof between Star, the Society and the individuals listed on Exhibit A thereto (the "SPA").

We have made such factual, accounting and legal investigations as we have deemed necessary to enable us to issue this certification, which investigations have in all cases been carried out in accordance with the worldwide audit methodologies and professional standards applied by RSM International in the United Kingdom, the Russian Federation, and all other jurisdictions in which RSM International does business. In conducting our examination, we have assumed the genuineness of all signatures, the accuracy of all documents submitted to us as originals, and the conformity to originals of all documents submitted to us as certified or reproduced copies.

Based upon and subject to the foregoing, we hereby certify that:

Член RSM International
международной аудиторской
и консалтинговой ассоциации

Член Института
Профессиональных Аудиторов (ИПАР).

# RSM Top-Audit

1.    The Society is a society with limited liability duly established and validly existing in accordance with the Civil Code of the Russian Federation and the Federal law of the Russian Federation No. 14 - ФЗ dated Febrary 8, 1998, "About Societies with Limited Liability."

2.    In order to transfer the shares of the Society in accordance with the terms of the SPA, notice must be given to the Antimonopoly Committee of the Russian Federation (as required by item 5, Article 18 of the Federal Law of the Russian Federation, "About Competition and the Restriction of Monopolistic Activity in the Commodity Markets" dated March 22,1991, No. 948-1), provided, however, that the consent of the Antimonopoly Committee will not be required for such share transfer to be legally binding and effective.

3.    No permits or licenses issued by State agencies of the Russian Federation are required for the share transfer described in the SPA to be legally binding and effective.

4.    As at the date hereof, legal ownership of all shares in the Society is vested in two participants, each of whom is an individual and a citizen of the Russian Federation (each, a "Participant", together the "Participants"). In order for the share transfer described in the SPA to be legally binding and effective: (a) each Participant must waive his or her right of first refusal to acquire the shares of the other Participant and the Society must also waive its right to acquire such shares from each Participant; and (b) each Participant must acknowledge the absence of any encumbrance on his or her shares, including but not limited to, any mortgage, share arrest, absence of judicial disputes or any other third party claims with respect to the shares. As at the date hereof, there are no encumbrances on the shares, including but not limited to, any mortgage, share arrest, judicial disputes or any other third party claims with respect to the shares.

5.    The Society has been duly registered with all relevant state agencies of the Russian Federation, including but not limited to, the Russian tax authorities, there are no proposed or pending investigations by such agencies, and the Society is in good standing with all such agencies.

# RSM Top-Audit

6.    The share transfer described in the SPA will have no effect upon the Society's status, as described in paragraph 5 above. Following the closing of the transaction described in the SPA, the Society's constituent documents should be amended to reflect the change in share ownership.

7.    The SPA will be legally binding upon each Participant if executed on behalf of each such Participant by Armenak Artemiovich Safakov, the holder of a power of attorney bearing identification number 63 AH 582319 issued by one Participant and a power of attorney bearing identification number 63 AБ 582319 issued by the other Participant, each of which is dated July 31, 2006. Each such power of attorney has been duly notarized and otherwise complies with all requirements applicable to the due and valid issuance of a power of attorney under the laws of the Russian Federation. There are no restrictions under the laws of the Russian Federation on the transfer of shares on behalf of a Participant by the holder of a validly issued power of attorney when such power of attorney authorizes the holder to effect such transfer.

8.    The SPA will be legally binding upon the Society if executed on behalf of the Society by Armenak Artemiovich Safakov, the holder of a power of attorney bearing identification number 63 AБ 582086 issued by the Society, which power of attorney is dated July 13, 2006. Such power of attorney has been duly notarized and otherwise complies with all requirements applicable to the due and valid issuance of a power of attorney under the laws of the Russian Federation. Such power of attorney also constitutes a valid waiver by the Society of its right of first refusal to acquire each Participant's shares.

Very truly yours,

RSM International

By:    RSM Top-Audit
A Member of the Firm

By: _____
Sergey Salnikov
Head of Investment Audit Unit
Head of the Investment Project "Volga-Oil"
Authorized Signatory

# EXHIBIT G

8-K 1 v054333_8k.htm

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): September 29, 2006

# STAR ENERGY CORPORATION

(Exact name of Registrant as specified in its charter)

| Nevada | 000-29323 | 87-0643634 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

245 Park Avenue, 24th and 39th Floors
New York, New York 10167
(Address of principal executive offices)

212-792-4334
(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

|_| Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

|_| Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

|_| Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

|_| Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Section 1 - Registrant's Business and Operations**

**Item 1.01 Entry into a Material Definitive Agreement.**

<u>Stock Purchase Agreement relating to Volga-Neft Limited Company</u>

On October 6, 2006, Star Energy Corporation ("Star") entered into a Stock Purchase Agreement (the "Stock Purchase Agreement") with Volga-Neft Limited Company, a corporation formed under the laws of the Russian Federation, Samara Region, Privolzhsky ("Volga"), and the two shareholders of Volga, who were Dzhalovyan Artiir Andreasovich and Dubrovskaya Olga AmUofyevna. Pursuant to the Stock Purchase Agreement, Star acquired Volga at a closing held on the same date by purchasing from Volga's shareholders all of their respective shares of Volga's common stock, which represented 100% of the issued and share capital of Volga. In consideration therefor, Star will deliver to Volga's shareholders an aggregate of 10,000,000 shares of Star's common stock. Such issuance represents 26.1% of the issued and outstanding shares of Star. As a result of the closing, Volga has become a wholly owned subsidiary of Star.

Pursuant to the Stock Purchase Agreement, Star further agreed to commence, as soon as practicable, a private placement of units, each unit consisting of one share of common stock and one warrant entitling the holder thereof to purchase one share of common stock for $2.00, expiring three years after the date thereof. The minimum number of units offered for sale shall be 1,000,000 units, and the maximum number of units offered for sale shall be 5,000,000 units. The purchase price of each unit shall be $1.00. The offer and sale of such units shall be made to accredited investors pursuant to a private placement in accordance with Rule 506 promulgated under the Securities Act. The private placement of the units shall be completed no later than 90 days after the date of the closing of the Stock Purchase Agreement.

<u>Agreement with IAB Island Ventures SA</u>

On October 6, 2006, Star and Volga entered into a separate agreement with IAB Island Ventures SA ("IAB"), pursuant to which IAB agreed to introduce Star and Volga to certain contacts for the purpose of financing either Star or Volga (the "IAB Agreement"). In consideration for IAB's services, Star and Volga shall pay IAB 10% percent of the aggregate value of the transaction consummated with such a contact. The IAB Agreement will become effective only if and when the closing of the Stock Purchase Agreement is consummated.

Pursuant to the IAB Agreement, both Star and Volga further agreed that for 12 months after the closing of the Stock Purchase Agreement, neither company shall have more than 5 individuals on the Board of Directors of each respective company. For 12 months after the closing of the Stock Purchase Agreement, IAB shall have the right to appoint 2 nominees to the Board of Directors of each of Star and Volga. Neither Star nor Volga shall, without the prior written consent of IAB (which consent shall not be unreasonably withheld) declare or pay out any dividend, make any distribution, or redeem any equity securities, or issue any equity securities or other securities of either company.

2

Assignment between Star and Ruairidh Campbell

On October 6, 2006, an Assignment and Bill of Sale was entered into between Star and Ruairidh Campbell, a former officer and director of Star. Pursuant to such assignment, Mr. Campbell agreed to transfer to Star his 3,250,000 shares of Star's common stock held by him for cancellation and return to Star's authorized but unissued common shares. In consideration therefor, Star agreed to assign to him all of Star's interests in a 15% working interest (12% net revenue interest) in and to certain oil and gas wells known as the Galvan Ranch Gas Wells, which are located in Webb County, Texas.

For all the terms of the Stock Purchase Agreement, the IAB Agreement, and the Assignment and Bill of Sale, reference is hereby made to such agreements annexed hereto respectively as Exhibits 10.1, 10.2, and 10.3. All statements made herein concerning such agreement are qualified by references to said exhibits.

**Section 2. Financial Information**

**Item 2.01 Completion of Acquisition or Disposition of Assets**

The disclosure set forth above under Item 1.01 (Entry into Material Agreement) is hereby incorporated by reference into this Item 2.01.

Pursuant to the Stock Purchase Agreement discussed above in Item 1.01, on October 6, 2006, Star acquired all of the issued and outstanding shares of Volga by purchasing such shares from Volga's two shareholders, Dzhalovyan Artiir Andreasovich and Dubrovskaya Olga AmUofyevna. In consideration therefor, Star delivered to Dzhalovyan Artiir Andreasovich and Dubrovskaya Olga AmUofyevna an aggregate of 10,000,000 shares of Star's common stock. Such issuance represents 26.1% of the issued and outstanding shares of Star. As a result of the closing, Volga has become a wholly owned subsidiary of Star.

Volga was incorporated under the laws of the Russian Federation, Samara Region, Privolzhsky. Volga is engaged in the exploration, development and production of oil and gas resources in the Russian Federation. Volga owns a parcel of land in Chapaevsk, Russia, measuring approximately 30 000 square meters, on which Volga intends to build an oil refinery. In addition, Volga owns sixty nine vehicles used for the transportation of oil and inflammable loads. Volga currently employs approximately 185 persons.

3

**Section 3 – Securities and Trading Markets**

**Item 3.02 Unregistered Sales of Equity Securities**

The disclosures set forth above under Item 1.01 (Entry into a Material Agreement) and Item 2.01 (Completion of Acquisition or Disposition of Assets) are hereby incorporated by reference into this Item 3.02.

On October 6, 2006, Star issued an aggregate of 10,000,000 shares of common stock to the two stockholders of Volga: Dzhalovyan Artiir Andreasovich and Dubrovskaya Olga AmUofyevna. The foregoing shares were issued pursuant to the Stock Purchase Agreement discussed above under Item 1.01. In consideration for such shares, the stockholders of Volga conveyed to Star all of their shares of the common stock of Volga. Such shares were issued under Section 4(2) of the Securities Act of 1933, as amended.

**Section 5 – Corporate Governance and Management**

**Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

The disclosures set forth above under Item 1.01 (Entry into a Material Agreement) and Item 2.01 (Completion of Acquisition or Disposition of Assets) are hereby incorporated by reference into this Item 5.02.

On October 5, 2006, Ruairidh Campbell resigned from his positions as director and as Chief Financial Officer and Principal Accounting Officer of Star, effective as of such date.

On September 29, 2006, Pierre Besuchet resigned from his position as director of Star, effective as of such date.

4

**Section 9-Financial Statements and Exhibits**

**Item 9.01 Financial Statements and Exhibits.**

(a) Financial Statements of business acquired. The financial information required hereunder will be submitted by an amendment to this Current Report on Form 8-K within 71 calendar days from the date of this Report.

(b) Pro forma financial information. The financial information required hereunder will be submitted by an amendment to this Current Report on Form 8-K within 71 calendar days from the date of this Report.

(c) Exhibits. The following exhibits are included with this report:

| | |
|---|---|
| Exhibit 10.1 | Stock Purchase Agreement, dated October 6, 2006, among Star Energy Corporation, Volga-Neft Limited Company, and the shareholders of Volga-Neft Limited Company. |
| Exhibit 10.2 | Agreement, dated October 6, 2006, among Star Energy Corporation, Volga-Neft Limited Company, and IAB Island Ventures SA |
| Exhibit 10.3 | Assignment and Bill of Sale, dated October 6, 2006, between Star Energy Corporation and Ruairidh Campbell |

5

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, Star Energy Corporation has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STAR ENERGY CORPORATION
(Registrant)

By: /s/ Marcus Segal

Name: Marcus Segal
Title: Chief Executive Officer and President

Date: October 6, 2006

6

# EXHIBIT H

**Feldman, David**

| | |
|---|---|
| **From:** | Myron L Gushlak [myron@bluewater.ky] |
| **Sent:** | Wednesday, November 15, 2006 1:00 PM |
| **To:** | Saul Muskat; david@dlubinassociates.com |
| **Cc:** | Elena Furman; pkealy@starvolga.com |
| **Subject:** | FW: |
| **Attachments:** | ????VolgaOct2006-06.doc; Volga-NeftJune2006??.doc; RSM22.pdf; ??????.doc |

These are the final Volga numbers from RSM.

Let's keep our eye on the ball people as Dec 11th is around the corner

Thank you

Myron.


-----Original Message-----
From: Сергей Сальников [mailto:saln-sergey@mail.ru]
Sent: Wednesday, November 15, 2006 7:08 AM
To: ilipovetsky@optonline.net
Subject:

**Volga- Oil Company**
**U.S.GAAP Financial Statement**
**October 06, 2006**

**LIMITED LIABILITY COMPANY**
**"VOLGA- OIL"**
**BALANCE SHEET**
( EXPRESSED IN U.S. DOLLARS)

| | FOR THE PERIOD JANUARY 01, 2006 OCTOBER, 06, 2006 | FOR THE PERIOD JANUARY 01, 2005 OCTOBER, 06, 2005 | NOTES |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS** | | | |
| Cash and Cash Equivalents | 15 683 | 5 941 | 4 |
| Accounts and notes receivables | 2 965 952 | 2 500 725 | 5 |
| Inventories | 3 432 764 | 7 167 394 | 6 |
| Current deferred income tax assets | 378 849 | 616 052 | 10 |
| Other | 636 366 | 496 390 | |
| **Total Current Assets** | **7 429 614** | **10 786 502** | |
| Property, plant and equipment | 27 350 725 | 2 612 657 | 7 |
| Deferred income tax assets | 232 240 | 295 136 | 10 |
| **Total Assets** | **35 012 579** | **13 694 295** | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| **CURRENT LIABILITIES** | | | |
| Short – term debt and current portion of long - term debt | 1 365 556 | 2 231 293 | 8 |
| Trade accounts and notes payable | 24 976 460 | 8 389 800 | |
| Other accounts payable and accrued liabilities | 2 050 784 | - | 9 |
| Taxes Payable | 161 313 | 78 279 | 10 |
| Current deferred income tax liabilities | 9 437 | 4 955 | 10 |
| **Total Current Liabilities** | **23 001 824** | **10 704 327** | |
| Long Term Debt | 1 202 264 | 483 755 | |
| Deferred income tax liabilities | 369 410 | 611 100 | 10 |
| **Total Liabilities** | **30 135 224** | **11 799 182** | |
| **STOCKHOLDERS' EQUITY:** | | | |
| Paid-in capital and added capital | 4 698 630 | 1 880 544 | |
| Retained Earnings/Loss | 178 725 | 14 569 | |
| **Total Stockholders Equity** | **4 877 355** | **1 895 113** | |
| **Total Liabilities and Stockholders' Equity** | **35 012 579** | **13 694 295** | |

LIMITED LIABILITY COMPANY
"VOLGA- OIL"

STATEMENTS OF INCOME
( EXPRESSED IN U.S. DOLLARS)

| | FOR THE PERIOD JANUARY 01, 2006 OCTOBER 06, 2006 | FOR THE PERIOD JANUARY 01, 2005 OCTOBER 06, 2005 | NOTES |
|---|---|---|---|
| **Sales:** | | | |
| Income | 83 084 954 | 86 564 **369** | |
| | | | |
| Petroleum products purchased | (61 161 563) | (64 272 770) | |
| Operating Expenses | (20 387 188) | (21 424 257) | |
| Selling, general and administrative | (402 535) | (419 392) | |
| | | | |
| Amortization/Depreciation | (829 421) | (128 546) | |
| **Total operating cost** | **(82 780 706)** | **(86 244 963)** | |
| | | | |
| Other Income/Expenses Net | (38 835) | (214 218) | |
| **Income before income tax and minoritary interest** | **265 413** | **105 187** | |
| | | | |
| **Income Tax** | | | |
| Current income tax expense | (86 257) | (25 161) | 10 |
| Deferred income tax expense | (15 000) | (4 375) | 10 |
| **Total income tax expense** | **(101 257)** | **(29 536)** | |
| **Income before minority interest** | **164 156** | **75 651** | |
| **Minority interest** | - | - | |
| **Net Income/Loss** | **164 156** | **75 651** | |

LIMITED LIABILITY COMPANY
"VOLGA- OIL"

STATEMENTS OF CASH FLOWS
( expressed in U.S. Dollars)

| | FOR THE PERIOD JANUARY 01, 2006 OCTOBER 06, 2006 | FOR THE PERIOD JANUARY 01, 2005 OCTOBER 06, 2005 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net Profit /Loss | 164 156 | 75 651 |
| Deferred income tax expense | 15 000 | 4 375 |
| Depreciation and amortization | 829 421 | 128 546 |
| (Increase) decrease in: | | |
| Changes in Receivables | (825 324) | (2 500 725) |
| Changes in Liabilities | 9 484 469 | 10 704 327 |
| Changes in other Operating Activities | (74 662) | (7 779 071) |
| Amounts due officers and Employees | - | - |
| Loss on disposal of assets | - | - |
| **Net cash and cash equivalents provided by (USED IN) OPERATING ACTIVITIES** | 9 593 060 | 633 103 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of Goodwill | - | - |
| Purchase of Capital Assets | (10 949 122) | (2 629 271) |
| **NET CASH USED FOR INVESTING ACTIVITIES** | (10 949 122) | (2 629 271) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Write-off deficit to Paid-in-Capital | - | - |
| Write-off comprehensive income to Paid Capital | - | - |
| Write-off stock subscription receivable | - | - |
| Increase in capital stock | - | 175 079 |
| Long-term loan | 1 242 020 | 1 827 030 |
| **Net cash from Financing Activities** | 1 242 020 | 2 002 109 |
| Net (Decrease) Increase in Cash | (114 042) | 5 941 |
| Cash- Beginning of Period | 129 725 | - |
| Cash – End of Period | 15 683 | 5 941 |

**Limited Liability Company**
**"Volga- Oil"**
**NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006**
( EXPRESSED IN U.S. DOLLARS)

## Note 1: Organization

The limited liability company "Volga - Oil " (the Company) was incorporated on January 25, 2005 in accordance to the Federal Law № 14 – FL from February 08,1998 " About societies with limited liability " in Samara region, Privolzhsky district, v. Obsharovka.
The Company's main activity is the trading of oil products (oil and naphtha) of services in the oil products sector.
The Company has set up a representative office in city Samara.

## Note 2: Basis of Presentation

The financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

*Use of estimates.* The preparation of financial statements in conformity with U.S. GAAP requires estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and the disclosure of contingent assets and liabilities. Actual amounts may differ from such estimates.

*Reporting and functional currencies.* The Company's functional currency is the US dollar as management uses the US dollar to manage the Company's financial risks and exposures, and to measure its performance. The local currency of Company is the Russian Rouble , in which case transactions and balances have been remeasured into US dollars in accordance with the relevant provisions of Statement of Financial Accounting Standards No. 52, Foreign Currency Translation ("SFAS 52"). Consequently, monetary assets and liabilities are translated at closing exchange rates and non-monetary items are translated at historic exchange rates and adjusted for any impairment. The consolidated statements of income and cash flows have been translated at the average exchange rates for the period. Exchange differences resulting from the use of these exchange rates have been included in the determination of net income and are included in exchange gains/(losses) in the statements of income.

*Exchange restriction and controls.* Exchange restrictions and controls exist relating to converting Russian Roubles to other currencies. At present, the Russian Rouble is not a convertible currency outside the Russian Federation. Future movements in the exchange rates between the Russian Rouble and the US dollar will affect the carrying value of the Company's Russian Rouble denominated monetary assets and liabilities. Such movements may also affect the Group's ability to realise non-monetary assets represented in US dollars in these consolidated financial statements. At 06 October 2006 and 06 October 2005 exchange rates were 26.78 and 28.61 Russian Roubles to the US dollar, respectively. Any translation of Russian Rouble amounts to US dollars should not be construed as a representation that such Russian Rouble amounts have been, could be, or will in the future be converted into US dollars at the exchange rate shown or at any other exchange rate.

*Comparative amounts.* Prior period amounts have been reclassified to conform with current period presentation with no effect to shareholders' equity or net income.

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
**NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006**
( EXPRESSED IN U.S. DOLLARS)

## Note 3: Summary of Significant Accounting Policies

*Long – term investments.* Long-term investments in other companies are accounted for at cost and adjusted for estimated impairment.

*Cash equivalents.* Cash equivalents include all liquid securities with original maturities of three months or less when acquired.

*Accounts receivable.* Accounts receivable are presented at net realisable value and include value-added and excise taxes which are payable to tax authorities upon collection of such receivables.

*Inventories.* Crude oil and petroleum products inventories are valued at the lower of cost, using the first-in first-out method, or net realisable value. Costs include applicable purchase costs and operating expenses. Materials and supplies inventories are recorded at the lower of average cost or net realisable value.

*Property, plant and equipment.* Long-lived assets are assessed for possible impairment in accordance with Statement of Financial Accounting Standards No. 121, Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of ("SFAS 121"). SFAS 121 requires long-lived assets with recorded values that are not expected to be recovered through undiscounted future cash flows to be written down to current fair value.
Depreciation of assets not directly associated with production is calculated on a straight-line basis as follows:
- Buildings and constructions 5 - 33 years
- Machinery and equipment 5 - 15 years
- Computers and telecommunications equipment 2 - 5 years
Maintenance and repairs and minor renewals are expensed as incurred. Major renewals and improvements are capitalised.

*Environmental liabilities.* Liabilities for environmental remediation are recorded when it is probable that obligations have been incurred and the amounts can be reasonably estimated.

*Pension and post-employment benefits.* The Group's mandatory contributions to the governmental pension plan are expensed when incurred. Discretionary pensions and other post-employment benefits are not material.

*Revenue recognition.* Revenues from the production and sale of crude oil and petroleum products are recognised when deliveries to customers are made, title has transferred and collectibility is reasonably assured.

*Deferred income tax.* Deferred income tax assets and liabilities are recognised for future tax consequences attributable to differences between the financial statement carrying amounts of

existing assets and liabilities and their respective tax bases, in accordance with SFAS No. 109 Accounting for Income Taxes. Deferred income tax assets and liabilities are measured using enacted tax rates in the years in which these temporary differences are expected to reverse.

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
**NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006**
( EXPRESSED IN U.S. DOLLARS)

*Comprehensive income.* SFAS No. 130, Reporting Comprehensive Income, requires disclosure of all changes in equity during a period except those resulting from investments by and distributions to the Company's shareholders. There is no difference between the Company's net income and comprehensive income for all periods presented.

### Note 4: Cash and Cash Equivalents

Cash balances of 06 October 2006 and 2005 included accounts denominated in Russian Roubles of USD 15 683 and USD 5 941, respectively.

During the period 01 January – 06 October 2006 and 2005 payments for income tax totalled USD 170 685 and USD 75 496, respectively.

### Note 5 : Accounts and Notes Receivable, Net

|  | October 06, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Trade accounts and notes receivable | 1 172 018 | 1 150 334 |
| Recoverable value - added tax | 293 488 | 625 181 |
| Advances to suppliers | 517 395 | 250 073 |
| Other receivables | 983 051 | 475 138 |
| **Total accounts and notes receivable, net** | 2 965 952 | 2 500 725 |

Prepaid and recoverable value-added and other taxes includes value-added tax from purchases that will be recoverable only when the underlying accounts payable have been settled.

### Note 6: Inventories

|  | October 06, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Crude oil and petroleum products | 2 153 606 | 6 092 285 |
| Materials and supplies | 1 279 158 | 1 075 109 |
| **Total Inventories** | 3 432 764 | 7 167 394 |

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006
( EXPRESSED IN U.S. DOLLARS)

### Note 7: Property, Plant and Equipment

| | Cost Accumulated Net book value DD&A |
|---|---|
| Refining and related equipment | 4 002 005 |
| Tank truck | 7 760 455 |
| Real Estate | 7 885 169 |
| Other assets | 454 492 |
| Assets under construction | 7 248 604 |
| **Balance at 06 October 2006** | 27 350 725 |
| | |
| Refining and related equipment | 587 848 |
| Tank truck | 663 615 |
| Real Estate | 1 004 828 |
| Other assets | 95 101 |
| Assets under construction | 261 266 |
| **Balance at 06 October 2005** | 2 612 657 |

The Company obtains licenses from the governmental authorities for the right of realization of activity in the field of storage, processings and transportations of crude oil and petroleum products, on operation of explosive industrial objects, on operation of oil and gas extraction productions, on application of explosive materials of industrial purpose. These licenses expire between 2006 and 2009; however, they may be extended at the initiative of the Company provided it is in compliance with the license terms.

### Note 8 : Debt

Short-term debt is as follows:

| | October 06, 2006 | 2005 |
|---|---|---|
| Short-term debt | 1 190 765 | 1 945 687 |
| Current portion of long-term debt | 174 791 | 285 606 |
| **Total short-term debt and current portion of long-term debt** | **1 365 556** | **2 231 293** |

Included in short-term debt at December 06, 2006 and 2005, were Russian Ruble denominated amounts of RR 151 million (USD 5 million) and RR nil, respectively. The Company's significant outstanding short-term borrowing agreements bear interest at 7 percent.

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006
( EXPRESSED IN U.S. DOLLARS)

### Note 9 : Other Accounts Payable and Accrued Liabilities

|  | October 06, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Promissory notes payable | - | - |
| Advances from customers | 33 670 | - |
| Salaries payable | 7 973 | - |
| Other | 9 141 | - |
| **Total Other Accounts Payable and Accrued Liabilities** | **50 784** | |

### Note 10: Taxes

Income before income tax and minority interest is comprised of the following:

|  | October 06, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Russian Federation | 101 257 | 29 536 |
| International | - | - |
| **Income before income tax** | **101 257** | **29 536** |

Total income tax expense is comprised of the following:

|  | October 06, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Federal taxes | 19 906 | 7 889 |
| Regional taxes | 61 043 | 15 168 |
| Municipal tax | 5 308 | 2 104 |
| Total current income tax expense | 86 257 | 25 161 |
| Russian Federation | 15 000 | 4 375 |
| International | | |
| Total deferred income tax expense | 101 257 | 29 536 |

**Total deferred tax expense**

In August 2001, the tax code of the Russian Federation was amended. As a result, new statutory income tax rates were in place effective from January 1, 2002. The amended tax code reduces the income tax rate for income received from ordinary types of activities from 35 to 24 percent,

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
**NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006**
( EXPRESSED IN U.S. DOLLARS)

### Note 10: Taxes(Continued)

the income tax rate for dividends received from domestic companies from 15 to 6 percent, and the income tax rate for dividends received from foreign companies from 35 to 15 percent.

Deferred income tax balances were classified in the balance sheets as follows:

|  | October 06, 2006 | 2005 |
|---|---|---|
| Current deferred income tax asset and other current assets | 378 849 | 616 052 |
| Noncurrent deferred income tax asset | 232 240 | 295 136 |
| Current deferred income tax liability | (9 437) | (4 955) |
| Noncurrent deferred income tax liability | (369 410) | (611 100) |
| **Net deferred income tax liability** | **232 242** | **295 133** |

LIMITED LIABILITY COMPANY
"VOLGA- OIL"
NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006
( EXPRESSED IN U.S. DOLLARS)

## Note 10: Taxes(Continued)

*Taxes payable.* Taxes payable at October 06, 2006 and 2005 were as follows:

|  | October 06, | |
|  | 2006 | 2005 |
|---|---|---|
| Income tax | 80 135 | 23 115 |
| Pension fund and other social taxes | 47 895 | 32 547 |
| Property tax | 20 295 | 13 791 |
| Tax penalties and interest | 3 247 | 2 207 |
| Other | 9 741 | 6 620 |
| **Taxes payable** | **161 313** | **78 279** |

## Note 11: Shareholders' Equity

For October, 06th share capital of the company makes USD 187 079 (5 010 000 RR). Founders of the company are two physical persons - citizens of the Russian Federation:
- Artur Jalovian - the share 50%;
- Olga Dubrovskaya - the share 50%.

Reserves available for distribution to shareholders are based on the statutory accounting reports of Company, which are prepared in accordance with Regulations on Accounting and Reporting of the Russian Federation and which differ from U.S. GAAP.

AUDITORS' REPORT

ON THE FINANCIAL(ACCOUNTING) STATEMENTS TO THE " VOLGA-OIL", LIMITED LIABILITY
COMPANY, ON THE RESULTS OF ACTIVITY AS FOR THE YEAR ENDED 30 OF JUNE, 2006 AND THE
YEAR ENDED 30 OF JUNE 2005.

Limited liability company "RSM " Top-Audit" has auditing the financial (accounting) statements
as for the year ended 30 of June, 2006 and the year ended 30 of June, 2005 to the " Volga- Oil",
Limited liability company in accordance with the Contract № 15/A dd. 15 February 2006, signed
on the basis of decision of the Company about " RSM "Top – Audit" LLC confirmation tj the
official auditor.

**Summery information on the "RSM "Top – Audit" LLC**

The " RSM " Top- Audit" LLC was registered in 1992 by the Registration Chamber of Moscow,
as well as by the Inspectorate № 5 of Ministry of Taxes and Fees of the Russian Federation in the
Central division of  Moscow.
License № 004827 was made out by the Registration Chamber of Moscow.

1. We have auditing financial ( accounting) statements as for the year ended 30 of June, 2006
and the year ended 30 of June, 2005, prepared on four pages:
   • Balance sheet;
   • Statement of profit and loss;
   • Statement of cash flow.
The present financial(accounting) statement have been prepared by the directors of the Company
"Volga-Oil" in accordance with:
- Standarts of bookkeeping;
- Order of Ministry of finance of the Russian Federation dd. 22 July 2003 № 67n " Bookkeep-
ping" forms for companies";
- Standarts US GAAP;
- other standarts of legislation in force of the Russian Federation which regulate bookkeeping
and financial(accounting) statements preparation.
2. We planned and performed our audit so as to obtain reasonable assurance as to whether the
financial(accounting) statements are free from material misstatement.
We used sampling in our audit which includes examination, on a test basis, of evidances
confirmed indexes in accounting statements and disclosure of information as to financial and
business activity, evaluation of compliance with principles and methods of bookkeepping
applied for preparation of the Company statements, examination of basic estimated figures
received by the directiors of the Company, as well as evaluation of presentation of accounting
statements.
We consider our audit gives sufficient evidences to form our oppinion on accuracy in all essetial
elements of the presented financial(accounting) statements and conformance of bookkeepping
methods to the Russian Federation.
In our opinion financial(accounting) statements of the Company give a true and fair view of the
financial state of the Company as at 30 June 2006 and 30 June 2005 and of results of financial
and business activity of the Company from 01 January up to 31 December 2006 and 01 January
up to 31 December 2005 according to requirements of legislation of the Russian Federation with
tranformation US GAAP as preparation of financial accounting) statements.

# LLC. "VOLGA- OIL"

## BALANCE SHEET

|  | JUNE, 30, 2006 U.S. $ | JUNE 30, 2005 U.S.$ |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents | 12 929 | 397 |
| Receivables | 153 306 | 167 136 |
| Inventory | 788 511 | 479 033 |
| Other | 27 595 | 35 471 |
| Total Current Assets | **982 341** | **682 037** |
| Fixed Assets | 28 182 888 | 15 814 075 |
| Long – term investments | 4 129 772 | 3 555 022 |
| **Total Assets** | **33 295 001** | **20 051 134** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable | 443 812 | 253 561 |
| Taxes Payable | 17 362 | 9 810 |
| Short/Current Long Term Debt | 633 173 | 560 733 |
| Other Current Liabilities | 13 299 | 94 646 |
| **Total Current Liabilities** | **1 107 646** | **918 750** |
| Long Term Debt | 5 442 115 | 2 958 366 |
| Other long-term liabilities | 26 491 786 | 16 163 989 |
| **Total Liabilities** | **33 041 547** | **20 041 105** |
| **STOCKHOLDERS' EQUITY:** | | |
| Paid-in capital | 185 076 | 359 |
| Retained Earnings/Loss | 68 378 | 9 669 |
| **Total Stockholders Equity** | 253 454 | 10 029 |
| **Total Liabilities and Stockholders' Equity** | **33 295 001** | **20 051 134** |

## LLC. "VOLGA- OIL"

STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)

|  | FOR THE PERIOD JUNE 30, 2006 DECEMBER 31, 2005 U.S.$ | FOR THE PERIOD JUNE 30, 2005 DECEMBER 31, 2004 U.S.$ |
|---|---|---|
| **Sales:** | | |
| Income | 30 591 407 | 1 437 995 |
| Operating Expenses | (28 415 608) | (1 170 211) |
| Selling, general and administrative | 2 175 799 | 267 784 |
| Amortization/Depreciation | (2 108 436) | (255 062) |
| Gross Profit | <u>67 363</u> | <u>12 722</u> |
| Total other Income/Expenses Net | (12 135) | - |
| Earnings before Interest and Taxes | 55 227 | 12 722 |
| Income Tax Expense | (13 254) | (3 053) |
| **Net Income/Loss Per Common Share** | 41 973 | 9 669 |

# LLC. "VOLGA- OIL"

## STATEMENTS OF CASH FLOWS

| | FOR THE PERIOD JUNE 30, 2006 DECEMBER 31, 2005 | FOR THE PERIOD JUNE 30, 2005 DECEMBER 31, 2004 |
|---|---|---|
| | U.S.$ | U.S.$ |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net Profit /Loss | 41 973 | 9 669 |
| Depreciation and amortization | 2 108 436 | 255 062 |
| (Increase) decrease in: | - | - |
| Changes in Receivables | 98 523 | (167 136) |
| Changes in Liabilities | 7 866 236 | 4 041 105 |
| Changes in other Operating Activities | (94 332) | (514 504) |
| Amounts due officers and Employees | - | - |
| Loss on disposal of assets | - | - |
| | | |
| **Net cash and cash equivalents provided by (USED IN) OPERATING ACTIVITIES** | **10 020 836** | **3 624 196** |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of Goodwill | - | - |
| Purchase of Capital Assets | (8 766 485) | (3 170 539) |
| | | |
| **NET CASH USED FOR INVESTING ACTIVITIES** | **(8 766 485)** | **(3 170 539)** |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Write-off deficit to Paid-in-Capital | - | - |
| Write-off comprehensive income to Paid Capital | - | - |
| Write-off stock subscription receivable | - | - |
| Increase in capital stock | - | - |
| Long-term loan | (1 242 020) | ( 453 260) |
| | | |
| **Net cash from Financing Activities** | **(1 242 020)** | **( 453 260)** |
| | | |
| Net (Decrease) Increase in Cash | 12 331 | 397 |
| Cash- Beginning of Period | 598 | - |
| Cash – End of Period | 12 929 | 397 |

AUDITORS' REPORT

**ON THE FINANCIAL(ACCOUNTING) STATEMENTS TO THE " VOLGA-OIL", LIMITED LIABILITY COMPANY, ON THE RESULTS OF ACTIVITY AS FOR THE YEAR ENDED 06 OF OCTOBER, 2006 AND THE YEAR ENDED 06 OF OCTOBER 2005.**

Limited liability company "RSM " Top-Audit" has auditing the financial (accounting) statements as for the year ended 06 of October, 2006 and the year ended 06 of October, 2005 to the " Volga- Oil", Limited liability company in accordance with the Contract № 15/A dd. 15 February 2006, signed on the basis of decision of the Company about " RSM "Top – Audit" LLC confirmation tj the official auditor.
In our opinion, applied accounting balances and corresponding reports on profits and losses, cashflow statement reflect authentically, in all essential aspects a financial position " Volga – Oil " as of October, 06th 2006 and 2005 according to the standard principles of book keeping of the United States of America.

**Summery information on the "RSM "Top – Audit" LLC**

The " RSM " Top- Audit" LLC was registered in 1992 by the Registration Chamber of Moscow, as well as by the Inspectorate № 5 of Ministry of Taxes and Fees of the Russian Federation in the Central division of Moscow.
License № 004827 was made out by the Registration Chamber of Moscow.

1. We have auditing the financial ( accounting) statements as for the year ended 06 of October, 2006 and the year ended 06 of October, 2005, prepared on four pages:
   • Balance sheet;
   • Statement of profit and loss;
   • Statement of cash flow.
The present financial(accounting) statement have been prepared by the directors of the Company "Volga-Oil" in accordance with:
- Standarts of bookkeeping;
- Order of Ministry of finance of the Russian Federation dd. 22 July 2003 № '67n " Bookkeep-ping" forms for companies";
- Standarts US GAAP;
- other standarts of legislation in force of the Russian Federation which regulate bookkeeping and financial(accounting) statements preparation.
In our opinion, applied accounting balances and corresponding reports on profits and losses, cashflow statement reflect authentically, in all essential aspects a financial position " Volga - Oil " as of October, 06th 2006 and 2005 according to the standard principles of book keeping of the United States of America.
2. Our duty consists in expressing opinion on reliability of the financial reporting on the basis of the lead audit. Audit includes check on a selective basis of acknowledgement of numerical data and the explanatories containing in the financial reporting, an estimation of application of rules of book keeping, an estimation of the assumptions made by a management, and also an estimation of the general form of representation of the financial reporting. We assume, that the audit lead by us gives the sufficient bases to express opinion under the given financial reporting



GENERAL                    BODROV A.A.
DIRECTOR

**Feldman, David**

| | |
|---|---|
| **From:** | Myron L Gushlak [myron@bluewater.ky] |
| **Sent:** | Thursday, November 16, 2006 1:35 PM |
| **To:** | Saul Muskat; david@dlubinassociates.com; pkealy@starvolga.com; Marcus Segal |
| **Subject:** | FW: |
| **Attachments:** | VN.pdf |

Here is the final opinion from RSM on Volga's 2006 and 2005 financials

Thank you

Myron

-----Original Message-----
From: Сергей Сальников [mailto:saln-sergey@mail.ru]
Sent: Thursday, November 16, 2006 10:45 AM
Subject:

**Independent Auditors' Report**

**To the Board of Directors and Stockholders of Volga- Neft:**

We have audited the accompanying balance sheets of Volga- Neft ("Volga - Neft") as of October 06, 2006 and October 06, 2005 and the related statements of earnings,comprehensive income and cash flows for each of the two years in the period ended October 06, 2006. These financial statements are the responsibility of Volga — Neft 's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of Volga- Neft at October 06, 2006 and October 06, 2005, and the results of its operations and its cash flows for each of the two years in the period ended October 06, 2006 in conformity with accounting principles generally accepted in the United States of America.

GENERAL
DIRECTOR



# EXHIBIT I

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K/A
(Amendment No.1)

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): September 29, 2006

STAR ENERGY CORPORATION
-----------------------
(Exact name of Registrant as specified in its charter)

| Nevada | 000-29323 | 87-0643634 |
|--------|-----------|------------|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

245 Park Avenue, 24th and 39th Floors
New York, New York 10167
------------------------
(Address of principal executive offices)

212-792-4334
(Registrant's telephone number, including area code)

------------------------------------------------------------
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):

|_| Written communications pursuant to Rule 425 under the Securities Act (17 CFR
230.425)

|_| Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
240.14a-12)

|_| Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
Act (17 CFR 240.14d-2(b))

|_| Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
Act (17 CFR 240.13e-4(c))

<PAGE>

EXPLANATORY NOTE:

This Amendment No. 1 on Form 8-K/A amends and supplements the Current Report on
Form 8-K of Star Energy, Inc., a Nevada corporation (the "Registrant"), dated
September 29, 2006 and filed with the Securities and Exchange Commission (the
"Commission") on October 6, 2006 (the "Initial Form 8-K"), to include financial

statements and pro forma financial information permitted pursuant to Item 9.01
of Form 8-K to be excluded from the Initial Form 8-K and filed by amendment to
the Initial Form 8-K no later than 71 days after the date on which the Initial
Form 8-K was required to be filed. As previously reported in the Initial Form
8-K, on October 6, 2006, the Registrant completed the acquisition of Volga-Neft
Limited Company, a corporation formed under the laws of the Russian Federation,
pursuant to a Stock Purchase Agreement dated October 6, 2006.

Section 9-Financial Statements and Exhibits
Item 9.01 Financial Statements and Exhibits.

(a) Financial Statements of business acquired. The following financial
statements of the Registrant are being filed with this report:

Report of Independent Registered Public Accounting Firm
Balance Sheets
Statements of Stockholders' Equity
Statements of Operations
Statements of Cash Flows
Notes to Financial Statements

(b) Pro forma financial information.

Pro-forma Consolidated Balance Sheet
Pro-forma Consolidated Statement of Deficit
Pro-forma Consolidated Statement of Operations
Notes to Pro-forma Consolidated Financial Statements

(c) Exhibits. None.


                                  2

<PAGE>


                              SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, Star Energy
Corporation has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.


                         STAR ENERGY CORPORATION
                         (Registrant)

                         By:     /s/ Patrick Kealy
                                 ------------------------------------
                         Name:   Patrick Kealy
                         Title:  Chief Executive Officer and President

Date: December 7, 2006


                                  3

<PAGE>


                  VOLGA-NEFT LIMITED LIABILITY COMPANY

                        FINANCIAL STATEMENTS

                         DECEMBER 31, 2005

(EXPRESSED IN U.S. DOLLARS)

CONTENTS

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM    {1}

BALANCE SHEETS    {2}

STATEMENTS OF STOCKHOLDERS' EQUITY    {3}

STATEMENTS OF OPERATIONS    {4}

STATEMENTS OF CASH FLOWS    {5}

NOTES TO FINANCIAL STATEMENTS    {6-11}

<PAGE>

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of

Volga-Neft Limited Liability Company

We have audited the accompanying balance sheets of Volga-Neft Limited Liability
Company as of October 6, 2006 and December 31 2005, and the related statements
of income, stockholders' equity and, and cash flows for the period and year
ended October 6, 2006 and December 31, 2005. These financial statements are the
responsibility of the company's management. Our responsibility is to express an
opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. The company is not required to
have, nor were we engaged to perform, an audit of its internal control over
financial reporting. Our audit included consideration of internal control over
financial reporting as a basis for designing audit procedures that are
appropriate in the circumstances, but not for the purpose of expressing an
opinion on the effectiveness of the company's internal control over financial
reporting. Accordingly, we express no such opinion. An audit also includes
examining, on a test basis, evidence supporting the amounts and disclosures in
the financial statements, assessing the accounting principles used and
significant estimates made by management, as well as evaluating the overall
financial statement presentation. We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in
all material respects, the financial position of Volga-Neft Limited Liability
Company as of October 6 ,2006 and December 31, 2005, and the results of its
operations and its cash flows for the ten months and year ended October 6, 2006
and December 31, 2005 in conformity with accounting principles generally

accepted in the United States of America.

RSM "Top - Audit"
Firm's Signature
119717, Moscow, B.Ordynka, 57,bl.2
City, State
10,November,2006
Report Date

General
Director            Bodrov V.

1

&lt;PAGE&gt;

VOLGA- NEFT LIMITED LIABILITY COMPANY
BALANCE SHEET
(EXPRESSED IN U.S. DOLLARS)

|                                                                      | OCTOBER, 6, 2006 | DECEMBER,31, 2005 |
| --- | --- | --- |
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and Cash Equivalents (note 3) | 15 683 | 598 |
| Accounts and notes receivables (note 4) (net of Allowance for doubtful accounts $ NIL) | 2 965 952 | 251 829 |
| Inventories (note 5) | 3 432 764 | 721 774 |
| Current deferred income tax assets (note 9) | 378 849 | -- |
| Other | 636 366 | -- |
| Total Current Assets | 7 429 614 | 974 201 |
| Property, plant and equipment (note 6) | 22 827 591 | 24 591 988 |
| Deferred income tax assets (note 9) | 232 240 | -- |
| Total Assets | 30 489 445 | 25 566 189 |
| **LIABILITIES** | | |
| CURRENT LIABILITIES | | |
| Short - term debt and current portion of long - term loans (note 7) | 1 365 556 | 844 873 |
| Trade accounts and notes payable | 24 976 460 | 8 325 826 |
| Other accounts payable and accrued liabilities (note 8) | 2 050 784 | 1 526 739 |
| Taxes Payable | 161 313 | 7 883 |
| Current deferred income tax liabilities (note 9) | 9 437 | -- |
| Total Current Liabilities | 28 563 550 | 10 705 321 |

```
Loans payable - Long term portion (note 7)        1 202 264      14 670 984
Deferred income tax liabilities (note 9)            369 410            --
- ----------------------------------------------------------------------------
Total Liabilities                                  30 135 224     25 376 305
- ----------------------------------------------------------------------------
```

                        STOCKHOLDERS' EQUITY

```
 Common Stock (note 10)
Authorized
authorized and issued at October 06, 2006
and December 31, 2005 - 5,010,000 shares;
nominal value - US $0.035 per share)               175 350        175 350

Retained Earnings                                  178 871         14 534
- ----------------------------------------------------------------------------
Total Stockholders' Equity                         354 221        189 884
- ----------------------------------------------------------------------------
Total Liabilities and Stockholders' Equity         30 489 445     25 566 189
- ----------------------------------------------------------------------------
```

<PAGE>                                                             2

Volga - Neft Limited Liability Company
Statements of Stockholders' Equity
Years Ended December 31, 2005 and period ended October 6, 2006
(Expressed in U.S. Dollars)

<TABLE>
<CAPTION>

|  | Number of Shares | Capital Stock | Additi Paid Capi |
|---|---|---|---|
| <S> | <C> | <C> | <C |
| Balance, begining | -- | -- | - |
| Common shares issued for cash | 5 010 000 | 175 350 | - |
| Net income | -- | -- | - |
| Balance, December 31, 2005 | 5 010 000 | 175 350 | - |
| Balance, begining | 5 010 000 | 175 350 | - |
| Net income | -- | -- | - |
| Cumulative Other Comprehensive Income | -- | -- | - |
| Balance, October 6, 2006 | 5 010 000 | 175 350 | - |

</TABLE>

<PAGE>                                                             3

VOLGA-NEFT LIMITED LIABILITY COMPANY
STATEMENTS OF OPERATIONS.
(EXPRESSED IN U.S. DOLLARS)

| | For the period JANUARY 1, 2006 TO OCTOBER, 6, 2006 | YEAR ENDED DECEMBER, 31, 2005 |
|---|---|---|
| Revenue | 83 084 954 | 98 365 572 |
| Cost of sales | (61 161 563) | (69 952 725) |
| Gross Profit | 21,923,391 | 28,412,847 |
| **Expenses** | | |
| Transportation | (17 822 188) | (21 441 229) |
| Salary of the industrial personnel | (2 565 000) | (2 695 480) |
| Staff costs | (140 800) | (146 670) |
| Distribution | (261 553) | (506 164) |
| Amortization/Depreciation | (829 421) | (3 600 324) |
| Total operating expenses | (21 618 962) | (28 389 867) |
| **Other income(expense)** | | |
| Interest expense (Loss) | (32 956) | (3 871) |
| Other Income (Expense) | (5 879) | -- |
| Other Income/Expenses Net | (38 835) | (3 871) |
| Income before income tax | 265 594 | 19 109 |
| **Income Tax** | | |
| Current income tax expense (note 9) | (86 257) | (4 575) |
| Deferred income tax expense (note 9) | (15 000) | -- |
| Total income tax expense | (101 257) | (4 575) |
| Net Income | 164 337 | 14 534 |
| Total Comprehensive Income | 164 337 | 14 534 |
| Basic and Diluted Income per Share (Note 10) | 0, 03 | 0, 00 |
| Basic and Diluted Weighted Average Number of Shares Outstanding during The year | 5 010 000 | 5 010 000 |

4

<PAGE>

VOLGA-NEFT LIMITED LIABILITY COMPANY
STATEMENTS OF CASH FLOWS
(expressed in U.S. Dollars)

<TABLE>

<CAPTION>

|  | FOR THE PERIOD JANUARY 1, 2006 OCTOBER, 6, 2006 | YEAR ENDED DECEMBER, 31, 2005 |
|---|---|---|
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |
| Net Income | 164 337 | 14 534 |
| Items not affecting cash: |  |  |
| Depreciation and amortization | 829 421 | 3 600 324 |
| Adjustments to reconcile net income to |  |  |
| Net cash (used in) operating activities: |  |  |
| Changes in Receivables | (2 714 123) | (251 829) |
| Changes Inventories | (2 710 990) | (721 774) |
| Changes in other | (636 366) | -- |
| Deferred income tax expense | 15 000 | -- |
| Changes in Trade accounts and notes payable | 21 173 768 | 8 324 832 |
| Changes in Taxes Payable | 153 430 | 7 883 |
| Net cash and cash equivalents provided by OPERATING ACTIVITIES | 16 274 477 | 10 973 970 |
| CASH FLOWS FROM INVESTING ACTIVITIES |  |  |
| Purchase of property, plant, and equipment | (17 501 412) | (10 621 254) |
| NET CASH USED FOR INVESTING ACTIVITIES | (17 501 412) | (10 621 254) |
| CASH FLOWS FROM FINANCING ACTIVITIES: |  |  |
| Issuance of capital stock | -- | 175 350 |
| Long-term loan | 1 242 020 | (527 468) |
| Net cash from Financing Activities | 1 242 020 | (352 118) |
| Net (Decrease) Increase in Cash | 15 085 | 598 |
| Cash- Beginning of Period | 598 | -- |
| Cash - End of Period | 15 683 | 598 |

Interest and Income Taxes Paid

| | | | |
|---|---|---|---|
| Interest paid | $ | 32,956 | $ | 3,871 |
| Income taxes paid | $ | 80,135 | $ | 4,575 |

</TABLE>

5

<PAGE>

VOLGA-NEFT LIMITED LIABILITY COMPANY
NOTES TO THE FINANCIAL STATEMENTS CLOSED AT OCTOBER 06, 2006
- ----------------------------------------------------------

(EXPRESSED IN U.S. DOLLARS)

1.    Operations and Business

Volga - Neft Limited Liability Company, (the Company), was incorporated on January 25, 2005 in accordance to the Federal Law No 14 - Federal Law, from February 08,1998 " About societies with limited liability " in Samara region, Privolzhsky district, v. Obsharovka of Russian Federation. The Company's main activity is the trading of oil products (oil and naphtha) The Company has set up a representative office in the city of Samara.

2.    Summary of Significant Accounting Policies

The accounting policies of the Company are in accordance with generally accepted accounting principles of the United States of America, and their basis of application is consistent with that of the previous year. Outlined below are those policies considered particularly significant:

a)    Cash and Cash Equivalents

For purposes of the statement reporting within the statement of cash flows, cash includes currency, cheques issued by others, other currency equivalents and current deposits. Cash equivalents include securities and short-term money market instruments that can be easily converted into cash. Investments that mature within three months from the investment date, are also included as cash equivalents.

b)    Inventories.

Crude oil and petroleum products inventories are valued at the lower of cost, using the first-in first-out method, or net realisable value. Costs include applicable purchase costs and operating expenses. Materials and supplies inventories are recorded at the lower of average cost or net realisable value.

c)    Property, Plant and Equipment

Property, plant and equipment are stated at historical costs. Major renewals and betterments are capitalized and expenditures for repairs and maintenance are charged to expense as incurred. Depreciation is provided at the following rates, using the straight-line method, which are formulated to charge operations with the cost of the equipment over their estimated useful lives as follows:

| | |
|---|---|
| Buildings and constructions | 5-33 years |
| Machinery and equipment | 5-15 years |
| Computer and telecommunication Equipment | 2-5 years |

d)    Revenue Recognition

Revenues from the production and sale of crude oil and petroleum products are recognised when deliveries to customers are made, title has transferred and collectibility is reasonably assured.

6

<PAGE>

e)    Use of Estimates

Preparation of financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and related notes to financial statements. These estimates are based on management's best knowledge of current events and actions the Company may undertake in the future. Actual results may ultimately differ from estimates, although management does not believe such changes will materially affect the financial statements in any individual year.

f)    Foreign Currency Translation

The Company accounts for foreign currency translation pursuant to SFAS No. 52, "Foreign Currency Translation" ("SFAS 52"). The Company's functional currency is the Russian Rouble. Under SFAS 52, all assets and liabilities are translated into United States dollars using the current exchange rate at the end of each fiscal period. Revenues and expenses are translated using the average exchange rates prevailing throughout the respective periods. Translation adjustments are included in other comprehensive income (loss) for the period. Certain transactions of the Company are denominated in United States dollars. Translation gains or losses related to such transactions are recognized for each reporting period in the related statement of operations and comprehensive income (loss).

g)    Environmental liabilities

Liabilities for environmental remediation are recorded when it is probable that obligations have been incurred and the amounts can be reasonably estimated.

h)    Pension and post-employment benefits

The Group's mandatory contributions to the governmental pension plan are expensed when incurred. Discretionary pensions and other post-employment benefits are not material.

i)    Income Tax

The Company accounts for income taxes pursuant to SFAS No. 109, "Accounting for Income Taxes". Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

j)    Comprehensive Income

The Company adopted Statement of Financial Accounting Standards ("SFAS") No. 130, "Reporting Comprehensive Income." SFAS No. 130 establishes standards for reporting and presentation of comprehensive income and its components in a full set of financial statements. Comprehensive income is presented in the statements of stockholders' equity, and consists of net earnings and unrealized gains (losses) on available for sale marketable securities; foreign currency translation adjustments and changes in market value of future contracts that qualify as a hedge; and negative equity adjustments recognized in accordance with SFAS No. 87. SFAS No. 130 requires only additional disclosures in the financial statements and does not affect the Company's financial position or

results of operations.

7

<PAGE>

k)    Financial Instruments

Fair Value

Unless otherwise noted, it is management's opinion that the Company is not exposed to significant interest, currency or credit risks arising from the financial instruments. The fair value of the financial instruments approximates their carrying values, unless otherwise noted. Foreign Currency Risk

Exchange restrictions and controls exist relating to converting Russian Roubles to other currencies. At present, the Russian Rouble is not a convertible currency outside the Russian Federation. Future movements in the exchange rates between the Russian Rouble and the US dollar will affect the carrying value of the Company's Russian Rouble denominated monetary assets and liabilities. Such movements may also affect the Group's ability to realise non-monetary assets represented in US dollars in these consolidated financial statements. At 06 October 2006 and 31 December 2005 exchange rates were 26.78 and 28.78 Russian Roubles to the US dollar, respectively. Any translation of Russian Rouble amounts to US dollars should not be construed as a representation that such Russian Rouble amounts have been, could be, or will in the future be converted into US dollars at the exchange rate shown or at any other exchange rate.

Concentration of Credit Risk

SFAS No. 105, "Disclosure of Information About Financial Instruments with Off-Balance Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance sheet risk and credit risk concentration. The Company does not have significant off-balance sheet risk.

The Company provides credit to its clients in the normal course of its operations. It carries out, on a continuing basis, credit checks of its clients, and maintains provisions for contingent credit losses that, once they materialize, are consistent with management's forecasts.

For other debts, the Company determines, on a continuing basis, the probable losses and sets up a provision for losses based on the estimated realizable value.

l)    Impairment of Long-Lived Assets

The Company evaluates the recoverability of long-lived assets and the related estimated remaining lives when events or circumstances lead management to believe that the carrying value of an asset may not be recoverable. For the periods ended December 31, 2005 and 2004, no events or circumstances occurred for which an evaluation of the recoverability of long-lived assets was required.

m)    Earnings per Share

The Company adopted FAS No.128, "Earnings per Share" which requires disclosure on the financial statements of "basic" and "diluted" earnings per share. Basic earnings per share, which does not include any dilutive securities, is computed by dividing the earnings available to common stockholders by the weighted average number of common shares outstanding for the year. In contrast, diluted

earnings per share considers the potential dilution that could occur from other financial instruments that would increase the total number of outstanding shares of common stock.

8

<PAGE>

n)    Recent Accounting Pronouncements

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets – an amendment of FASB Statement No. 140" ("SFAS No. 156"). SFAS No. 156 simplifies the accounting for loan servicing rights and the financial instruments used to hedge risks associated with those rights. SFAS No. 156 requires that servicing be valued initially at fair value, and subsequently accounted for at either fair value, or amortized over the economic life of the related lease. SFAS No. 156 is effective for fiscal years beginning after September 15, 2006. The implementation of SFAS No. 156 is not expected to have a material impact on the Company's results of operations and financial position.

In April 2006, the FASB issued FASB Staff Position ("FSP"), FASB Interpretation No. ("FIN") 46(R)-6, "Determining the Variability to be Considered in Applying FASB Interpretation No. 46(R)" ("FSP FIN 46(R)-6"). FSP FIN 46(R)-6 provides accounting guidance on how to distinguish between arrangements that create variability (i.e., the risks and rewards) within an entity and arrangements that are subject to that variability (i.e., variable interests). FSP FIN 46(R)-6 is responding to a need for accounting guidance on arrangements that can be either assets or liabilities (i.e., derivative financial instruments). FSP FIN 46(R)-6 is effective for the first fiscal period that begins after June 15, 2006.

In June 2006, the FASB issued FIN No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, "Accounting for Income Taxes" ("SFAS 109"). The interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides accounting guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006.

3.    Cash and Cash Equivalents

Cash balances of 6 October 2006 and 31 December 2005 included accounts denominated in Russian Roubles equivalent to $15,683 and $ 598, respectively.

4.    Accounts and Notes Receivable, Net

|  | October 06, | December,31 |
|---|---|---|
|  | 2006 | 2005 |
| Trade accounts and notes receivable | 1 172 018 | 149 995 |
| Recoverable value – added tax | 293 488 | 26 722 |
| Advances to suppliers | 517 395 | -- |
| Other receivables | 983 051 | 75 112 |

```
- ------------------------------------------------------------------
Total accounts and notes receivable, net      2 965 952      251 829
==================================================================
```

9

<PAGE>

Prepaid and recoverable value-added and other taxes includes value-added tax
from purchases that will be recoverable only when the underlying accounts
payable have been settled.

5.    Inventories

|                               | October 06, | December,31 |
|-------------------------------|-------------|-------------|
|                               | 2006        | 2005        |
| Crude oil and petroleum products | 2 153 606 | 574 002 |
| Materials and supplies        | 1 279 158   | 147 772     |
| Total Inventories             | 3 432 764   | 721 774     |

6.    Property, Plant and Equipment

<TABLE>
<CAPTION>

|                               | 2006 |  | 2005 | |
|-------------------------------|------|--------------|------|------|
|                               | Cost | Accumulated Depreciation | Cost | Accumulated Dep |
| <S>                           | <C>  | <C>          | <C>  | <    |
| Machinery and equipment       | 16 290 124 | 483 220 | 20 825 424 | 2 |
| Buildings and constructions   | 7 195 564  | 338 985 | 7 195 564  | 1 |
| Computer and telecommunication | 171 324   | 7 216   | 171 324    |   |
|                               | 23 657 012 | 829 421 | 28 192 312 | 3 |
| Net carrying amount           |            | 22 827 591 |          | 24 |

</TABLE>

The Company obtains licenses from the governmental authorities for the right of
realization of activity in the field of storage, processings and transportations
of crude oil and petroleum products, on operation of explosive industrial
objects, on operation of oil and gas extraction productions, on application of
explosive materials of industrial purpose. These licenses expire between 2006
and 2009; however, they may be extended at the initiative of the Company
provided it is in compliance with the license terms.

7.    Loans payable

<TABLE>
<CAPTION>

| | 2006 | | | 2005 |
| | Current Portion | Long-term Portion | Current Portion | |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | < |
| Samara branch of the Sberbank of the Russian Federation | 1 139 829 | 1 006 775 | 686 543 | 1 |
| "Levko" Corp. | 225 727 | 195 489 | 158 330 | |
| Total | 1 365 556 | 1 202 264 | 844 873 | 1 |

</TABLE>

<PAGE>

10

The Company's significant outstanding short-term borrowing agreements bear interest at 7 percent are repayable over 5 years, and are secured by property, plan and equipment as per note 6..

8.    Other Accounts Payable and Accrued Liabilities

<TABLE>
<CAPTION>

| | October 06, | Dec |
| | 2006 | |
| --- | --- | --- |
| <S> | <C> | <C |
| Promissory notes payable | -- | |
| Advances from customers | 2 033 670 | 1 |
| Salaries payable | 7 973 | |
| Other | 9 141 | |
| Total Other Accounts Payable and  Accrued Liabilities | 2 050 784 | 1 |

</TABLE>

9.    Taxes

The Company accounts for income taxes pursuant to SFAS No. 109, "Accounting for Income Taxes". This Standard prescribes the use of the liability method whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates. The effects of future changes in tax laws or rates are not anticipated.

Corporate income tax rates applicable in 2005 and 2004 are 24% percent of taxable income.

Under SFAS No. 109 income taxes are recognized for the following: a) amount of

tax payable for the current year, and b) deferred tax liabilities and assets for future tax consequences of events that have been recognized differently in the financial statements than for tax purposes.

The reconciliation between total tax expense and the expected income tax is as follows:

```
<TABLE>
<CAPTION>
                                            October, 06, 2006    December
<S>                                              <C>               <C>
Accounting income                             $ 265 594          $ 19
Non-deductible expenses                            --
Items deductible for tax, not for accounting     156 310
                                             ----------------------
                                              $ 421 904          $ 19

Applicable tax rate                               24%
                                             ----------------------

Less: Russian small/medium business credit
(if applicable)                                   --

Income tax expense(should agree with the income
statement)                                    $ 101 257          $  4
Income tax expense                           ----------------------
</TABLE>
```

10.  Common Stock

```
<TABLE>
<CAPTION>
Authorized                                              October,6, 20
        5 010 000 common shares, par value $ 0.03 per share
Issued
<S>                                                         <C>
        5 010 000 common shares                          $ 175,350
        (December 31, 2005  5,010,000)

</TABLE>
```

                                                                11

<PAGE>

                        STAR ENERGY CORPORATION

                             PRO-FORMA

                   CONSOLIDATED FINANCIAL STATEMENTS

                  NINE MONTHS ENDED SEPTEMBER 30, 2006

                             UNAUDITED

CONTENTS

Pro-forma Consolidated Balance Sheet                           1

Pro-forma Consolidated Statement of Deficit                    2

Pro-forma Consolidated Statement of Operations                3

Notes to Pro-forma Consolidated Financial Statements        4 - 5

<PAGE>

STAR ENERGY CORPORATION
Pro-forma Consolidated Balance Sheet
September 30, 2006
Unaudited

<TABLE>
<CAPTION>

| | Star Energy Corporation (US) Sept. 30, 2006 | Volga-Neft LLC (Russia) Sept. 30, 2006 | Pro-Forma Adjustments |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| ASSETS | | | |
| Current | | | |
| Cash and cash equivalents | $ 268 | $ 15,683 | $ -- |
| Accounts and notes receivable | 7,968 | 2,965,952 | -- |
| Inventory | -- | 3,432,764 | 6,707,814 |
| Other current assets | -- | 636,366 | -- |
| Prepaid | -- | -- | -- |
| Deferred Taxes | -- | 378,849 | -- |
| Total current assets | 8,236 | 7,429,614 | 6,707,814 |
| Properties, Plant and Equipment | 45,730 | 27,350,725 | 69,101 |
| Deferred Taxes | -- | 232,240 | -- |
| TOTAL ASSETS | $ 53,966 | $ 35,012,579 | $ 6,776,915 |
| LIABILITIES | | | |
| Current | | | |
| Accounts payable and accrued liabilities | $ 6,347 | $ 27,108,422 | $ -- |
| Short -term debt and current portion of long-term debt | -- | 1,365,556 | -- |
| Income taxes payable | -- | 80,135 | -- |
| Deferred taxes | -- | 9,437 | -- |
| Related party payable | 2,785 | -- | -- |
| Note payable | 30,000 | -- | -- |
| Total current liabilities | 39,132 | 28,563,550 | -- |

| | | | |
|---|---|---|---|
| Asset Retirement Obligation | 1,357 | -- | -- |
| Long Term Debt | -- | 1,202,264 | -- |
| Deferred taxes | -- | 369,410 | -- |
| | --------------- | --------------- | --------------- |
| TOTAL LIABILITIES | 40,489 | 30,135,224 | -- |
| | --------------- | --------------- | --------------- |
| STOCKHOLDERS' EQUITY | | | |
| Capital Stock | 31,563 | 187,079 | (180,329) |
| Additional Paid in Capital | 77,363 | 4,511,551 | 7,135,969 |
| Accumulated Deficit | (95,449) | 178,725 | (178,725) |
| | --------------- | --------------- | --------------- |
| | 13,477 | 4,877,355 | 6,776,915 |
| | --------------- | --------------- | --------------- |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 53,966 | $ 35,012,579 | $ 6,776,915 |
| | =============== | =============== | =============== |

</TABLE>

-1-

<PAGE>

STAR ENERGY CORPORATION
Pro-Forma Consolidated Statement of Deficit
Nine Months Ended September 30, 2006
Unaudited

<TABLE>
<CAPTION>

| | Star Energy Corporation (US) Sept. 30, 2006 | Volga-Neft LLC (Russia) Sept. 30, 2006 | Pro-Forma Adjustments |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Accumulated Deficit – beginning of period | $ (39,311) | $ 14,569 | $ (14,569) |
| Net (Loss) earnings | (56,138) | 164,156 | (164,156) |
| | --------------- | --------------- | --------------- |
| (Accumulated Deficit) Retained Earnings – end of period | $ (95,449) | $ 178,725 | $(178,725) |
| | =============== | =============== | =============== |

</TABLE>

-2-

<PAGE>

STAR ENERGY CORPORATION
Pro-Forma Consolidated Statement of Operations

Nine Months Ended September 30, 2006
Unaudited

```
<TABLE>
<CAPTION>
```

| | Star Energy Corporation (US) Sept. 30, 2006 | Volga-Neft LLC (Russia) Sept. 30, 2006 | Pro-Forma Adjustments |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Revenue | | | |
| Oil and gas revenues | $ 33,431 | $ 83,084,954 | $(83,084,954) |
| | | | |
| Expenses | | | |
| Production and operating costs | 13,849 | 81,548,751 | (81,548,751) |
| Depreciation | 2,611 | 829,421 | (829,421) |
| Selling, general and administrative | 73,109 | 402,535 | (402,535) |
| | 89,569 | 82,780,707 | (82,780,707) |
| | | | |
| Operating Loss | (56,138) | 304,247 | (304,247) |
| | | | |
| Other Income (Expense) | | | |
| Other | -- | 38,834 | (38,834) |
| Loss on disposition of property | -- | -- | -- |
| | -- | 38,834 | (38,834) |
| | | | |
| Loss Before Income Taxes | (56,138) | 265,413 | (265,413) |
| Income taxes - current | -- | (86,257) | 86,257 |
| Income taxes - deferred | -- | (15,000) | 15,000 |
| | | | |
| Net Loss | $ (33,431) | $ 164,156 | $ (164,156) |

```
</TABLE>
```

-3-

```
<PAGE>
```

STAR ENERGY CORPORATION

Notes to Pro-Forma Consolidated Financial Statements
September 30, 2006
Unaudited

1.    Basis of Presentation:

      These unaudited pro-forma consolidated financial statements have been
      prepared to give effect to the following:

      The acquisition on October 6, 2006 whereby Star Energy Corporation
      ("Star") issued 10,000,000 restricted common shares valued at $11,700,000
      (representing 26.1% of the issued and outstanding shares of the company)
      in return for 100% of all outstanding common shares of Volga-Neft Limited
      Company ("Volga") a Russian company.

      On October 6, 2006, an Assignment and Bill of sale was entered into
      between Star and Ruairidh Campbell, a former officer and director of Star.
      Pursuant to such assignment, Mr. Campbell agreed to transfer to Star his
      3,250,000 shares of Star's common stock held by him for cancellation and
      return to Star's authorized but unissued common shares. In consideration
      thereof, Star agreed to assign to Mr. Campbell all of Star's interest in a
      15% working interest (12% net revenue interest) in and to certain oil and
      gas wells known as the Galvan Ranch Gas Wells, which are located in Webb
      County, Texas.

      After these transactions, Star has 38,312,500 common shares issued and
      outstanding.

      The pro-forma consolidated financial statements are based on the balance
      sheets of the following:

            a)    Star as at September 30, 2006 (unaudited) and December 31,
                  2005 (audited).

            b)    Volga as at September 30, 2006 (unaudited).

      The pro-forma consolidated financial statements include the statement of
      earnings for the following:

            a)    Star for the nine months ended September 30, 2006 (unaudited)
                  and for the year ended December 31, 2005 (audited)..

            b)    Volga for the nine months ended September 30, 2006
                  (unaudited).

      The pro-forma consolidated balance sheet as at September 30, 2006 gives
      effect to the transactions as at October 6, 2006 and the pro-forma
      statement of earnings for the nine months ended September 30, 2006 gives
      effect to the transactions as if they had taken place at the beginning of
      the period.

      The pro-forma consolidated financial statements are not necessarily
      indicative of the actual results that would have occurred had the proposed
      transactions occurred on the dates indicated and not necessarily
      indicative of future earnings or financial position.

                                        -4-

<PAGE>

STAR ENERGY CORPORATION
Notes to Pro-Forma Consolidated Financial Statements
September 30, 2006
Unaudited


2.    Pro-Forma Adjustments:

To record the consolidation of Star with Volga including:

a)    The merger of Star and Volga was accounted for by purchase method,
with the net assets of Volga brought forward at their fair market
value basis.

b)    To eliminate the pre-acquisition shareholders' equity of Volga at
September 30, 2006.


-5-

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# EXHIBIT J

## Feldman, David

| | |
|---|---|
| **From:** | Myron L Gushlak [myron@bluewater.ky] |
| **Sent:** | Tuesday, April 03, 2007 8:10 AM |
| **To:** | msegal@starenergycorp.com; pkealy@starenergycorp.com; Saul Muskat; Terence Chan |
| **Cc:** | david@dlubinassociates.com |
| **Subject:** | FW: Financial Statements |

**Attachments:** VN2006Dec.pdf

Final rsm version signed, let me know if there are any further issues

Myron

**From:** Armenak Safarov [mailto:go2safarov@yahoo.com]
**Sent:** Monday, April 02, 2007 3:04 PM
**To:** myron@bluewater.ky; vitalyfargesen@capitallendingllc.com
**Subject:** Financial Statements

From: Сергей Сальников <saln-sergey@mail.ru>
Sent: Monday, April 2, 2007 4:58:13 PM

Be a PS3 game guru.
Get your game face on with the latest PS3 news and previews at Yahoo! Games.

7/16/2007

VOLGA - NEFT LIMITED LIABILITY COMPANY

FINANCIAL STATEMENTS

DECEMBER 31, 2006 AND DECEMBER 31, 2005

(EXPRESSED IN U.S. DOLLARS)

CONTENTS

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM    {1}

BALANCE SHEETS  {2}

STATEMENTS OF STOCKHOLDERS' EQUITY   {3}

STATEMENTS OF OPERATIONS   {4}

STATEMENTS OF CASH FLOWS   {5}

NOTES TO FINANCIAL STATEMENTS    {6-11}

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of

**Volga-Neft Limited Liability Company**

We have audited the accompanying balance sheets of Volga - Neft Limited Liability Company as of December 31, 2006 and December 31, 2005, and the related statements of income, stockholders' equity and, and cash flows for the period and year ended December 31, 2006 and December 31, 2005. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Volga - Neft Limited Liability Company as December 31,2006 and December 31, 2005, and the results of its operations and its cash flows for the year ended December 31, 2006 and December 31, 2005 in conformity with accounting principles generally accepted in the United States of America.

Firm's Signature -

Moscow City,

March, 12, 2007

Report Date :

Auditor

1

# Volga – Neft LIMITED LIABILITY COMPANY
## BALANCE SHEET
## (Expressed in U.S. Dollars)

|  | DECEMBER 31, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents (note 3) | 16 467 | 598 |
| Accounts and notes receivables (note 4) (net of Allowance for doubtful accounts $ NIL) | 1 801 077 | 251 829 |
| Inventories (note 5) | 2 535 746 | 721 774 |
| Deferred income tax assets (note 9) | 371 272 | - |
| Other current assets | 74 288 | - |
| **Total Current Assets** | 4 798 850 | 974 201 |
| | | |
| Property, plant and equipment (note 6) | 29 377 584 | 26 297 182 |
| Financial investment (note 10) | 1 000 000 | - |
| Deferred income tax assets (note 9) | 356 912 | - |
| **Total Assets** | 35 533 346 | 27 271 383 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Short – term debt(note 7) | 2 365 922 | 844 873 |
| Trade accounts and notes payable | 26 465 992 | 8 325 826 |
| Other accounts payable(note 8) | - | 1 526 729 |
| Taxes payable | 170 862 | 7 883 |
| Current deferred income tax liabilities | 11 235 | - |
| **Total Current Liabilities** | 29 014 011 | 10 705 321 |
| Loans payable – long term portion(note 7) | 1 262 377 | 14 670 984 |
| Deferred income tax liabilities (note 9) | 236 884 | - |
| | | |
| **Total Liabilities** | 30 513 272 | 25 376 305 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Common Stock (note 10) | | |
| Authorized | | |
| authorized and issued at September 30, 2006 | | |
| and December 31, 2005 : 10,000 shares; | | |
| nominal value – US $0.034 per share) | 187 079 | 175 350 |
| Additional paid in Capital | 4 511 551 | 1 705 194 |
| Retained Earnings | 321 444 | 14 534 |
| | | |
| **Total Stockholders' Equity** | 5 020 074 | 1 895 078 |
| **Total Liabilities and Stockholders' Equity** | 35 533 346 | 27 271 383 |

2

Volga –Neft Limited Liability Company
Statements of Stockholders' Equity
Years Ended December 31, 2005 and period ended December, 2006
(Expressed in U.S. Dollars)

| | Number of Shares | Capital Stock | Additional Paid in Capital | Cumulative Other Comprehensive Income | Retained Earnings | Stockholders' Equity |
|---|---|---|---|---|---|---|
| Balance, begining | - | - | - | - | - | - |
| Common shares issued for cash | 5 010 000 | 175 350 | 1 705 194 | - | - | 1 880 544 |
| Net income | - | - | - | - | 14 534 | 14 534 |
| Balance, December 31, 2005 | 5 010 000 | 175 350 | 1 705 194 | - | 14 534 | 1 895 078 |
| Balance, begining | 5 010 000 | 175 350 | 1 705 194 | - | 14 534 | 1 895 078 |
| Net income | - | - | - | - | 306 910 | 306 910 |
| Cumulative Other Comprehensive Income | - | 11 729 | 2 806 357 | - | - | 2 818 086 |
| Balance, December 31, 2006 | 5 010 000 | 187 079 | - | - | 321 444 | 5 020 074 |

Volga – Neft LIMITED LIABILITY COMPANY
STATEMENTS OF OPERATIONS.
(Expressed in U.S. Dollars)

|  | For the period | |
| --- | --- | --- |
|  | YEAR ENDED DECEMBER 31, 2006 | YEAR ENDED DECEMBER 31, 2005 |
| Revenue | 115 283 850 | 98 365 572 |
| Cost of sales | (81 900 695) | (69 952 725) |
| Gross Profit | 33 383 155 | 28 412 847 |
| Expenses | | |
| Transportation | (25 001 653) | (21 441 229) |
| Salary of the industrial personnel | (3 803 299) | (2 695 480) |
| Staff costs | (148 376) | (146 670) |
| Distribution | (277 246) | (506 164) |
| Amortization/Depreciation | (3 708 334) | (3 600 324) |
| Total operating expenses | (32 938 908) | (28 389 867) |
| Other income (expense) | | |
| Interest expense (Loss) | (34 274) | (3 871) |
| Other Income/Expenses Net | (6 144) | --- |
| Income before income tax | (40 418) | (3 871) |
| Income Tax | | |
| Current income tax expense (note9) | (96 919) | (4 575) |
| Total income tax expense | (96 919) | (4 575) |
| Net Income | 306 910 | 14 534 |
| Total Comprehensive Income | 306 910 | 14 534 |
| Basic and Diluted Income per Share (Note 11) | 0, 06 | 0,00 |
| Basic and Diluted Weighted Average Number of Shares Outstanding during The year | 5 010 000 | 5 010 000 |

**Volga – Neft LIMITED LIABILITY COMPANY**
STATEMENTS OF CASH FLOWS
(Expressed in U.S. Dollars)

| | YEAR ENDED DECEMBER 31, 2006 | YEAR ENDED DECEMBER 31, 2005 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net Income | 306 910 | 14 534 |
| Items not affecting cash: | | |
| Amortization/Depreciation | 3 708 334 | 3 600 324 |
| Adjustments to reconcile net income to | | |
| Net cash (used in) operating activities: | | |
| Changes in Receivables | (1 549 248) | (251 829) |
| Changes Inventories | (1 813 972) | (721 774) |
| Changes in other | (74 288) | |
| Changes in Trade accounts and notes payable | 18 602 697 | 8 324 832 |
| Changes in Taxes Payable | 162 979 | 7 883 |
| | | |
| **Net cash and cash equivalents provided by OPERATING ACTIVITIES** | 19 343 412 | 10 973 970 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of property, plant, and equipment | (18 613 742) | (10 621 254) |
| | | |
| **NET CASH USED FOR INVESTING ACTIVITIES** | (18 613 742) | (10 621 254) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Issuance of capital stock | 11 729 | 175 350 |
| Long-term loan | (725 530) | (527 468) |
| **Net cash from Financing Activities** | (713 801) | (352 118) |
| | | |
| Net (Decrease) Increase in Cash | 15 869 | 598 |
| Cash- Beginning of Period | 598 | |
| Cash – End of Period | 16 467 | 598 |

5.

**VOLGA - NEFT LIMITED LIABILITY COMPANY**
**NOTES TO THE FINANCIAL STATEMENTS CLOSED AT DECEMBER 31, 2006**
**AND DECEMBER 31, 2005**
**(Expressed in U.S. Dollars)**


**1.     Operations and Business**

Volga - Neft Limited Liability Company, (the Company), was incorporated on January 25, 2005 in accordance to the Federal Law No 14 - Federal Law, from February 08,1998 " About societies with limited liability " in Samara region, Privolzhsky district, v. Obsharovka of Russian Federation. The Company's main activity is the trading of oil products (oil and naphtha) The Company has set up a representative office in the city of Samara.

**2.     Summary of Significant Accounting Policies**

The accounting policies of the Company are in accordance with generally accepted accounting principles of the United States of America, and their basis of application is consistent with that of the previous year. Outlined below are those policies considered particularly significant.

**a)     Cash and Cash Equivalents**

For purposes of the statement reporting within the statement of cash flows, cash includes currency, cheques issued by others, other currency equivalents and current deposits. Cash equivalents include securities and short-term money market instruments that can be easily converted into cash. Investments that mature within three months from the investment date, are also included as cash equivalents.

**b)    Inventories**

Expenses for purchase of the materials, necessary for transportation of crude oil and petroleum products include applicable purchase costs and operating expenses. Materials and supplies inventories are recorded at the lower of average cost or net realisable value.

**c) Property, Plant and Equipment**

Property, plant and equipment are stated at historical costs. Major renewals and betterments are capitalized and expenditures for repairs and maintenance are charged to expense as incurred. Depreciation is provided at the following rates, using the straight-line method, which are formulated to charge operations with the cost of the equipment over their estimated useful lives as follows:

|   |   |
|---|---|
| Buildings and constructions | 5-33 years |
| Machinery and equipment | 5-15 years |
| Computer and telecommunication Equipment | 2-5 years |

**d) Revenue Recognition**

Revenues from transportation of crude oil and petroleum products are recognised when deliveries to customers are made, title has transferred and collectibility is reasonably assured.

**e)     Use of Estimates**

Preparation of financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the amounts reported in the financial statements and related notes to financial statements. These estimates are based on management's best knowledge of current events and actions the Company may undertake in the future. Actual results may ultimately differ from estimates, although management does not believe such changes will materially affect the financial statements in any individual year.

**f)     Foreign Currency Translation**

6

The Company accounts for foreign currency translation pursuant to SFAS No. 52, "Foreign Currency Translation" ("SFAS 52"). The Company's functional currency is the Russian Rouble. Under SFAS 52, all assets and liabilities are translated into United States dollars using the current exchange rate at the end of each fiscal period. Revenues and expenses are translated using the average exchange rates prevailing throughout the respective periods. Translation adjustments are included in other comprehensive income (loss) for the period. Certain transactions of the Company are denominated in United States dollars. Translation gains or losses related to such transactions are recognized for each reporting period in the related statement of operations and comprehensive income (loss).

g)    Environmental liabilities

Liabilities for environmental remediation are recorded when it is probable that obligations have been incurred and the amounts can be reasonably estimated.

h)    Pension and post-employment benefits

The Group's mandatory contributions to the governmental pension plan are expensed when incurred. Discretionary pensions and other post-employment benefits are not material.

i)    Income Tax

The Company accounts for income taxes pursuant to SFAS No. 109, "Accounting for Income Taxes". Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

j)    Comprehensive Income

The Company adopted Statement of Financial Accounting Standards ("SFAS") No. 130, "Reporting Comprehensive Income." SFAS No. 130 establishes standards for reporting and presentation of comprehensive income and its components in a full set of financial statements. Comprehensive income is presented in the statements of stockholders' equity, and consists of net earnings and unrealized gains (losses) on available for sale marketable securities; foreign currency translation adjustments and changes in market value of future contracts that qualify as a hedge; and negative equity adjustments recognized in accordance with SFAS No. 87. SFAS No. 130 requires only additional disclosures in the financial statements and does not affect the Company's financial position or results of operations.

k)    Financial Instruments

Fair Value

Unless otherwise noted, it is management's opinion that the Company is not exposed to significant interest, currency or credit risks arising from the financial instruments. The fair value of the financial instruments approximates their carrying values, unless otherwise noted.
Foreign Currency Risk Exchange restrictions and controls exist relating to converting Russian Roubles to other currencies. At present, the Russian Rouble is not a convertible currency outside the Russian Federation. Future movements in the exchange rates between the Russian Rouble and the US dollar will affect the carrying value of the Company's Russian Rouble denominated monetary assets and liabilities. Such movements may also affect the Group's ability to realise non-monetary assets represented in US dollars in these consolidated financial statements. At 31 December 2006 and 31 December 2005 exchange rates were 26.33 and 28.78 Russian Roubles to the US dollar, respectively. Any translation of Russian Rouble amounts to US dollars should not be construed as a representation that such Russian Rouble amounts have been, could be, or will in the future be converted into US dollars at the exchange rate shown or at any other exchange rate.

Concentration of Credit Risk

SFAS No. 105, "Disclosure of Information About Financial Instruments with Off-Balance Sheet Risk and Financial Instruments with Concentration of Credit Risk", requires disclosure of any significant off-balance sheet risk and credit risk concentration. The Company does not have significant off-balance sheet risk.

The Company provides credit to its clients in the normal course of its operations. It carries out, on a continuing basis, credit checks of its clients, and maintains provisions for contingent credit losses that, once they materialize, are consistent with management's forecasts.

For other debts, the Company determines, on a continuing basis, the probable losses and sets up a provision for losses based on the estimated realizable value.

l)    Impairment of Long-Lived Assets

The Company evaluates the recoverability of long-lived assets and the related estimated remaining lives when events or circumstances lead management to believe that the carrying value of an asset may not be recoverable. For the periods ended December 31, 2005 and December 31, 2006, no events or circumstances occurred for which an evaluation of the recoverability of long-lived assets was required.

m)    Earnings per Share

The Company adopted FAS No.128, "Earnings per Share" which requires disclosure on the financial statements of "basic" and "diluted" earnings per share. Basic earnings per share, which does not include any dilutive securities, is computed by dividing the earnings available to common stockholders by the weighted average number of common shares outstanding for the year. In contrast, diluted earnings per share considers the potential dilution that could occur from other financial instruments that would increase the total number of outstanding shares of common stock.

n)    Recent Accounting Pronouncements

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets - an amendment of FASB Statement No. 140" ("SFAS No. 156"). SFAS No. 156 simplifies the accounting for loan servicing rights and the financial instruments used to hedge risks associated with those rights. SFAS No. 156 requires that servicing rights be valued initially at fair value, and subsequently accounted for at either fair value, or amortized over the economic life of the related lease. SFAS No. 156 is effective for fiscal years beginning after September 15, 2006. The implementation of SFAS No. 156 is not expected to have a material impact on the Company's results of operations and financial position.

In April 2006, the FASB issued FASB Staff Position ("FSP"), FASB Interpretation No. ("FIN") 46(R)-6, "Determining the Variability to be Considered in Applying FASB Interpretation No. 46(R)" ("FSP FIN 46(R)-6"). FSP FIN 46(R)-6 provides accounting guidance on how to distinguish between arrangements that create variability (i.e., the risks and rewards) within an entity and arrangements that are subject to that variability (i.e., variable interests). FSP FIN 46(R)-6 is responding to a need for accounting guidance on arrangements that can be either assets or liabilities (i.e., derivative financial instruments). FSP FIN 46(R)-6 is effective for the first fiscal period that begins after June 15, 2006.

In June 2006, the FASB issued FIN No. 48, "Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109" ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with FASB Statement No. 109, "Accounting for Income Taxes" ("SFAS 109"). The interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provides accounting guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006.

3. Cash and Cash Equivalents

Cash balances of 31 December 2006 and 31 December 2005 included accounts denominated in Russian Roubles equivalent to $ 16,467 and $ 598 respectively.

## 4. Accounts and Notes Receivable, Net

|  | December 31 2006 | December 31 2005 |
|---|---|---|
| Accounts and notes receivable | 711 785 | 149 995 |
| Recoverable value - added tax | 178 126 | 26 722 |
| Advances to suppliers | 314 108 | - |
| Other receivables | 597 058 | 75 112 |
| **Total accounts and notes receivable, net** | **1 801 077** | **251 829** |

## 5. Inventories

|  | December 31 2006 | December 31 2005 |
|---|---|---|
| Crude oil and petroleum products | 1 657 112 | 574 002 |
| Materials and supplies | 878 634 | 147 772 |
| **Total Inventories** | **2 535 746** | **721 774** |

## 6. Property, Plant and Equipment

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Cost | Accumulated Depreciation | Cost | Accumulated Depreciation |
| Machinery and equipment | 24 468 030 | 3 324 918 | 22 530 618 | 2 097 548 |
| Buildings and constructions | 8 446 564 | 375 874 | 7 195 564 | 1 471 452 |
| Computer and telecommunication | 171 324 | 7 542 | 171 324 | 31 324 |
|  | 33 085 918 | 3 708 334 | 29 897 506 | 3 600 324 |
| Net carrying amount | 29 377 584 | | 26 297 182 | |

The Company obtains licenses from the governmental authorities for the right of realization of activity in the field of storage, processings and transportations of crude oil and petroleum products, on operation of explosive industrial objects, on operation of oil and gas extraction productions, on application of explosive materials of industrial purpose. These licenses expire between 2006 and 2010; however, they may be extended at the initiative of the Company provided it is in compliance with the license terms.

## 7. Loans payable

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Current Portion | Long-term Portion | Current Portion | Long-term Portion |
| Samara branch of the Sberbank of the Russian Federation | 1 139 829 | 1 006 775 | 686 543 | 11 374 352 |
| "Leyko" Corp. | 225 727 | 195 489 | 158 330 | 760 046 |
| " Partner" LLC | 1 000 366 | 60 113 | - | - |
| **Total** | **2 365 922** | **1 262 377** | **844 873** | **14 670 984** |

The company receives interest-free long-term loans from partners on business on account of performance in the future of works on transportation of production of the given partners.

## 8. Other Accounts Payable and Accrued Liabilities

|  | December 31 2006 | December 31 2005 |
|---|---|---|
| Promissory notes payable | - | - |
| Advances from customers | - | 1 512 957 |
| Salaries payable | - | 6 528 |
| Other | - | 7 254 |
| Total Other Accounts Payable and Accrued Liabilities | - | 1 526 739 |

## 9. Taxes

The Company accounts for income taxes pursuant to SFAS No. 109, "Accounting for Income Taxes". This Standard prescribes the use of the liability method whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates. The effects of future changes in tax laws or rates are not anticipated.

Corporate income tax rates applicable in 2006 and 2005 are 24% percent of taxable income.

Under SFAS No. 109 income taxes are recognized for the following: a) amount of tax payable for the current year, and b) deferred tax liabilities and assets for future tax consequences of events that have been recognized differently in the financial statements than for tax purposes.

The reconciliation between total tax expense and the expected income tax is as follows:

|  | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Accounting income | $ 403 829 | $ 19 109 |
| Non-deductible expenses | - | - |
|  | $ 403 829 | $ 19 109 |
| Applicable tax rate | 24 % | 24 % |
| Less: Russian small/medium business credit (if applicable) | - | - |
| Income tax expense (should agree with the income statement) |  |  |
| Income tax expense | $ 96 919 | $ 4 575 |

## 10. Financial Investment

Financial investments are presented by investments of company " StarEnergy " in the form of gratuitously transferred financial resources.

## 11. Authorized Capital Stock

|  | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Authorized |  |  |
| 5 010 000 common shares, par value $ 0.03 per share |  |  |
| Issued |  |  |
| 5 010 000  common shares (December 31, 2005 5 010 000) | $ 187,079 | $ 175,350 |

In October at the company "Volga – Neft" has occured as result of merge there was change of the proprietor. The company has exchanged 100 % of shares for 26 % of shares of american public company " StarEnergy ".

# EXHIBIT K

**Kamlet, Bradley**

| | |
|---|---|
| **From:** | Saul Muskat [smuskat@sfgroup.ca] |
| **Sent:** | Friday, April 13, 2007 2:14 PM |
| **To:** | saln-sergey@mail.ru |
| **Cc:** | david@dlubinassociates.com; ~~msegal@staronergycorp.com~~ patrick@kealy.com; myron@gushlak.com |
| **Subject:** | Volga-Neft LLC |
| **Importance:** | High |
| **Sensitivity:** | Confidential |
| **Attachments:** | Saul Muskat.vcf |

Dear Mr. Salnikov:

Please see the email that we received today from Mr. Roman Lerner General Director of your firm RSM Top-Audit whereby he has stated that the firm RSM Top-Audit did not perform the audit of Volga Neft LLC for 12-31-06, nor any other audit work.
If fact Mr. Lerner is stating that any financial statements that we have been sent are false and in fact not from RSM Top-Audit.
Clarification is needed immediately.


*Saul Muskat*
*SF Partnership LLP*
*4950 Yonge Street*
*Suite 400*
*Toronto, Ontario, M2N 6K1*
*Tel : 416-646-8052*
*Fax: 416-250-1225*
*Fax: 416-250-5083*


-----Original Message-----
*From: ASoskin@top-audit.ru [mailto:ASoskin@top-audit.ru]*
*Sent: April 13, 2007 9:40 AM*
*To: Rebecca Campbell*
*Subject: volga-neft*


*Dear Ms. Campbell,*


*This is to officially announce that the auditing company RSM Top-Audit has NEVER audited the financial statements of Volga-Neft LLC.*

*For Volga-Neft LLC the preparations for a business plan presentation were only performed (Contract No. m26/65(BH)-06 dated as of 29.04.2006). We have never provided any other services to this company.*

*In this regard, please be advised that the document, whose copy was attached to the incoming letter of 12.04.2007 to RSM Top-Audit and which is signed and sealed supposedly on behalf of RSM Top-Audit, is a false one.*

*Sincerely,*

**Roman Lerner**
**General Director**

At SF Partnership,LLP, we have an on-going commitment to client care.
We seek to provide our clients with reliable services that make good business sense.
For more information about SF Partnership,LLP, please visit our web-site at www.sfgroup.ca
This e-mail and any attachments to it are confidential and intended solely for the use of the person to whom they are addressed. If you are not the addressee, you shall not disclose, disseminate, distribute, copy or take any action in reliance on the contents of this e-mail nor any attachments to it. Please notify the sender by return e-mail that you have received the message in error and delete the information from your system.  No Employee or Agent is authorized to conclude any Binding Agreement on behalf of any member of SF Partnership,LLP ("SF") with another Party by e-mail without express written confirmation by a Partner of SF.  SF accepts no liability for the content of this e-mail, or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing. Any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of SF.  Although SF has taken reasonable precautions to ensure that no viruses are present in this e-mail or any files attached to it, SF cannot accept any responsibility for any loss or damage arising from the use of this e-mail or its attachments.

# EXHIBIT L

# Wilkinson, Robert Montague

**From:** Margulis, Howard L.
**Sent:** Tuesday, April 17, 2007 10:56 PM
**To:** jean_stephens@rsmi.com; ruth.mooney@rsmi.com
**Cc:** Patrick Kealy (patrick@kealy.com); Wolchek, Ellen C.; david@dlubinassociates.com
**Subject:** Star-Volganeft/Moscow Office of RSM
**Importance:** High
**Sensitivity:** Confidential

Dear Jean:

Further to our email correspondence earlier today, below please find the details you requested in order to address the confusion that has arisen between our client, Star Energy (which is the U.S. parent of Volga-Neft LLC, a Russian entity) and RSM in Moscow. Where specific documents and their RSM signatories are referenced, copies of those documents are attached hereto as PDF files.

In August of 2006, the Moscow office of RSM, in its capacity as Volga-Neft's independent auditor, was asked to provide written certification of certain issues in connection with a stock purchase transaction pursuant to which Star (a publicly traded company) acquired 100% of Volga-Neft's stock. A copy of said certification letter dated August 22, 2006 (executed by Sergei Salnikov in his capacity as head of the Audit Unit for RSM in Moscow) is attached.

Following the stock purchase described above, RSM in Moscow continued to act as Volga-Neft's independent auditor. Among the items prepared and issued by RSM in this capacity were the following: a quarterly financial statement and auditors' report dated September 30, 2006 (signed by a Mr. Bodrov on behalf of RSM in Moscow), a Report on Independent Registered Public Accounting Firm from RSM Top-Audit dated November 10, 2006 (which Report was included with a Form 8-K filed by Star Energy with the SEC on December 7, 2006, and was also signed by Mr. Bodrov) , and a year-end financial statement and auditors' report dated December 31, 2006 (signed by a Mr. Zolotukhin on behalf of RSM in Moscow).

During the course of Star Energy's audit for 2006, Star's auditors (being SF Partnership LLP in Toronto) became uncomfortable with the information and/or lack of information received from RSM in Moscow. Documentation was promised yet never delivered or, when delivered, was not in the proper form to enable the auditors to perform their task. On Friday, April 13th, 2007, the auditors received an email message from a Mr. Lerner at RSM in Moscow stating as follows: "RSM Top-Audit has NEVER audited the financial statements of Volga-Neft LLC" and indicating that the audit reports "signed and sealed supposedly on behalf of RSM Top-Audit "are "false." Upon issuing such email, which of course sparked grave concern, Mr. Lerner promptly went on holiday and, according to his secretary, cannot be reached until his return. In response to an urgent email request to Mr. Salnikov, on Saturday, April 14th, the auditors spoke by phone with someone identifying himself as Mr. Salnikov's translator. Said translator, who indicated that he does not work for RSM, instructed the auditors "not to worry" and that Mr. Lerner's email was "wrong." The translator indicated that Mr. Salnikov would be issuing a retraction of Mr. Lerner's letter, but no such retraction has followed, and all attempts to reach Mr. Salnikov have been unsuccessful.

As a result of this matter, Star's auditors have been unable to file the financials and report on Form 10-KSB as required under U.S. securities laws. The filing deadline having been this evening, if the auditors do not file such Form by 9:30 a.m. on Wednesday, April 18th, Star will be required to suspend the public trading of its stock.

We respectfully request that you give this matter your prompt and urgent attention immediately upon the start of your workday in the U.K. London being 5 hours ahead of New York, we trust that you will be able to resolve this matter with your colleagues in Moscow and communicate the same to us no later than 8:30 a.m. New York Time. I will be in the office at 8:30 a.m. tomorrow, however should you need to reach me earlier, please telephone me on my mobile: 001-732-616-0100.

Thank you for your assistance with this very urgent matter. I look forward to speaking with you tomorrow morning.

Yours sincerely,

4/20/2007

Howard

Howard L. Margulis, Esq.
Partner
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York NY  10174
212-704-6000 Main
212-704-6336 Direct
212-704-8330 Direct Fax
732-616-0100 Mobile
Conference Call Dial-In:
800-240-1720 (U.S.)
334-323-9873 (Int'l)
Passcode: 29249703
howard.margulis@troutmansanders.com
www.troutmansanders.com

-----Original Message-----
From: Margulis, Howard L.
Sent: Tuesday, April 17, 2007 1:30 PM
To: jean_stephens@rsmi.com; Ruth.Mooney@rsmi.com
Cc: Patrick@Kealy.Com; 'david'; Welchek, Ellen C.
Subject: RE: Star-Volganeft/Moscow Office of RSM
Importance: High
Sensitivity: Confidential

Dear Jean:

I will ask that CEO Patrick Kealy provide details by email to both you and Ruth.  Thank you for your attention to this and I shall look forward to resolving this as soon as possible.

Best regards,

Howard

Howard L. Margulis, Esq.
Partner
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York NY  10174
212-704-6000 Main
212-704-6336 Direct
212-704-8330 Direct Fax
732-616-0100 Mobile
Conference Call Dial-In:
800-240-1720 (U.S.)
334-323-9873 (Int'l)

4/20/2007

STS0000227

Passcode: 29249703
howard.margulis@troutmansanders.com
www.troutmansanders.com
[81476681]

-----Original Message-----
From: jean_stephens@rsmi.com [mailto:jean_stephens@rsmi.com]
Sent: Tuesday, April 17, 2007 1:27 PM
To: Margulis, Howard L.; Ruth.Mooney@rsmi.com
Subject: Re: Star-Volganeft/Moscow Office of RSM

Howard

I have received your email and it is impossible for me to address this issue today as our office in Russia is closed due to the time difference. Further since I first became aware of this issue only on Friday, I will need some time to get the facts in order for me to appropriately address your concerns. It would assist if you would provide as much detail as possible and I will address the issue when I am in the office and the Moscow office is open tomorrow.

Kind Regards

Jean M Stephens

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Any advice contained in this email (including any attachments unless expressly stated otherwise) is not intended or written to be used, and cannot be used, for purposes of avoiding tax penalties that may be imposed on any taxpayer.

From: "Margulis, Howard L." [Howard.Margulis@troutmansanders.com]
Sent: 04/17/2007 11:45 AM
To: jean.stephens@rsmi.com
Subject: Star-Volganeft/Moscow Office of RSM

Dear Jean and Ruth:

Please see my email of Friday below.

Late last week a rogue (read: misinformed) employee of your firm's Moscow office issued a written disavowal of audit work conducted by that office for our client Star Energy (www.starvolga.com). This audit forms the basis for which Star Energy's U.S. accounting firm will rely for a financial statement filing due at the United States Securities and Exchange Commission ("SEC") today. There has been some contact between the principals of Star-Volga and your firm's Moscow office to the

4/20/2007                                                                 STS0000228

effect that this disclaimer will be revoked and a comfort letter provided but no such documentation has been forthcoming as of the present time. As there is a deadline of today for Star Energy's audit with the SEC in Washington, D.C. we really must have someone in your firm's office in London give specific instructions to the Moscow office to provide these documents immediately via email or facsimile so that our U.S. auditors may proceed to release their statements. My mobile number is 732-616-0100 in the United States. Many thanks.

Best regards,

Howard L. Margulis, Esq.
Counsel to Star Energy Corporation

Howard L. Margulis, Esq.
Partner
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York NY 10174
212-704-6000 Main
212-704-6356 Direct
212-704-8330 Direct Fax
732-616-0100 Mobile
Conference Call Dial-In:
800-240-1720 (U.S.)
334-323-9873 (Int'l)
Passcode: 29249703
howard.margulis@troutmansanders.com
www.troutmansanders.com
[81476681]

-----Original Message-----
From:  Margulis, Howard L.
Sent:  Friday, April 13, 2007 2:01 PM
To:    'jean.stephens@rsmi.com'
Cc:    'david's.Patrick@Kealy.Com; Wolchek, Ellen C.
Subject:   Star-Volganeft/Moscow Office of RSM
Importance:  High
Sensitivity:  Confidential

Dear Jean:

Please call me immediately on my mobile in the United States - 732-616-0100. It is an urgent matter regarding your firm's Moscow office. There are serious implications for SEC compliance which we must discuss urgently. Many thanks.

Regards,

Howard L. Margulis, Esq.
Counsel for Volganeft

Howard L. Margulis, Esq.
Partner
Troutman Sanders LLP

4/20/2007

IRS. Utah - Virginia Moscow Office of RUM

The Chrysler Building
405 Lexington Avenue
New York NY 10174
212-704-6000 Main
212-704-6336 Direct
212-704-8330 Direct Fax
732-616-0100 Mobile
Conference Call Dial-In:
800-240-1720 (U.S.)
334-323-9873 (Int'l)
Passcode: 29249703
howard.margulis@troutmansanders.com
www.troutmansanders.com
[81476681]

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related

matter(s) that may be addressed herein.


This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

STS0000230

| From: | Patrick [patrick@kealy.com] |
|---|---|
| Sent: | Friday, April 13, 2007 3:16 PM |
| To: | Elena Fisher |
| Subject: | Fw: Star-Volganeft/Moscow Office of RSM |
| | |
| Importance: | High |

Sent wirelessly via BlackBerry from T-Mobile.

-----Original Message-----
From: "Margulis, Howard L." <Howard.Margulis@troutmansanders.com>
Date: Fri, 13 Apr 2007 14:00:53
To:<jean.stephens@rsmi.com>
Cc:"david" <david@dlubinassociates.com>,<Patrick@Kealy.Com>,"Wolchek, Ellen C."
<Ellen.Wolchek@troutmansanders.com>
Subject: Star-Volganeft/Moscow Office of RSM

Dear Jean:

Please call me immediately on my mobile in the United States - 732-616-0100.  It is an
urgent matter regarding your firm's Moscow office.  There are serious implications for SEC
compliance which we must discuss urgently.  Many thanks.

Regards,

Howard L. Margulis, Esq.
Counsel for Volganeft

Howard L. Margulis, Esq.
Partner
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York NY  10174
212-704-6000 Main
212-704-6336 Direct
212-704-8330 Direct Fax
732-616-0100 Mobile
Conference Call Dial-In:
800-220-1720 (U.S.)
334-323-9873 (Int'l)
Passcode: 29249703
howard.margulis@troutmansanders.com
<file://www.troutmansanders.com> www.troutmansanders.com [81476661]

-----------------------------

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we
inform you that any tax advice that may be contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction(s) or tax-related matter(s) that may be
addressed herein.

1

WCHD0013359

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.446 / Virus Database: 269.4.0/759 - Release Date: 4/12/2007 7:58 PM

2

WCHD0013360

# EXHIBIT M

# RSM Top-Audit

RSM Top-Audit
Bldg. 2,54 Bolshaya Ordynka St.
Moscow, 119017, Russia
Tel./fax: 7 (495) 363 2848 / 981 4121
www.top-audit.ru        Email: ma@top-audit.ru

18.04.2007 № 651 - 849 / 1

Dear Jean,

In response to your inquiry please be advised of the following:

This is to reaffirm that nobody in RSM Top-Audit has ever audited the financial statements of Limited Liability Company Volga-Neft («Volga-Oil»).

For Volga-Neft LLC, we only prepared, in spring of 2006, a presentation of their business plan (Contract № 126/65(BH)-06 dated as of 29.04.2006; Fee: USD 15,000.00; Acceptance Protocol signed on 30.06.2006; Payments made on 06.07.2006, 15.11.2006, and 20.12.2006) on the basis of information provided by representatives of Volga-Neft LLC. We did not verify this information, since no audit contract was entered into (we do emphasize the latter point).

After August 2006 Volga-Neft LLC is not a client of ours any more and cannot be one, since it has an overdue debt under the aforesaid Contract.

In December 2006 their representatives approached us and proposed signing an audit contract.
However, after they received from us a preliminary inquiry (preliminary examination chart) aimed to estimate the cost of and timeframes for the audit no authorized representatives of Volga-Neft LLC have ever contacted us or ever submitted any documents.

Therefore, RSM Top-Audit has no obligations to audit the financial statements of Volga-Neft LLC (and cannot have any).

We have not provided any other services to Volga-Neft LLC either.

On Friday (13.04.2007) we received an inquiry from the company Star.
Being very much astonished by the inquiry, we requested the documents which they had referred to.

RSM Top-Audit is an independent member firm of RSM International an affilation of independent accounting and consulting firms.

RSM Top-Audit is a member of the Association of Accountants - Auditors of the Commonwealth.

STS0000219

As soon as we received from Star a facsimile copy of the audit report, confirming the Volga-Neft LLC financial statements, we immediately sent a letter (attached) to Volga-Neft management in Russia and to Star.

We stated - and would like to underscore that again - that the document with such information had not been (and cannot be) issued by RSM Top-Audit.

Mr. Sergey Salnikov has never been an auditor and by all means cannot be the Head of the Audit Unit (his explanations are attached).

We have never heard the names mentioned in Mr. Howard Margulis's letter (Bodrov, Zolotukhin). We have never had people (especially auditors) with such names among our staff.

Yesterday in the evening (17.04.2007), after 9:00 PM Moscow time (i.e., long after COB, when nobody remained in the office except a secretary on duty) an inquiry came from the United States and a request for a conversation with Mr. Roman Lemer.

Since no authorized officers were in the office, the secretary (who does not speak English) just said that General Director Lemer would only be able to answer the questions after he returned from a vacation (on which he currently is).

General Director Roman Lemer is on a planned vacation from 17 April, and in this connection the suspicions of American colleagues cause perplexity.

The information that on Saturday, 14 April 2007, emails were exchanged and there were talks with S. Salnikov is a fabrication as Saturday is not a work day and access into the office is not given to anyone.

We have proved information that from 13 April 2007 to 17 April 2007 no one of RSM Top-Audit members of staff communicated with the representatives of Star and/or its auditors and lawyers.

The only communication with the foreign colleagues took place on Friday, 13 April 2007 and following this communication a letter signed by R. Lemer was sent, which contained full retraction of the allegation that we were or are the auditors of Volga-Neft LLC ("Volga-Oil, LLC").

Before 13 April 2007 Star (as well as its auditors and lawyers) never approached us to confirm the financial statements of Volga-Neft LLC.

Thus, the persons related to Volga-Neft LLC and to the audit company in Canada have provided unreliable documents to them.

We are most indignant about the conduct of unknown to us persons who have used the bona fides of RSM Top-Audit and the fact that our company is accredited with SEC, forged the signature and our seal and produced falsified documents.

This is evident fraudulent practice to which neither RSM Top-Audit, nor RSM international are related.

Best regards,
Elena Loss
Managing Partner, Chair of the Board of Directors
RSM Top-Audit

Please, also forward this letter to the colleagues in the United States and Canada who have addressed you.

# EXHIBIT N

# RSM Top-Audit

RSM Top-Audit
Bldg. 2, 54 Bolshaya Ordynka St.
Moscow 119017, Russia
Tel./fax: 7 (495)  353 2848 / 981 4121
www.top-audit.ru          Email: mail@top-audit.ru

20.04.2007                 № 1 - 859

Dear Mr. Howard Margulis,

Please, consider the present letter to be the official reply of RSM Top-Audit to your query addressed to Jean Stephens, Chief Executive Officer of RSM International.

Yesterday, upon the request of Jean Stephens, Head of RSM International, we sent a detailed reply regarding the actual history of relations between RSM Top-Audit and the company Volga-Neft, LLC. We would like to add the following to the above mentioned letter:

We officially state that RSM Top-Audit has never acted as the auditor of Volga-Neft, LLC. The only work that we performed for the company Volga-Neft, LLC in accordance with Contract No. 126/65(BH)-06 dated as of 29.04.2006 was the preparation of presentation of a business-plan and was carried out in time, according to the Acceptance Protocol dated as of 30.06.2006. The payment for the work was performed in several parts — on 06.07.2006, 15.11.2006, and 20.12.2006.

In August 2006 replying to the query of Volga-Neft, LLC with the request to consult you on the legal terms for the possible purchase of a share of Volga-Neft, LLC we issued a written consultation letter signed by Ms. Nina Dantser, Head of Audit, dated 18.08.2006. This consultation was provided within the framework of Contract No. 126/65(BH)-06 dated as of 29.04.2006 as the payment for our services was not performed in full at that moment, and RSM Top-Audit did not consider the Contract executed. After the full payment for our services on 20.12.2006 the company Volga-Neft, LLC was no longer considered the client of RSM Top-Audit.

No other letters, all the more so no audit reports, have been signed by anyone from RSM Top-Audit or sent to Volga-Neft, LLC, Star Energy Corporation, SF Partnership LLP or Mr. Howard Margulis as well as any other persons. The names mentioned in your letter of Mr. Zolotukhin and Mr. Bodrov, who are allegedly the auditors of RSM Top-Audit, are unknown to us. People with such names have never worked and do not work in RSM Top-Audit.

The company RSM Top-Audit has never prepared reports, audit reports, never confirmed the financial statements of Volga-Neft, LLC either under the RAS or under the ISA.

RSM Top-Audit was first approached via email by Ms. Rebecca Campbell on behalf of SF Partnership LLP on Thursday, 12.04.2007, and via telephone by the people who called themselves representatives of the New York office of Star Energy Corporation on Friday, 13.04.2007.

RSM Top-Audit is an independent member firm
of RSM International an affiliation of independent
accounting and consulting firms.

RSM Top-Audit is a member of the Association
of Accountants - Auditors of the Commonwealth.

STS0000223

In response to the query of Ms. Campbell a letter signed by Roman Lerner, General Director of RSM Top-Audit, was sent on 13.04.2007 via email which contained retraction of the information that RSM Top-Audit ever acted as the auditor of Volga-Neft, LLC. As regards the telephone conversation on Friday, 13.04.2007, Eugene Shokhor, Audit Partner of RSM Top-Audit, participated in it, and he was astonished and unpleasantly surprised with the pronounced information that RSM Top-Audit was the auditor of Volga-Neft, LLC. Mr. Shokhor refuted peremptorily this information.

Following this telephone conversation RSM Top-Audit immediately gave an official written response signed by Roman Lerner, General Director of RSM Top-Audit, that RSM Top-Audit never audited the company Volga-Neft, LLC. This letter was sent via DHL to Star Energy Corporation at the address: Star Energy Corporation, 245 Park Avenue, 24th and 39th Floors, New York, 10167, 212-792-4334 *(a copy of the letter and the filled DHL form are attached).*

Your statement in the letter addressed to Jean Stephens on 18.04.2007 that the auditors of Star Energy Corporation, being SF Partnership LLP, "became uncomfortable with the information and/or lack of information received from RSM in Moscow. Documentation was promised yet never delivered or, when delivered, was not in the proper form to enable the auditors to perform their task" is an outrageous falsification of the information on the relations between RSM Top-Audit and Volga-Neft, LLC.

Regarding Star Energy Corporation, we became aware only on Friday, 13.04.2007, from the telephone conversation that it had acquired Volga-Neft, LLC. RSM Top-Audit never promised to present the documentation, never presented the documentation and never could present the documentation as it was not the auditor of Volga-Neft, LLC and never corresponded with Star Energy Corporation or even more so with SF Partnership LLP.

The remaining part of the letter which concerns Mr. Salnikov and communication with him via email and telephone on Saturday, 14.04.2007, is an egregious forgery. No communication could take place on Saturday, 14.04.2007, as this was not a work day and the office was closed for the members of staff. We confirm that Mr. Salnikov is a member of staff of RSM Top-Audit and works in the capacity of Consultant on business-plans. However, he is not and he never has been an auditor as he does not have a license giving the right to audit activities and he does not have the right to sign any documents related to audit. We state that Volga-Neft, LLC is well aware of Mr. Salnikov's status in RSM Top-Audit.

We are perplexed about what official documents have given you as a legal entity, SF Partnership LLP and Star Energy Corporation the confidence that RSM Top-Audit acted as the auditor of Volga-Neft, LLC.

Your conviction, which we do not understand, that RSM Top-Audit carried out an audit assignment for Volga-Neft, LLC causes bewilderment and indignation as neither your company, nor the auditors of Star Energy Corporation, being SF Partnership LLP, ever approached RSM Top-Audit in relation to Volga-Neft, LLC.

We suppose that as is implied by the International Standards of Auditing all the above mentioned companies had to address officially the predecessor auditor (which function, according to the allegations of Volga-Neft, LLC, was performed by RSM Top-Audit). Had the company SF

STS0000224

Partnership LLP approached us in this timely manner at the beginning of its acting as the auditor of Star Energy Corporation, the company would have received from us an official reply stating that RSM Top-Audit never provided audit services to Volga-Neft, LLC. Unfortunately, no such resort to us took place. All the information on the contacts, management of RSM Top-Audit as well as authorized persons having the right to signature in the name of RSM Top-Audit is in free access at the official website of RSM Top-Audit (http://www.top-audit.ru/eng/). Mr. Salnikov is not such authorized person.

Moreover, we claim that the letter (Ref. No ЕЛ-1795) dated as of 22.08.2006 and allegedly signed by Mr. Salnikov is a falsified document. Mr. Salnikov has never prepared or signed a letter of such content, and RSM Top-Audit has a relevant written and certified statement by Mr. Salnikov.

Our register for the record of outgoing documentation has a completely different letter under the Ref. No. ЕЛ-1795 dated 16.08.2006 and addressed to the "Sokhnut", Jewish Agency in Russia, which is signed by the Head of Legal and Tax Consultancy.

We consider the whole situation as described in the letter of Mr. Howard Margulis to Ms. Jean Stephens dated as of 18.04.2007 to be an egregious forgery aimed at misleading SEC and the citizens of the US using the bona fides of RSM Top-Audit.

We believe that it is our duty to inform SEC that the good reputation of RSM Top-Audit was exploited by the companies Volga-Neft, LLC and Star Energy Corporation and that the auditors of Star Energy Corporation, SF Partnership LLP, did not carry out all the necessary procedures implied by the International Standards of Auditing in order to obtain sufficient assurance as to whether RSM Top-Audit was the auditor of Volga-Neft, LLC.

A copy of the present letter is forwarded to Jean Stephens, Chief Executive Officer of RSM International.

Elena Loss
Chair of the Board of Directors, RSM Top-Audit

Attachment:
1. Official retraction letter dated as of 18.04.2007 No. ЕЛ-849, signed by Elena Loss and addressed to Jean Stephens, Chief Executive Officer of RSM International.
2. Official retraction letter dated as of 13.04.2007 No. ЕЛ-811 addressed to Star Energy Corporation, and sent via DHL.
3. Filled DHL form.
4. Notarized statement of Mr. Salnikov (Russian and English).

# EXHIBIT O

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 OR 15(d)**
**of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): March 12, 2007

---

# STAR ENERGY CORPORATION
(Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **Nevada** | **000-29323** | **87-0643634** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**317 Madison Avenue**
**New York, New York 10017**
(Address of principal executive offices) (Zip Code)

**Registrant's telephone number, including area code: (212) 500-5006**

---

Check the appropriate box if the Form 8-K filing is intended to simultaneously satisfy the reporting obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act

☐ Soliciting material pursuant to Rule 14a-12 of the Exchange Act

☐ Pre-commencement communications pursuant to Rule 14d-2(b) Exchange Act

☐ Pre-commencement communications pursuant to Rule 13e-4(c) Exchange Act

## ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

On March 12, 2007, Star Energy Corporation (the "Company") entered into a memorandum of understanding to acquire Anglo-Ukra Energy, a Ukranian holding company. Anglo-Ukra Energy is a special purpose Ukrainian holding entity for acquisition and development of certain Ukrainian energy projects. The memorandum provides the Company with the right to concessions of three oil and gas fields in the Ukraine (Region, Sakhalinska and Bukovyna). The three fields subject to the memorandum contain total reserves of over 150 million barrels of oil and 75 billion cubic feet of natural gas. In connection with the transaction, the Company has agreed to issue, at the closing of the transactions under a definitive agreement to be negotiated and executed, 1,500,000 shares of common stock. As part of the Company's anticipated expansion into the Ukraine, the Company plans to open and staff an office in Kiev.

The closing of the transaction will be subject to the execution of a definitive agreement and to the conditions to be set forth in the definitive agreement, including approval by the Company's Board of Directors, completion of due diligence, and receipt of required governmental and third party approvals. In addition, the closing of this transaction will be conditioned upon the execution by a third party of a release relinquishing all rights in an option to acquire Region. There can be no assurance that the Company will complete the transactions contemplated by the memorandum.

## ITEM 4.01 CHANGES IN REGISTRANT'S CERTIFYING ACCOUNTANT

The information in Item 4.02 to this current report on Form 8-K is incorporated by reference into this Item 4.01.

## ITEM 4.02 NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REPORT

The Company has been advised that financial statements previously filed by the Company for its subsidiary, Volga-Neft Limited Company ("Volga-Neft"), should no longer be relied upon. The financial statements for Volga-Neft were filed in the Company's December 8, 2006 Form 8-K/A in connection with its acquisition of Volga-Neft. RSM Top-Audit provided the audited financial statements for Volga-Neft in connection with that transaction. During the course of the Company's audit for 2006, the Company's independent auditors requested certain documentation from RSM Top-Audit regarding the financial statements for Volga-Neft. After delays in obtaining the appropriate information, the Company and its independent auditors were informed by RSM Top-Audit that RSM Top-Audit is of the position that it had not audited the financial statements of Volga-Neft, including the financial information that was filed by the Company in its December 8, 2006 Form 8-K/A. The Company and its advisors have sought to discuss these matters with RSM Top-Audit, but have been unable to consult directly with the personnel responsible for the audit of Volga-Neft and have received conflicting information from RSM Top-Audit. Volga-Neft has dismissed RSM Top-Audit and, on May 1, 2007, hired Kramer Weisman and Associates, LLP, an independent auditor registered with the Public Company Accounting Oversight Board, to audit its financial statements, and a report is expected to be provided to the Company when complete. As a result, the Company determined that the previously filed financial statements of Volga-Neft contained in the December 8, 2006 Form 8-K/A should not be relied upon. The Company anticipates receipt of the audit report from Kramer Weisman and Associates, LLP during May 2007.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STAR ENERGY CORPORATION
(Registrant)

By: _____/s/ Patrick J. Kealy_____

Date: May 10, 2007

Patrick J. Kealy
*President and CEO*

# EXHIBIT P

8-K/A 1 f8ka_031207.htm STAR ENERGY CORPORATION

<div style="text-align:center">

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 8-K/A**
(Amendment No. 1)

**CURRENT REPORT**
**Pursuant to Section 13 OR 15(d)**
**of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **March 12, 2007**

**STAR ENERGY CORPORATION**
(Exact name of registrant as specified in its charter)

</div>

| **Nevada**<br>(State or other jurisdiction<br>of incorporation) | **000-29323**<br>(Commission<br>File Number) | **87-0643634**<br>(IRS Employer<br>Identification No.) |
|---|---|---|

| **317 Madison Avenue, New York New York**<br>(Address of principal executive offices) | **10017**<br>(Zip Code) |
|---|---|

<div style="text-align:center">

Registrant's telephone number, including  **(212) 500-5006**

</div>

Check the appropriate box if the Form 8-K filing is intended to simultaneously satisfy the reporting obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act

☐   Soliciting material pursuant to Rule 14a-12 of the Exchange Act

☐   Pre-commencement communications pursuant to Rule 14d-2(b) Exchange Act

☐   Pre-commencement communications pursuant to Rule 13e-4(c) Exchange Act

## ITEM 4.01    CHANGES IN REGISTRANT'S CERTIFYING ACCOUNTANT

The information in Item 4.02 to this Current Report on Form 8-K is incorporated by reference into this Item 4.01.

## ITEM 4.02    NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REPORT

Pursuant to a Stock Purchase Agreement, on October 6, 2006, Star Energy Corporation (the "Company") acquired 100% of the capital stock of Volga-Neft Limited Company, a Russian limited liability company primarily engaged in the processing and sale of crude oil in Samara, Russian Federation ("Volga-Neft"). As a result of this acquisition, Volga-Neft became the Company's wholly-owned subsidiary. This transaction was reported in a Current Report on Form 8-K filed by the Company with the Securities and Exchange Commission on October 6, 2006.

Financial statements provided on behalf of Volga-Neft were filed in the Company's December 8, 2006 amendment to the Form 8-K filed on Form 8-K/A. These financial statements purported to contain balance sheets as of October 6, 2006 and December 31 2005, and the related statements of income, stockholders' equity and cash flows for the period January 1, 2006 through October 6, 2006 and for the year ended December 31, 2005, of Volga-Neft believed by the Company to have been audited by and reported upon by RSM Top-Audit, LLC, an independent public accounting firm based in the Russian Federation that is registered with the Public Company Accounting Oversight Board ("RSM Top-Audit").

During the course of the Company's audit of its financial statements for the year ended December 31, 2006, the Company's independent registered public accounting firm (the "Company's Auditor") requested certain documentation from RSM Top-Audit regarding the financial statements of Volga-Neft. After delays in obtaining the appropriate information, on April 13, 2007, the Company's Auditor was informed by correspondence from RSM Top-Audit, and the Company's Auditor, in turn, advised the Company on that date, that RSM Top-Audit had not audited financial statements of Volga-Neft, including the financial statements that were filed by the Company in its December 8, 2006 Form 8-K/A. In response to a request from the Company's Auditor requesting clarification of the April 13 correspondence on April 13, 2007, a person purporting to be an interpreter for a representative of RSM Top-Audit advised the Company's Auditor by telephone that the April 13 correspondence was not intended for the Company and would be retracted. After correspondence from counsel to the Company sent on April 17, 2007 requesting RSM International Limited, an international network of accounting and consulting firms, of which RSM Top-Audit is a part, to intercede, on April 20, 2007, RSM Top-Audit again advised that it had not audited Volga-Neft financial statements. Between April 20 and May 1, 2007, the Company and its advisors attempted to discuss these matters with RSM Top-Audit, but were unable to consult directly with the RSM Top-Audit personnel who the Company believed were responsible for the audit of Volga-Neft.

As a result of the foregoing events, the Company determined on May 1, 2007 that the previously filed financial statements of Volga-Neft contained in the December 8, 2006 Form 8-K/A should not be relied upon. This determination was made after reviewing the prior correspondence from RSM Top-Audit and after consulting with the Company's counsel and independent auditor, and with the approval of the audit committee of the Company's Board of Directors. Although the Company's audit committee did not directly discuss these matters with the Company's Auditor, members of senior management kept the audit committee apprised of their ongoing discussions with the Company's Auditor.

-2-

On May 1, 2007, Volga-Neft, with the approval of the Company's audit committee, dismissed RSM Top-Audit and retained Kramer Weisman and Associates, LLP, an independent public accounting firm registered with the Public Company Accounting Oversight Board ("Kramer Weisman"), to audit its financial statements as of and for the year ended December 31, 2006. On June 11, 2007, Kramer Weisman advised the Company that it would be unable to audit Volga-Neft's opening and closing inventories and, therefore, would not be able to complete an audit of Volga-Neft. With the approval of the Company's audit committee, on or about June 14, 2007, the Company and Kramer Weisman mutually agreed to abandon the audit and Kramer Weisman's retention was terminated.

As reported in the Company's Annual Report on Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission on June 19, 2007, on June 14, 2007, the Company, Volga-Neft and the individuals from whom the Company acquired the shares of Volga-Neft, rescinded the Company's acquisition of Volga-Neft.

On July 23, 2007, the Company received a report from Nixon Peabody, LLP, which was based upon certain documentation, and certain interviews conducted with personnel, made available by the Company, Volga-Neft and RSM Top-Audit, which report did not constitute a comprehensive analysis because a number of key witnesses and certain sources of documentary evidence were not available to Nixon Peabody. Following receipt of that report, the Company concluded that it is unlikely that RSM Top-Audit performed any audit of Volga-Neft's financial statements, that RSM Top-Audit may not, in fact, have been engaged by Volga-Neft to perform an audit, and that, while actions taken by various individuals in Russia, at least one of whom was employed by RSM Top-Audit, may have resulted in the Company's receipt of the purported audit report of RSM Top-Audit and neither the Company nor any of its officers or directors knew of these facts or the absence of the audits prior to RSM Top-Audit's advice on April 13, 2007 that RSM Top-Audit had not audited the financial statements of Volga-Neft.

The accountant's report purported to be issued by RSM Top-Audit did not contain an adverse opinion or disclaimer of opinion, nor was it qualified or modified as to uncertainty, audit scope or accounting principles. During the two years ended December 31, 2005 and the period thereafter until the dismissal of RSM Top-Audit, except as discussed above with respect to the issue of whether the audits were performed by and whether the audit report referred to above was issued by RSM Top-Audit, (i) there was no disagreement between the Company and RSM Top-Audit on any matter of accounting principle or practice, financial disclosure, or auditing scope or procedure, which, if not resolved, would have caused RSM Top-Audit to make reference to the subject matter of the disagreement in connection with an audit report, (ii) no such disagreement was discussed with the Board of Directors or any committee of the Board of Directors of the Company and (iii) RSM Top-Audit did not advise the Company of the existence of any matter described in Item 304(a)(1)(iv)(B) of Regulation S-B. While the Company placed no restraints on the authority of RSM Top-Audit, Kramer Weisman or the Company's Auditor to respond fully to inquiries from the others, the Company had not been requested by RSM Top-Audit to authorize RSM Top-Audit, and the Company had not formally authorized RSM Top-Audit, to respond to inquiries of Kramer Weisman or the Company's Auditor. The Company does not have a sufficient basis to make a statement as to whether, during its past two fiscal years and the period from October 6, 2006 until the dismissal of RSM Top-Audit on May 1, 2007, (i) there were any disagreements between Volga-Neft and RSM Top-Audit on any matter of accounting principle or practice, financial disclosure, or auditing scope or procedure, which if not resolved would have caused RSM Top-Audit to make reference to the subject matter of the disagreements in connection with an audit report, (ii) any such disagreement was discussed with the Board of Directors of Volga-Neft or (iii) RSM Top-Audit advised Volga-Neft of the existence of any matter described in Item 304(a)(1)(iv)(B) of Regulation S-B. The Company also is unable to determine whether Volga-Neft had authorized RSM Top-Audit to respond fully to the inquiries of Kramer Weisman and the Company's Auditor. The Company is providing RSM Top-Audit with a copy of this Report and requesting that RSM Top-Audit furnish the Company with a letter addressed to the Securities and Exchange Commission stating whether it agrees with the statements made by the Company. Any

-3-

letter received from RSM Top-Audit in response to the Company's request will be filed as an exhibit to this Report.

During the Company's past two fiscal years and period subsequent thereto prior to the Company's engaging Kramer Weisman, neither the Company nor anyone on behalf of the Company consulted Kramer Weisman regarding (a) either the application of accounting principles to a specified transaction, either completed or contemplated, or the type of audit opinion that might be rendered on the financial statements of the Volga-Neft, and no written or oral advice of Kramer Weisman was provided with respect to any accounting, auditing or financial reporting issue or (b) any matter that was either the subject of a disagreement or any event described in Item 304(a)(1)(iv) of Regulation S-B.

Kramer Weisman has not issued any report on the financial statements of Volga-Neft. During the two years ended December 2006 and the period thereafter until the termination of the retention of Kramer Weisman, (i) there were no disagreements between Volga-Neft or the Company and Kramer Weisman on any matter of accounting principle or practice, financial disclosure, or auditing scope or procedure, which if not resolved would have caused Kramer Weisman to make reference to the subject matter of the disagreements in connection with an audit report, (ii) no such disagreement was discussed with the Boards of Directors of Volga-Neft or the Company and (iii) Kramer Weisman did not advise Volga-Neft or the Company of the existence of any matter described in Item 304(a)(1)(iv)(B) of Regulation S-B. The Company provided Kramer Weisman with a copy of this Report, requesting Kramer Weisman to review the disclosures contained in this Report and providing Kramer Weisman with the opportunity to furnish the Company with a letter addressed to the Securities and Exchange Commission containing any new information, clarification of the Company's expression of its views or the respects in which Kramer Weisman does not agree with the disclosures made in this Report A copy of the letter received from Kramer Weisman in response to the Company's request is being filed Exhibit 16.1 to this Report.

## ITEM 9.01    FINANCIAL STATEMENTS AND EXHIBITS.

(d)    Exhibits:

16.1    Letter dated July 31, 2007 from Kramer Weisman and Associates, LLP

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

STAR ENERGY CORPORATION
(Registrant)

Date: July 31, 2007

By: /s/ Patrick J. Kealy
Patrick J. Kealy
President and CEO

-4-

### Exhibit Index

| Exhibit Number | Description |
| --- | --- |
| 16.1 | Letter dated July 31, 2007 from Kramer Weisman and Associates, LLP |